**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **OCLC, Inc.,** | **Case No. 24-cv-144** |
| **Plaintiff,** | **Judge** |
| **v.** | **Magistrate Judge** |
| **ANNA'S ARCHIVE, f/k/a PIRATE LIBRARY MIRROR, MARIA DOLORES ANASZTASIA MATIENZO and JOHN DOES #1–20,** | **DEMAND FOR JURY TRIAL** |
| **Defendants.** | |

---

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

---

OCLC, Inc., ("OCLC"), by and through counsel, files this Complaint for injunctive relief and damages against Anna's Archive, formerly known as Pirate Library Mirror, Maria Dolores Anasztasia Matienzo, and John Does #1–20, individually and doing business as Anna's Archive, ("Defendants"), and in support thereof, states the following:

### NATURE OF ACTION

1.     OCLC is an Ohio non-profit organization founded in 1967 that provides shared technology services, original research, and community programs for its membership and the library community at large.

2.     OCLC provides the digital infrastructure and services for libraries to collaborate, create, and share bibliographic records, which results in efficiencies and lowering overall costs for record creation.  OCLC offers a range of products and services to address the challenges faced by

libraries through sharing data, streamlining workflows, and connecting people to the knowledge held in the world's library collections.

3.     At the center of OCLC's products and services is its database of bibliographic records and associated metadata, which OCLC markets as WorldCat®.  WorldCat® is the authoritative source of library bibliographic records, which member libraries use primarily for cataloging purposes.

4.     OCLC has spent more than 55 years and hundreds of millions of dollars, including approximately 68 million dollars over the past two years and 162 million dollars over the past five years, developing and enhancing its WorldCat® records.  WorldCat® is an integral part of OCLC's other product and service offerings to libraries and academic institutions around the world and is an essential part of OCLC's overall business, making up an average of 40% of OCLC's revenue over the past 5 years.

5.     OCLC also maintains and operates the world's largest library catalog website called WorldCat.org.  WorldCat.org is a search engine that allows individuals to easily search the world's libraries by connecting thousands of library collections in one place.

6.     To accomplish this, WorldCat.org allows individuals to search member libraries' catalogs as represented by their corresponding WorldCat® records in the WorldCat® database. When an individual views a search result from WorldCat.org, they see a more limited view of a WorldCat® record, *i.e.*, with less metadata than is available for the record in the WorldCat® database for cataloging purposes.

7.     When OCLC member libraries subscribe to WorldCat® through OCLC's WorldCat® Discovery Services/FirstSearch, the subscription includes the WorldCat.org service. Libraries are willing to pay for WorldCat.org as part of their WorldCat® subscription because

WorldCat.org creates online visibility for member libraries and traffic, both digital and physical, to libraries' holdings.

8.     OCLC has also invested substantial resources in WorldCat.org.  Over the past three years, OCLC has spent nearly $6.8 million on WorldCat.org, improving WorldCat.org's features, user interface, search infrastructure, application infrastructure, networking, and more.

9.     Beginning in the fall of 2022, OCLC began experiencing cyberattacks on WorldCat.org and OCLC's servers that significantly affected the speed and operations of WorldCat.org, other OCLC products and services, and OCLC's servers and network infrastructure. These attacks continued throughout the following year, forcing OCLC to devote significant time and resources toward non-routine network infrastructure enhancements, maintenance, and troubleshooting.

10.     In October 2023, OCLC learned that Anna's Archive, a "pirate" or "shadow" library, and the individuals who run it had illegally hacked WorldCat.org over the previous year, harvesting and stealing 2.2 terabytes ("TB") of WorldCat® data—what Anna's Archive describes as "700 million unique actual records."  Anna's Archive has since made OCLC's WorldCat® data available for *en masse* for free download and now is actively encouraging its visitors to make use of the data in "interesting" ways.

11.     Defendants Anna's Archive, Maria Dolores Anasztasia Matienzo, and John Does #1–20, the individuals operating and doing business as Anna's Archive, have no legal justification for their actions and admit that their general operations violate U.S. and other jurisdictions' copyright laws.  Defendants also are well aware of the risk of their illegal actions—that they may be identified and held personally liable, and that Anna's Archive may be shut down.  To that end,

Defendants maintain alternative domains for Anna's Archive and actively conceal their individual identities.

12. Defendants' hacking of WorldCat.org is yet another iteration of the pirate library's flagrant disregard for the law and the work of others—this time, the decades of work and investment that OCLC and its member libraries have spent developing and enhancing the bibliographical data in WorldCat®. In the words of Anna's Archive, they have taken OCLC's WorldCat® data and are "giving it all away."

13. Moreover, Defendants recognize the value of the WorldCat.org search engine and WorldCat® data. In the blog post announcing their hacking and scraping of the data via WorldCat.org, Defendants publicly thanked OCLC for "the decades of hard work you put into building the collections that we now liberate. Truly: thank you."

14. By hacking WorldCat.org, scraping and harvesting OCLC's valuable WorldCat® data, making the data publicly available in the aggregate, and actively encouraging nefarious use of the data, Defendants have breached WorldCat.org's Terms and Conditions, unjustly enriched themselves, tortiously interfered with OCLC's contractual and business relationships, violated Ohio's anti-hacking statute, and committed trespass to chattels and conversion of OCLC's property.

15. Moreover, Defendants openly admit that they engaged in a conspiracy to commit these acts, acknowledging that they "set our sights on the largest book database in the world: WorldCat," which they did to create a "TODO list" of books and other materials to pirate.

16. OCLC has experienced substantial harm from Defendants' actions, and it will continue to do so unless Defendants are stopped from pursuing their current course of action.

## THE PARTIES

17.     OCLC is an Ohio nonprofit corporation with its principal place of business in Dublin, Ohio.

18.     Anna's Archive, formerly known as Pirate Library Mirror ("PiLiMi"), is an illegal shadow or pirate library that holds itself out as a non-profit organization.  Anna's Archive is not a registered Ohio entity, nor does it have its principal place of business in Ohio.

19.     Maria Dolores Anasztasia Matienzo[1] is a citizen of Washington and resides in Seattle, Washington.  Matienzo owns, operates, and/or controls Anna's Archive.

20.     John Does #1–20 are unknown persons who also own, operate, and/or control Anna's Archive.

## JURISDICTION AND VENUE

21.     This is a complaint for declaratory relief, injunctive relief, and damages under Ohio law for breach of contract, unjust enrichment, tortious interference of contract and business relationships, violation of Ohio Revised Code § 2913.04, trespass to chattels, conversion of property, and conspiracy to do the same.  Jurisdiction is conferred by 28 U.S.C. § 1332 and § 2201. The amount in controversy exceeds the value of $75,000, exclusive of interest and costs, and an actual controversy exists between the parties.

22.     Defendants themselves and through their agents and/or affiliates transacted business in Ohio; caused tortious injury by an act or omission in Ohio; caused tortious injury in Ohio by an act or omission outside Ohio and regularly do or solicit business, engage in a persistent course of conduct, and/or derive substantial revenue from services rendered in Ohio; caused

---

[1] Defendant Matienzo was known as Mark Andrew Matienzo until November 28, 2022.  On information and belief, Defendant Matienzo committed some of the acts described in this complaint while known as Mark Andrew Matienzo.

tortious injury in Ohio to OCLC by an act outside Ohio committed with the purpose of injuring OCLC, when they might reasonably have expected OCLC would be injured thereby in Ohio; and caused tortious injury to OCLC by a criminal act, several elements of which take place in Ohio, which Defendants themselves committed or in the commission of which the Defendants are guilty of complicity.  Ohio Rev. Code § 2307.382(A)(1), (3), (4), (6), and (7).

23.     Venue is appropriate in this district under 28 U.S.C. § 1391.

## STATEMENT OF FACTS

**I.      OCLC is a Global Library Organization that Provides Vital Technological Services to Libraries.**

24.     OCLC is a non-profit, membership, computer library service and research organization dedicated to the public purposes of furthering access to the world's information and reducing the rate of the rise in library costs.

25.     OCLC employs approximately 1,277 people in the United States, Canada, Europe, and Asia Pacific, 781 of whom are based in Ohio.

26.     More than 29,000 libraries in 123 countries and territories around the world have used OCLC services to locate, acquire, catalog, lend, preserve, and manage library materials.

27.     OCLC's services to the library community fall into four broad categories: Management Services, Metadata Services, Discovery and Reference Services, and Resource Sharing Services (collectively, "OCLC's Services").

28.     Now more than ever, libraries are faced with a rapidly changing environment, evolving user needs, and increasing pressure to maintain a robust presence online.  OCLC's Services provide a range of products that address these challenges by sharing data, streamlining workflows, and connecting people to the knowledge held in the world's library collections.

**A.     WorldCat® is OCLC's premiere bibliographical record and cataloging product.**

29.     OCLC has spent more than 55 years creating the WorldCat® database into what it is today, and it is singularly OCLC's most valuable asset.

30.     WorldCat® is the world's most comprehensive database of information about library collections.

31.     Over 10,000 libraries have subscriptions to use WorldCat®.  These member libraries represent academic libraries, such as The Ohio State University; community colleges, like Columbus State Community College; public libraries, including the Columbus Metropolitan Library; state and government libraries; special libraries, like the Henry Ford Hospital; and library consortia, such as OhioLink.

32.     WorldCat® contains more than 551 million bibliographic records.  When these records are combined with the more than 27,000 collections from leading publishers, WorldCat® provides access to its subscribers of more than 3.4 billion items from a variety of resources.

33.     WorldCat® is a collection of OCLC member-contributed records, publisher records, and OCLC-created records that give libraries a greater web-scale presence.  The more libraries that participate, the better and more useful WorldCat® becomes to libraries, their end users, and other organizations that want to interact with libraries on the Web.

34.     WorldCat® is also a registry of library holdings.  Each member library's collection or holdings is represented in bibliographic records in WorldCat®, creating a network which supports research, local discovery, and resource sharing.

35.     WorldCat® records are bibliographic data regarding a work, such as title, author, edition, publisher, number of pages, subject, and classification—and more—obtained from OCLC member libraries, publishers, vendors, and national libraries.

36.     OCLC has invested significant resources into developing, maintaining, improving, and enhancing WorldCat®.

37.     OCLC merges, de-duplicates, arranges, and adds metadata to enhance these records to support discovery of, exploration of, and access to the records.  Algorithms look for duplicates and provide other data control to maintain the high quality of WorldCat® records.

38.     This includes adding OCLC's own unique identifying number, the "OCN," which enhances queries and serves as an authoritative index for specific items or works.

39.     Of the entire WorldCat® collection, more than 93% of the records have been modified, improved, and/or enhanced by OCLC.

40.     Significant costs are involved in the ongoing provision of the high-quality database on which members rely.

41.     This requires members to share the benefits and costs of WorldCat® as part of the overall OCLC Cooperative.

42.     Because there is a practical need to sustain the economic viability and value of WorldCat® over the long term, all members must agree to OCLC's contractual requirements, including the WorldCat® Rights and Responsibilities for the OCLC Cooperative, to be part of the OCLC Cooperative (attached here as Exhibit A).

43.     In turn, OCLC agrees to maintain the exceptionally high quality of WorldCat® data, enrich the data, make it available in WorldCat.org for discovery purposes, *i.e.*, so that individuals can easily search member libraries' catalogues, and otherwise "use member-contributed data to support its public purposes and to benefit the cooperative."

44.     Members must have a paid subscription to use WorldCat®.

45. Not only is WorldCat® data valuable to members, WorldCat® is valuable to OCLC. WorldCat® is integrated into and supports nearly all of OCLC's other products and services, including WorldCat.org (albeit in a more limited format).

**B. WorldCat.org is a powerful search engine for the world's library catalog.**

46. WorldCat.org is the world's largest library catalog website. WorldCat.org connects thousands of library collections in one central location, making it easy for individuals to browse the world's libraries from one search platform on the Web.

47. WorldCat.org connects individuals to their local libraries by driving search results to items in nearby libraries based upon their holdings of those items.

48. WorldCat.org's search engine searches the WorldCat® database.

49. When an individual enters a search in WorldCat.org, the individual is taken to a results page that allows a user to browse results, select a particular book or other media from the results, and view a list of which libraries nearest to them have a copy.

50. When an individual selects a result from the search results, the individual can view more limited information from a library's bibliographical record available in WorldCat®.

51. The information available through WorldCat.org on a result page includes data that is freely accessible on the web, such as title, publication, copyright, author, and editor, and limited data "enriched" by OCLC, such as OCN, International Standard Book Number ("ISBN"), International Standard Serial Number ("ISSN"), and pagination. This enriched data is more difficult to find outside of WorldCat® and varies by each result in WorldCat.org.

52. Most WorldCat® data available in a WorldCat® record is unavailable to an individual on WorldCat.org. This is because a full WorldCat® record is part of a member library's subscription for cataloging and other library services.

53. WorldCat.org results also include "borrow" buttons that take an individual to the library associated with the result so the individual can borrow the book or other material from the library directly.

54. WorldCat.org creates essential online visibility and traffic for libraries and their collections, which member libraries are willing to pay for as part of their WorldCat® Discovery Services/FirstSearch subscription.

55. OCLC has invested significant resources into developing, maintaining, improving, and enhancing WorldCat.org.

56. Over the past three years, OCLC has spent nearly $6.8 million reimagining and rebuilding WorldCat.org, improving WorldCat.org's features, user interface, search infrastructure, application infrastructure, networking, and more.

57. WorldCat.org supports over 3 million users per month.

58. When an individual searches on WorldCat.org, the individual agrees to the OCLC WorldCat.org Services Terms and Conditions (attached here as Exhibit B). OCLC grants the individual a license to use WorldCat® data available on WorldCat.org for a limited purpose, and in exchange, the individual agrees, among other limitations, not to use the data for commercial use; not to harvest "material amounts" of data; not to distribute, display, or disclose the data; and not to store the data.

59. Though individuals on WorldCat.org may see some WorldCat® data when they view one record at a time, the main value of WorldCat® data is the modifications, improvements, and/or enhancements by OCLC to WorldCat® records (most of which are unavailable on WorldCat.org) *and* the aggregate availability of these high-quality records in the WorldCat® database.

## II.     Anna's Archive is a Well-Known Illegal Pirate Library.

60.     Defendant Anna's Archive was created in July 2022.

61.     Anna's Archive is "the world's largest shadow library."[2]

62.     Shadow libraries, also commonly referred to as pirate libraries, are online databases and/or search engines that host and/or direct users to books, content, media, and other materials online for download that are copyrighted, offered without the consent of the owners and/or creators of the content, or not otherwise intended to be publicly accessible.

63.     In plain terms, pirate libraries illegally distribute and make available copyrighted books and other materials for free download, without recognizing the work of publishers, authors, editors, journalists, etc., through renumeration or compliance with copyright law.

64.     Anna's Archive was created and is operated by a team of anonymous "archivists" that refer to themselves as "Anna," *i.e.*, Defendants Matienzo and John Does #1–20.

65.     The individual defendants own, operate, control, and/or do business as Anna's Archive and make every effort to remain anonymous because they knowingly engage in illegal activity.  The individual defendants use usernames as pseudonyms to mask their identities, employ domain proxy services, and omit identifying information on the Anna's Archive's domains/websites and blog, among other strategies, to conceal their identities.[3]

66.     There are six internet domains controlled by Defendants in connection with Anna's Archive:  annas-archive.org, annas-archive.gs, annas-archive.se, annas-blog.org, annas-software.org, and pilimi.org.

---

[2] Anna's Blog, https://annas-blog.org/ (last visited Jan. 12, 2024).
[3] *E.g.*, *How to run a shadow library: operations at Anna's Archive*, Anna's Blog (Mar. 19, 2023), https://annas-blog.org/how-to-run-a-shadow-library.html.

67.    Anna's Archive is an online pirate library search engine engaging in and facilitating mass copyright infringement.[4]  Defendants openly acknowledge this, explaining "[w]e deliberately violate the copyright law in most countries."[5]

68.    Although Defendants assert that Anna's Archive's domains do not host copyrighted materials, Anna's Archive has "mirrored," or duplicated and stored elsewhere, shadow library databases that host copyrighted materials, including, Z-Library,[6] Sci-Hub, LibGen, and others. Defendants, through the Anna's Archive's domains, distribute the data through "torrents, announcing it somewhere, [and] getting people to spread it," *i.e.*, "seed" the torrent.[7]

69.    By using Anna's Archive's search, visitors can download pirated materials from third-party sources and torrent links.[8]

70.    Anna's Archive has two goals.[9]  First, to "preserve books, papers, comics, magazines, and more, by bringing these materials from various shadow libraries together in one place.  All this data is preserved forever by making it easy to duplicate it in bulk, resulting in many

---

[4] *See* Wikipedia.org, Anna's Archive, https://en.wikipedia.org/wiki/Anna%27s_Archive (last visited Jan. 12, 2024); *About*, Anna's Archive, https://annas-archive.org/about (last visited Jan. 12, 2024) (noting Anna's Archive partially maintains its Wikipedia page).

[5] *Introducing the Pirate Library Mirror (EDIT: moved to Anna's Archive):  Preserving 7TB of books (that are not in Libgen)*, Anna's Blog (July 1, 2022) https://annas-blog.org/blog-introducing.html.

[6] In 2022, the United States arrested and charged the creators of Z Library with criminal copyright infringement, wire fraud, and money laundering.  Press Release, United States Attorneys' Office Eastern District of New York, Two Russian Nationals Charged with Running Massive E-Book Piracy Website (Nov. 16, 2022), https://www.justice.gov/usao-edny/pr/two-russian-nationals-charged-running-massive-e-book-piracy-website.  The United States seized various domain names associated with Z Library. *Id.*

[7] *How to become a pirate archivist*, Anna's Blog (Oct. 17, 2022), https://annas-blog.org/blog-how-to-become-a-pirate-archivist.html.

[8] A torrent scatters pieces of the files across the internet and on different servers and facilitates peer-to-peer file sharing over the BitTorrent protocol; visitors thus download small pieces of an original file from different sources.

[9] *About*, Anna's Archive, https://annas-archive.org/about (last visited Jan. 12, 2024).

copies around the world." This goal includes "wide distribution." Second, to "make our collections easily and freely accessible to anyone."[10] These "goals" are merely euphemisms for piracy and Defendants' related illegal activities, such as hacking, data scraping, and data harvesting.

71. Defendants describe their activities as preserving "all knowledge and culture of humanity" and ensuring "this knowledge and culture [is] available to anyone in the world." In reality, Defendants are perpetuating the widespread violation of copyright law and theft of intellectual property with the clear knowledge that their actions are illegal and damaging to creators.

72. Although Defendants describe their illegal Anna's Archive enterprise as a "non-profit," they encourage donations in the form of a monthly subscription. These subscriptions range from $5 to $100 a month and offer a variety of increasing benefits commensurate with increasing subscription fees—primarily, the volume and speed of downloads from its torrents.

73. For example, a $5 per month subscription will give a visitor "20 fast downloads per day," while a $100 per month subscription grants a visitor "1000 fast downloads per day" and naming rights to a torrent file on Anna's Archive ("Adopt a torrent").[11]

74. As of January 12, 2024, Anna's Archive boasts a daily download rate of 370,000.[12]

**III.    Defendants Illegally Scrape and Harvest Data from WorldCat.org.**

75. Beginning in October 2022, OCLC suffered persistent attacks to WorldCat.org and its servers. These attacks continued for roughly a year.

---

[10] *Id.*
[11] *Donate*, Anna's Archive, https://annas-archive.org/donate (last visited Jan. 12, 2024).
[12] *See supra*, note 9.

76. These attacks were accomplished with bots (automated software applications) that "scraped" and harvested data from WorldCat.org and other WorldCat®-based research sites and that called or pinged the server directly. These bots were initially masked to appear as legitimate search engine bots from Bing or Google.

77. To scrape or harvest the data on WorldCat.org, the bots searched WorldCat.org results, running a script based on OCN for individual JavaScript Object Notation, or "JSON," records. As a result, WorldCat® data including freely accessible and enriched data, such as OCNs, were scraped from individual results on WorldCat.org.

78. The bots also harvested data from WorldCat.org by pretending to be an internet browser, directly calling or "pinging" OCLC's servers, and bypassing the search, or user interface, of WorldCat.org. More robust WorldCat® data was harvested directly from OCLC's servers, including enriched data not available through the WorldCat.org user interface.

79. Finally, WorldCat® data was harvested from a member's website incorporating WorldCat® Discovery Services, a subscription-based variation of WorldCat.org that is available only to a member's patrons. Again, the hacker pinged OCLC's servers to harvest WorldCat® records directly from the servers. To do this through WorldCat® Discovery Services/FirstSearch, the hacker obtained and used the member's credentials to authenticate the requests to the server as a member library.

80. From WorldCat® Discovery Services, hackers harvested 2 million richer WorldCat® records that included data not available in WorldCat.org. This hacking method resulted in the harvesting of some of OCLC's most proprietary fields of WorldCat® data.

81. These hacking attacks materially affected OCLC's production systems and servers, requiring around-the-clock efforts from November 2022 to March 2023 to attempt to limit service

outages and maintain the production systems' performance for customers. To respond to these ongoing attacks, OCLC spent over 1.4 million dollars on its systems' infrastructure and devoted nearly 10,000 employee hours to the same.

82. Despite OCLC's best efforts, OCLC's customers experienced many significant disruptions in paid services during the aforementioned period as a result of the attacks on WorldCat.org, requiring OCLC to create system workarounds to ensure services functioned.

83. During this time, customers threatened and likely did cancel their products and services with OCLC due to these disruptions.

84. Because OCLC had to combat these persistent hacking attacks, OCLC was forced to divert existing personnel and resources from OCLC's other products and services. As a result, OCLC's development and improvements to other products and services were delayed and limited.

85. OCLC has devoted, at various times, ten or more employees to respond to and mitigate the harm from these attacks from October 2022 to present.

## IV. Anna's Archive Unmasks itself as the Perpetrator of the Attacks on WorldCat.org and Makes OCLC's WorldCat® Records Publicly Available.

86. On October 3, 2023, Defendants published a blog post, boasting, "[o]ver the past year, we've meticulously scraped all WorldCat records." [13] Defendants also made this announcement on Anna's Archive's X account, formerly known as Twitter.[14] In their blog post, Defendants outlined their scheme to hack WorldCat.org.

---

[13] *1.3B WorldCat scrape & data science mini-competition*, Anna's Blog (Oct. 3, 2023), https://annas-blog.org/worldcat-scrape.html.
[14] After OCLC sent cease and desist letters to Defendant Matienzo and the remaining Defendants via email addresses provided on Anna's Archive's domains, the X account for Anna's Archive was deleted. *See* @AnnaArchivist, X, https://twitter.com/AnnaArchivist (last visited Jan. 12, 2024) ("This account doesn't exist.").

87.     Defendants explained that "[a] year ago, we set out to answer this question:  What percentage of books have been permanently preserved by shadow libraries?"  They went on, "[t]o answer the question of which percentage of books has been preserved . . . we need to know the denominator:  how many books exist in total?  And ideally we don't just have a number, but actual metadata.  Then we can not only match them against shadow libraries, but also **create a TODO list of remaining books to preserve!**  We could even start dreaming of a crowdsourced effort to go down this TODO list," *i.e.*, a crowdsourced effort to pirate books on the "TODO list."

88.     As part of these efforts, Defendants "set our sights on the largest book database in the world: WorldCat" to "create a TODO list of remaining books to preserve," *i.e.*, to pirate.

89.     And "[o]ver the past year, we've meticulously scraped all WorldCat records.  At first, we hit a lucky break.  WorldCat was just rolling out their complete website redesign (in Aug 2022).  This included a substantial overhaul of their backend systems, introducing many security flaws.  We immediately seized the opportunity, and were able scrape hundreds of millions (!) of records in mere days."

90.     Defendants acknowledged that WorldCat® is a "proprietary database" in which OCLC "aggregates metadata records from libraries all over the world, in exchange for giving those libraries access to the full dataset, and having them show up in end-users' search results." "Even though OCLC is a non-profit, their business model requires protecting their database.  Well, we're sorry to say, friends at OCLC, we're giving it all away.  :-)."

91.     As a result of their hacking and data scraping and harvesting, Defendants have stolen 2.2 TB of WorldCat® data, which they claim comprises 1.3 billion OCNs and 700 million unique actual bibliographic records.

92.     In total, WorldCat® has 1.4 billion OCNs, meaning Defendants claim that they were able to harvest, to some extent, 97.4% of unique WorldCat® records.

93.     Defendants, through the Anna's Archive domains, have made, and continue to make, all 2.2 TB of WorldCat® data available for public download through its torrents. Defendants also announced their torrents on the Anna's Archive blog, X, Reddit, and other platforms, and are encouraging users to download and analyze the data, creating a "mini-competition for data scientists."

94.     Defendants call for visitors to "help seed our torrents, scan and upload some books, help build Anna's Archive, help scrape more collections, or simply become a member."

95.     Defendants also incorporated the harvested WorldCat® data into the Anna's Archive search engine so that such data appears in search results displayed to visitors.

## V.     WorldCat® Data Available Publicly in the Aggregate is a Serious Threat to OCLC and its Library Services that Depend on WorldCat® Data.

96.     When Defendants torrented the 2.2 TB of WorldCat® data that they harvested by hacking WorldCat.org, Defendants effectively distributed OCLC's valuable WorldCat® data.

97.     Moreover, by creating a competition for the most unique use of OCLC's WorldCat® data, Defendants have all but ensured that individuals will download the data, use it for their own means, and incorporate it into other applications that facilitate its distribution.

98.     Most of the records contain enrichments from OCLC and its members.

99.     This includes metadata unique to WorldCat® records and created by OCLC. For example, the Anna's Archive's blog post indicates that Defendants harvested metadata that denotes associations between records, such as between an original work and a parodying work. OCLC adds these associations data as part of its enrichment process.

100.    OCLC faces significant harm now that metadata representing 97.4% of all WorldCat® records is available in the aggregate for public download.  Competitors can download and analyze the data, as well as use the aggregate data for anti-competitive purposes.  Moreover, current and future customers may download and copy the data, foregoing OCLC's Services, including WorldCat®.

101.    The more libraries that participate in WorldCat® and catalog their records with OCLC, the more records that are available through WorldCat® and the more valuable that WorldCat® becomes to OCLC's members.  Any loss in OCLC membership and WorldCat® participation has a direct, negative impact on members that remain.  The distribution of WorldCat® records and metadata for free will contract OCLC membership and WorldCat® participation.

102.    WorldCat® is also one of OCLC's most financially important offerings to its members, making up an average of 40% of OCLC's revenue over the past 5 years.

103.    WorldCat® also sits at the center of OCLC's family of products and services.  OCLC's cataloging, resource sharing, discovery, OCLC publisher, and OCLC data services all benefit from WorldCat® records.  OCLC's other products and services that would be affected by a successful attack by Defendants on WorldCat® include: WorldShare Management Services, WorldShare Metadata/OCLC Cataloging, Group Cataloging, WorldCat® Discovery Services/FirstSearch, WorldShare License Manager, WorldShare Collection Evaluation, WorldShare Interlibrary Loan, Tipasa, WorldCat.org, ILLiad, GreenGlass, and Chorea Insights.

104.    Providing WorldCat® records for free in a mass download also decreases WorldCat®'s value to OCLC's other products and services, further devaluing OCLC's products and services to current and potential customers.  The negative impact of Defendants' distribution

of WorldCat® records could have catastrophic consequences for every aspect of OCLC's operations.

106. Defendants know of the aforementioned importance of WorldCat® to OCLC's operations and its ability to continue to compete in the library services market.

106. Moreover, Defendants acknowledge the value to the library community that OCLC provides and the value of its efforts to collect, enrich, and refine WorldCat® records and data:

> PS: We do want to give a genuine shout-out to the WorldCat team. Even though it was a small tragedy that your data was locked up, you did an amazing job at getting 30,000 libraries on board to share their metadata with you. As with many of our releases, we could not have done it without the decades of hard work you put into building the collections that we now liberate. Truly: thank you.

## VI. The Individuals Behind Anna's Archive and their Conspiracy to Illegally Target and Harm OCLC.

107. After Anna's Archive identified itself as the perpetrator of the hacking attacks, OCLC set out to identify the individuals behind Anna's Archive.

108. Defendant Maria Dolores Anasztasia Matienzo is software engineer at Tome and former catalog librarian at a direct competitor of OCLC.

109. On information and belief, in addition to her extensive online presence, she has a GitHub (a software code hosting platform) account called, "anarchivist," and she developed a repository for a python module for interacting with OCLC's WorldCat® Affiliate web services.

110. On her personal blog, Matienzo describes herself as an "archivist."

111. Matienzo has publicly stated that libraries and archives should be open and publicly available.

112. On information and belief, Matienzo has a deep understanding of OCLC's WorldCat® and software coding, which she has utilized to support Anna's Archive, along with her experience at an OCLC competitor.

113. On information and belief, the other individuals behind Anna's Archive, Defendants John Does #1–20, reside in various foreign countries, including Israel and Brazil.

114. On information and belief, Defendants John Does #1–20 have experience with data scraping, with online piracy, with software development, at OCLC's competitors, etc., which they use to support Anna's Archive, including through the attacks on OCLC.

115. In a blog post, Anna's Archive had previously stated, "we would love to quit our jobs in finance and tech."[15]

116. On information and belief, the individual defendants' professional profiles fit the blog post's "jobs in finance and tech" description.

117. Upon information and belief, each individual defendant has used their library cataloging, software, and/or technological skills to create Anna's Archive, willfully violate international, federal, and state law, directly target OCLC, hack WorldCat.org, and distribute WorldCat® data, in order to facilitate the piracy of protected works.

118. As set forth in Anna's Archive's blog, Defendants have acted, and continue to act, in concert in furtherance of a plan or agreement to tortiously interfere with OCLC's contractual and prospective business relationships in relation to OCLC's WorldCat® service, hack WorldCat.org and OCLC's servers, and trespass upon and convert OCLC's property, including its WorldCat® data and servers.

119. As a result of Defendants' plans, OCLC will face difficulties meeting its obligations under the WorldCat®'s Rights and Responsibilities agreement and its service agreements with customers.

---

[15] *3x new books added to the Pirate Library Mirror (+24TB, 3.8 million books)*, Anna's Blog (Sept. 25, 2022), https://annas-blog.org/blog-3x-new-books.html.

120.    Upon information and belief, as a result of Defendants' plan, one or more OCLC WorldCat® customers or potential WorldCat® customers has or will opt to forego OCLC services, including WorldCat®.

121.    Upon information and belief, Defendants' coordinated and intentional predatory and tortious targeting of OCLC's WorldCat® data is willful and malicious, and it has caused, and will continue to cause, significant injury to WorldCat® and OCLC in Ohio and elsewhere, as discussed in this Complaint.

## COUNT ONE
## Breach of Contract

122.    OCLC incorporates the paragraphs above by reference as if fully restated herein.

123.    OCLC WorldCat.org Services Terms and Conditions ("Terms and Conditions") create a valid and binding contract between OCLC and Defendants, where OCLC grants the user a license to use WorldCat® data available on WorldCat.org, and in exchange the user agrees not to use the data for commercial use; to harvest "material amounts" of data; to distribute, display, or disclose the data; or to store the data.

124.    OCLC fully performed its obligations under the Terms and Conditions by providing each of the Defendants with access to certain WorldCat® data through WorldCat.org.

125.    Defendants materially breached the terms set forth in the Terms and Conditions, including but not limited to, its harvesting and scraping of WorldCat® data from WorldCat.org, bypassing WorldCat.org's user interface and directly accessing WorldCat® data from OCLC's servers, offering WorldCat® data for its own commercial use, displaying, distributing, and disclosing the data, and permanently storing via mirroring and torrent WorldCat® data.

126.    As a direct and proximate result of Defendants' breach of the Terms and Conditions, OCLC has incurred damages, OCLC has suffered immediate and irreparable injury,

loss, or damage in Ohio and elsewhere for which there is no adequate remedy at law, including irreparable injury to its business and loss of customer good will, and other intangible assets, and additional damages and expenses that are not readily calculable.

127.    Alternatively, the actions as described above will and/or have caused OCLC to be damaged in an amount to be determined at trial.

**COUNT TWO**
**Unjust Enrichment**

128.    OCLC incorporates the paragraphs above by reference as if fully restated herein.

129.    OCLC conferred a benefit on Defendants by providing access to WorldCat.org, which contains certain WorldCat® data.

130.    Defendants have knowledge of the benefit of WorldCat® data, as demonstrated by their statements on Anna's Archive's blog recognizing the propriety nature of WorldCat®, praising WorldCat®, and thanking OCLC for "the decades of hard work you put into building the collections."

131.    Defendants have unjustly retained WorldCat® data, despite cease-and-desist requests made by OCLC, by not only avoiding paying for OCLC products and services, which would have granted them bulk access to WorldCat® data, but also by offering access to the WorldCat® data to others.

132.    Defendants' retention of the WorldCat® data is in bad faith because Defendants exploited its access to WorldCat® data with the specific intent to harvest and scape data, even though they acknowledge WorldCat® data is proprietary, and that they are "giving it all away."

133.    Defendants' unjust enrichment proximately caused OCLC to suffer immediate and irreparable injury, loss, or damage in Ohio and elsewhere for which there is no adequate remedy

at law, including irreparable injury to its business and loss of customer good will, and other intangible assets, and additional damages and expenses that are not readily calculable.

134.    Alternatively, the actions as described above will and/or have caused OCLC to be damaged in an amount to be determined at trial.

### COUNT THREE
### Tortious Interference of Contract

135.    OCLC incorporates the foregoing paragraphs above by reference as if fully restated herein.

136.    OCLC, as the owner of the world's preeminent cataloging record service, WorldCat®, has entered into contractual relationships with its WorldCat® customers, which outline the benefits of OCLC's cooperative and the access to WorldCat® records and data *en masse*.

137.    Upon information and belief, Defendants have knowledge of OCLC's contracts with WorldCat® customers given Defendants' acknowledgment that WorldCat® data is proprietary, their previous experience at OCLC competitors, and that OCLC does not grant access to WorldCat® data without a subscription.

138.    Upon information and belief, when Defendants harvested WorldCat® data and distributed it, and when Defendants hacked WorldCat.org and OCLC's servers, they intended for or were substantially certain that OCLC would face material difficulties in fulfilling its obligations under the WorldCat®'s Rights and Responsibilities agreement and current service agreements with customers, that customers would cancel their service agreements with OCLC, and otherwise materially interfere with OCLC's contractual relationships with its customers.

139.    Defendants' interference with OCLC's existing contracts lacks any justification as evidenced by its improper motives, illegal interests in promoting the piracy of literary works and

of OCLC's WorldCat® records and metadata, and the predatory nature of its direct attack on OCLC.

140.    As a direct and proximate result of Defendants' tortious interference with OCLC's contracts, OCLC has suffered immediate and irreparable injury, loss, or damage in Ohio and elsewhere for which there is no adequate remedy at law, including irreparable injury to its business and loss of customer good will, and other intangible assets, and additional damages and expenses that are not readily calculable.

141.    Alternatively, the actions as described above will and/or have caused OCLC to be damaged in an amount to be determined at trial.

142.    In addition, Defendants' conduct was undertaken intentionally with malice, oppression, and/or fraud, justifying the imposition of punitive damages in an amount sufficient to punish Defendants and deter Defendants from engaging in similar conduct.

## COUNT FOUR
### Conspiracy to tortiously interfere with contract

143.    OCLC incorporates the foregoing paragraphs above by reference as if fully restated herein.

144.    Defendants conspired to tortiously interfere with OCLC's contractual relationships with its WorldCat® customers.

145.    Defendants formed a malicious combination, or a tacit understanding or design, to hack WorldCat.org and OCLC's servers and offer WorldCat® data in bulk, which Defendants know will create material difficulties for OCLC to fulfill its obligations under the WorldCat®'s Rights and Responsibilities agreement and current service agreements with customers and will cause customers to cancel their service agreements with OCLC.

146. Defendants did so intentionally, deliberately, willfully, maliciously, and without justification to injure OCLC in Ohio and elsewhere.

147. Pursuant to this malicious combination, Defendants have induced or will induce WorldCat® customers to terminate their agreements with OCLC.

148. These underlying unlawful acts committed pursuant to the formed conspiracy will and/or have directly and proximately caused OCLC to suffer immediate and irreparable injury, loss, or damage in Ohio and elsewhere for which there is no adequate remedy at law, including irreparable injury to its business and loss of customer good will, and other intangible assets, and additional damages and expenses that are not readily calculable.

149. Alternatively, the actions as described above will and/or have caused OCLC to be damaged in an amount to be determined at trial.

150. In addition, Defendants' conduct was undertaken intentionally with malice, oppression, and/or fraud, justifying the imposition of punitive damages in an amount sufficient to punish Defendants and deter Defendants from engaging in similar conduct.

## COUNT FIVE
### Tortious interference with prospective business relationships

151. OCLC incorporates the foregoing paragraphs above by reference as if fully restated herein.

152. OCLC, as the owner of WorldCat®, has had, or will have, prospective business relationships with potential customers seeking a cataloging record service as part of their ILS/LSP platforms.

153. Upon information and belief, Defendants know OCLC has these prospective business relationships, which is why they scraped and hacked WorldCat.org and OCLC's servers and are offering WorldCat® data in bulk.

154.    Upon information and belief, widely distributing pirated metadata online, devaluing the commercial value of the metadata, and interfering with WorldCat.org and OCLC's servers is consistent with Defendants' mission to offer the world's knowledge for free.

155.    Defendants have intentionally, deliberately, willfully, maliciously, and without justification caused or will cause these prospective WorldCat® customers to not enter into a business relationship with OCLC for WorldCat® by hacking WorldCat.org and OCLC's servers and offering WorldCat® data on Anna's Archives websites and via torrents.

156.    As a direct and proximate result of Defendants' tortious interference with OCLC's prospective business relationships with future WorldCat® customers, OCLC will suffer immediate and irreparable injury, loss, or damage in Ohio and elsewhere for which there is no adequate remedy at law, including irreparable injury to its business and loss of customer good will, and other intangible assets, and additional damages and expenses that are not readily calculable.

157.    Alternatively, the actions as described above will and/or have caused OCLC to be damaged in an amount to be determined at trial.

158.    In addition, Defendants' conduct was undertaken intentionally with malice, oppression, and/or fraud, justifying the imposition of punitive damages in an amount sufficient to punish Defendants and deter Defendants from engaging in similar conduct.

## COUNT SIX
### Conspiracy to tortiously interfere with prospective business relationships

159.    OCLC incorporates the paragraphs above by reference as if fully restated herein.

160.    Defendants conspired to tortiously interfere with OCLC's future business relationships with potential WorldCat® customers.

161. Upon information and belief, widely distributing pirated metadata online, devaluing the commercial value of the metadata, and interfering with WorldCat.org and OCLC's servers is consistent with Defendants' mission to offer the world's knowledge for free.

162. Defendants formed a malicious combination, or a tacit understanding or design, to scrape WorldCat.org, offer WorldCat® data in bulk, and interfere with WorldCat.org and OCLC's servers.

163. Defendants did so intentionally, deliberately, willfully, maliciously, and without justification to injure OCLC in Ohio and elsewhere.

164. Pursuant to this malicious combination, Defendants have induced or will induce potential WorldCat® customers from engaging in agreements with OCLC.

165. These underlying unlawful acts committed pursuant to the formed conspiracy will and/or have directly and proximately caused OCLC to suffer immediate and irreparable injury, loss, or damage in Ohio and elsewhere for which there is no adequate remedy at law, including irreparable injury to its business and loss of customer good will, and other intangible assets, and additional damages and expenses that are not readily calculable.

166. Alternatively, the actions as described above will and/or have caused OCLC to be damaged in an amount to be determined at trial.

167. In addition, Defendants' conduct was undertaken intentionally with malice, oppression, and/or fraud, justifying the imposition of punitive damages in an amount sufficient to punish Defendants and deter Defendants from engaging in similar conduct.

### COUNT SEVEN
### Civil Recovery for Criminal Acts
### Violation of Ohio Revised Code § 2913.04

168.    OCLC incorporates the paragraphs above by reference as if fully restated herein.

169.    Defendants gained access to and/or caused access to be gained to OCLC's computers, computer systems, and/or computer networks when it hacked WorldCat.org and scraped and/or harvested WorldCat® data and accessed OCLC's servers.

170.    Defendants did so knowingly and without OCLC's consent and/or exceeding OCLC's consent as outlined in the OCLC WorldCat.org Services Terms and Conditions.

171.    Under Ohio Revised Code § 2307.60, anyone injured in person or property by a criminal act may recover damages in a civil action, including exemplary and punitive damages, and attorneys' fees.

172.    As a result of Defendants' criminal actions, OCLC has and/or will suffer injuries, including, but not limited to, decreased value of WorldCat® and OCLC's Services, damage to OCLC's servers and other infrastructure, and diminished good will with its customers.

173.    As a direct and proximate cause of Defendants' joint and willful violations of § 2913.04, OCLC is entitled to compensatory and punitive damages at an amount to be determined at trial, as well as attorneys' fees, pursuant to § 2307.60.

### COUNT EIGHT
### Conspiracy to violate Ohio Revised Code § 2913.04

174.    OCLC incorporates the paragraphs above by reference as if fully restated herein.

175.    Defendants conspired to gain access to and/or cause access to be gained to OCLC's computers, computer systems, and/or computer networks by hacking WorldCat.org and accessing OCLC's servers without and/or exceeding OCLC's consent.

176. Defendants formed a malicious combination, or a tacit understanding or design, to unlawfully scrape WorldCat® data and access OCLC's servers in order to copy and distribute WorldCat® data.

177. Defendants did so intentionally, deliberately, willfully, maliciously, and without justification to injure OCLC in Ohio and elsewhere.

178. Pursuant to this malicious combination, Defendants have and/or will have decreased value of WorldCat® and OCLC's other products and services, damaged to OCLC's servers and other infrastructure, and diminished good will with its customers.

179. These underlying unlawful acts committed pursuant to the formed conspiracy will and/or have directly and proximately caused OCLC to suffer immediate and irreparable injury, loss, or damage in Ohio and elsewhere for which there is no adequate remedy at law, including irreparable injury to its business and loss of customer good will, and other intangible assets, and additional damages and expenses that are not readily calculable.

180. Alternatively, the actions as described above will and/or have caused OCLC to be damaged in an amount to be determined at trial.

181. In addition, Defendants' conduct was undertaken intentionally with malice, oppression, and/or fraud, justifying the imposition of punitive damages in an amount sufficient to punish Defendants and deter Defendants from engaging in similar conduct.

## COUNT NINE
## Trespass to Chattels

182. OCLC incorporates the paragraphs above by reference as if fully restated herein.

183. The compilation of WorldCat® data was created, modified, enhanced, and is possessed by OCLC, and only exists, in bulk, through purchase of a subscription with OCLC.

184.    Without authorization from OCLC or in excess of any authorization, Defendants intentionally intermeddled with WorldCat® data, WorldCat.org, and OCLC's servers when they harvested data from WorldCat.org and OCLC's servers.

185.    Without authorization from OCLC or in excess of any authorization, Defendants intentionally used WorldCat® data when they made the data publicly available via torrent links on Anna's Archives' websites and when they damaged OCLC's servers and related infrastructure. Without authorization from OCLC, Defendants intentionally accessed OCLC's servers and related infrastructure when they hacked and harvested data from WorldCat.org.

186.    Defendants' trespass to WorldCat® data and OCLC's servers and related infrastructure has impaired its condition, quality, and/or value by, including but not limited to, offering WorldCat® data for public download, and damaging OCLC's servers and related infrastructure and reputation with its customers.

187.    As a result of Defendants' trespass upon OCLC's chattels, OCLC will suffer immediate and irreparable injury, loss, or damage in Ohio and elsewhere for which there is no adequate remedy at law, including irreparable injury to its business and loss of customer good will, and other intangible assets, and additional damages and expenses that are not readily calculable.

188.    Alternatively, the actions as described above will and/or have caused OCLC to be damaged in an amount to be determined at trial.

189.    In addition, Defendants' conduct was undertaken intentionally with malice, oppression, and fraud, justifying the imposition of punitive damages in an amount sufficient to punish Defendants and deter Defendants from engaging in similar conduct.

## COUNT TEN
### Conspiracy to Trespass to Chattels

190.     OCLC incorporates the foregoing paragraphs above by reference as if fully restated

herein.

191.     Defendants conspired to trespass OCLC's personal property.

192.     Defendants formed a malicious combination, or a tacit understanding or design, to

harvest the WorldCat® data from WorldCat.org, and then, use WorldCat® data when they made

the data publicly available for download through the Anna's Archives websites, and to damage

OCLC's servers and related infrastructure.

193.     Defendants did so intentionally, deliberately, willfully, maliciously, and without

justification to injure OCLC in Ohio and elsewhere.

194.     Pursuant to this malicious combination, Defendants have and/or will have

decreased the value of becoming a member in OCLC's cooperative offering bulk access to

WorldCat® data, *i.e.*, affecting OCLC's business, and damaged OCLC's servers and related

infrastructure and goodwill with its members.

195.     These underlying unlawful acts committed pursuant to the formed conspiracy will

and/or have directly and proximately caused OCLC to suffer immediate and irreparable injury,

loss, or damage in Ohio and elsewhere for which there is no adequate remedy at law, including

irreparable injury to its business and loss of customer good will, and other intangible assets, and

additional damages and expenses that are not readily calculable.

196.     Alternatively, the actions as described above will and/or have caused OCLC to be

damaged in an amount to be determined at trial.

197.    In addition, Defendants' conduct was undertaken intentionally with malice, oppression, and/or fraud, justifying the imposition of punitive damages in an amount sufficient to punish Defendants and deter Defendants from engaging in similar conduct.

## COUNT ELEVEN
### Conversion

198.    OCLC incorporates the foregoing paragraphs above by reference as if fully restated herein.

199.    The compilation of WorldCat® data was created, modified, enhanced, and is possessed by OCLC, and only exists, in bulk, through purchase of a subscription with OCLC.

200.    Without authorization or at least intentionally in excess of any authorization, Defendants exercised control and dominion over WorldCat® data when they harvested and distributed the data through the Anna's Archives' websites and exercised control and dominion over OCLC's servers and related infrastructure when hacking and harvesting data from WorldCat.org.

201.    Defendants' use of the WorldCat® data and OCLC's servers and related infrastructure constitutes a substantial and unreasonable interference with the right of OCLC to protect the WorldCat® data, a right which Defendants have recognized in Anna's Archives' Blog, and to protect its servers and related infrastructure.

202.    Not only have Defendants unlawfully acquired the WorldCat® data through its scraping of WorldCat.org and harvesting through OCLC's servers and its violations of OCLC's Services Terms and Conditions, but Defendants, also, have refused to halt their unlawful possession, use, and distribution of the WorldCat® data despite OCLC's express demand.

203.    As a direct and proximate result of Defendants' conversion of WorldCat® data and OCLC's servers and related infrastructure, OCLC will suffer immediate and irreparable injury,

loss, or damage in Ohio and elsewhere for which there is no adequate remedy at law, including irreparable injury to its business and loss of customer good will, and other intangible assets, and additional damages and expenses that are not readily calculable.

204.    Alternatively, the actions as described above will and/or have caused OCLC to be damaged in an amount to be determined at trial.

205.    In addition, Defendants' conduct was undertaken intentionally with malice, oppression, and/or fraud, justifying the imposition of punitive damages in an amount sufficient to punish Defendants and deter Defendants from engaging in similar conduct.

**COUNT TWELVE**
**Conspiracy to Convert OCLC's Property**

206.    OCLC incorporates the foregoing paragraphs above by reference as if fully restated herein.

207.    Defendants conspired to convert OCLC's personal property.

208.    Defendants formed a malicious combination, or a tacit understanding or design, to scrape the WorldCat® data from WorldCat.org and harvest the WorldCat® data from OCLC's servers, and then, use the WorldCat® data when they made the data publicly available for download on Anna's Archives' websites. Defendants also formed a malicious combination, or a tacit understanding or design to deprive OCLC of the use of its servers and related infrastructure when it harvested the WorldCat® data from OCLC's servers.

209.    Defendants did so intentionally, deliberately, willfully, maliciously, and without justification to injure OCLC in Ohio and elsewhere.

210.    Pursuant to this malicious prosecution, Defendants have and/or will have decreased the value of becoming a member in OCLC's cooperative offering bulk access to the WorldCat®

data, i.e., affecting OCLC's business, and damaged OCLC's servers and related infrastructure and goodwill with its members.

211. These underlying unlawful acts committed pursuant to the formed conspiracy will and/or have directly and proximately caused OCLC to suffer immediate and irreparable injury, loss, or damage in Ohio and elsewhere for which there is no adequate remedy at law, including irreparable injury to its business and loss of customer good will, and other intangible assets, and additional damages and expenses that are not readily calculable.

212. Alternatively, the actions as described above will and/or have caused OCLC to be damaged in an amount to be determined at trial.

213. In addition, Defendants' conduct was undertaken intentionally with malice, oppression, and/or fraud, justifying the imposition of punitive damages in an amount sufficient to punish Defendants and deter Defendants from engaging in similar conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, OCLC, Inc. requests that the Court enter judgment in its favor and against Defendants as follows:

(a) a declaration that Defendants' scraping of the WorldCat® data constitutes a (1) breach of contract or unjust enrichment, (2) tortious inference with contracts, (3) tortious interference with prospective business relationships, (4) violation of Ohio Revised Code § 2913.04, (5) trespass to chattels, (6) conversion, and (7) conspiracy to commit (2) through (6);

(b) permanent injunctive relief prohibiting Defendants (1) from scraping or harvesting WorldCat® data from WorldCat.org or OCLC's servers, (2) from using, storing, or distributing the WorldCat® data on Anna's Archive websites, and (3) from encouraging others to scrape, harvest, use, store, or distribute WorldCat® data, and (4) requiring the deletion of all copies of WorldCat® data in possession of, or easily accessible to, Defendants, including all torrents

identified on any Anna's Archive websites or within possession of, or easily accessible to Defendants;

(c)     an award of compensatory damages in favor of OCLC against Defendants in an amount to be determined at trial in excess of $75,000;

(d)     an award of punitive damages;

(e)     an award of attorneys' fees, pre-judgment interest, costs, and expenses, incurred in connection with this action; and/or

(f)     for such other and further relief as the court deems just.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury of the maximum number permitted by law.

Respectfully submitted,

Dated: January 12, 2024

/s/ *Jeffrey M. Walker*
Jeffrey M. Walker (0096567), Trial Attorney
Traci L. Martinez (0083989)
Kathryn M. Brown (0100426)
Brittany Silverman (0102263)
SQUIRE PATTON BOGGS (US) LLP
2000 Huntington Center
41 South High Street
Columbus, Ohio  43215
Telephone: +1 614 365 2700
Facsimile: +1 614 365 2499
jeffrey.walker@squirepb.com
traci.martinez@squirepb.com
kathryn.brown@squirepb.com
brittany.silverman@squirepb.com

*Attorneys for Plaintiff, OCLC, Inc.*