**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **OCLC, Inc.,** | **Case No. 2:24-cv-00144-MHW-EPD** |
| **Plaintiff,** | **Judge Michael H. Watson** |
| **v.** | **Magistrate Judge Elizabeth A. Preston Deavers** |
| **ANNA'S ARCHIVE, f/k/a PIRATE LIBRARY MIRROR, MARIA DOLORES ANASZTASIA MATIENZO, and JOHN DOES #1–20,** | |
| **Defendants.** | |

## MOTION TO SERVE DEFENDANT ANNA'S ARCHIVE BY EMAIL

Pursuant to Federal Rule of Civil Procedure 4(h)(2) and (f)(3), Plaintiff OCLC, Inc. respectfully moves this Court for an order authorizing alternative service of process on Defendant Anna's Archive, formerly known as Pirate Library Mirror. Specifically, Plaintiff requests that this Court authorize service via email upon Defendant Anna's Archive and issue an order:

a) Authorizing email service by OCLC upon Defendant Anna's Archive at the email addresses AnnaArchivist@proton.me, AnnaDMCA@proton.me, AnnaArchivist+security@proton.me, and domainabuse@tucows.com;

b) Ordering OCLC to present to the Office of the Clerk summons directed to Defendant Anna's Archive at these email addresses;

c) Ordering OCLC to serve the Complaint, summons, and the other case-initiating documents upon Defendant Anna's Archive; and

d) Ordering OCLC's attorneys to file a declaration of proof of service in lieu of a signed receipt.

The basis for this Motion is set forth in more detail in the Memorandum in Support, which OCLC has filed simultaneously in this matter.

Respectfully submitted,

Dated: January 24, 2024

/s/ *Jeffrey M. Walker*

Jeffrey M. Walker (0096567), Trial Attorney
Traci L. Martinez (0083989)
Kathryn M. Brown (0100426)
Brittany Silverman (0102263)
SQUIRE PATTON BOGGS (US) LLP
2000 Huntington Center
41 South High Street
Columbus, Ohio 43215
Telephone: +1 614 365 2700
Facsimile: +1 614 365 2499
jeffrey.walker@squirepb.com
traci.martinez@squirepb.com
kathryn.brown@squirepb.com
brittany.silverman@squirepb.com

*Attorneys for Plaintiff, OCLC, Inc.*

<u>**MEMORANDUM OF LAW IN SUPPORT**</u>

Plaintiff OCLC, Inc. ("OCLC") respectfully submits this Memorandum of Law in Support of its Motion to Serve Defendant Anna's Archive by email.  OCLC seeks permission to serve Defendants Anna's Archive, formerly known as Pirate Library Mirror or "PiLiMi," with the Complaint and Summons, as well as the other papers required to be served in this case, by email as described below and as permitted by Federal Rule of Civil Procedure 4(h)(2) and (f)(3).

## I.      INTRODUCTION

OCLC is suing Defendants Anna's Archive, Maria Dolores Anasztasia Matienzo, and John Does #1–20 (collectively, "Defendants") for the illegal hacking and data harvesting of OCLC's proprietary website, WorldCat.org.  OCLC is a non-profit library service and research organization whose WorldCat® database is the premiere bibliographic record and cataloging product for libraries.  WorldCat.org is the world's largest library catalog website, and its search engine queries the WorldCat® database for bibliographic records, connecting individuals to the library holdings at their local libraries.  The individual Defendants own, operate, and/or control Defendant Anna's Archive, the world's largest shadow or pirate library.

Defendants do not dispute their actions or the illegality of those actions.  In a blog post by Anna's Archive, Defendants admit that they hacked, scraped, and harvested data from WorldCat.org and that they are offering OCLC's WorldCat® data for free bulk download. Moreover, Defendants are actively encouraging individuals to download and analyze the data by creating a "mini-competition for data scientists," perpetuating the illegal distribution of OCLC's WorldCat® data in the aggregate.  Defendants' conduct is a breach of OCLC's WorldCat.org Services Terms and Conditions and constitutes unjust enrichment, tortious interference of OCLC's contractual and business relationships, violations of Ohio Revised Code § 2913.04, trespass to

chattels, and conversion, as well as conspiracy to do the same. Defendants' conduct poses a significant threat to OCLC and its services that depend on WorldCat®.

Service through alternative means upon Anna's Archive, which is likely a foreign entity, is necessary in this instance. Anna's Archive and those behind it have taken great pains to conceal their physical addresses and other identifying information while operating Anna's Archive, despite OCLC's diligent efforts to uncover this information. But Anna's Archive is a quintessentially online enterprise that flagrantly violates various jurisdictions' copyright laws by offering pirated materials for download. In fact, email service is likely the only reliable way to effectuate service of process on Anna's Archive so that OCLC may obtain the relief it seeks against Anna's Archive. Email service under these circumstances is authorized by the Federal Rules of Civil Procedure.

## II.     STATEMENT OF FACTS

### A.     OCLC Provides Libraries with Essential Services Powered by WorldCat®.

OCLC is a non-profit organization that provides shared technology services, original research, and community programs for its members and the library community. Compl. ¶ 1, Dkt. 1 at PageID 1. Specifically, OCLC provides the digital infrastructure and services for libraries to collaborate, create, and share bibliographic records. *Id.* ¶ 2.

WorldCat® is the cornerstone of OCLC's offerings. *Id.* ¶¶ 31, 103, PageID 7, 18. WorldCat® is the world's most comprehensive database of information about library collections, built by the thousands of libraries that subscribe to WorldCat®, as well as OCLC itself. *Id.* ¶¶ 30, 33–34, PageID 7. WorldCat® provides members with bibliographic records of more than 3.4 billion items from a variety of resources, many contributed by member libraries. *Id.* ¶ 32. Each member library's collection, or holdings, are represented in bibliographic records in WorldCat®, creating a network which supports research, local discovery, and resource sharing. *Id.* ¶ 34.

WorldCat.org is the world's largest library catalog website. *Id.* ¶ 46, PageID 9. Individuals use the WorldCat.org search engine to query library holdings represented in the WorldCat® database. *Id.* ¶¶ 46–47. Individuals view search results that consist of more limited information from a library's bibliographic record available in WorldCat®, and these results drive individuals to the holdings of their local libraries. *Id.* ¶¶ 48–52. OCLC has invested significant resources into developing, maintaining, improving, and enhancing WorldCat.org. *Id.* ¶ 55, PageID 10. For this reason, when an individual searches on WorldCat.org, the individual agrees to the OCLC WorldCat.org Services Terms and Conditions. *Id.* ¶ 58. OCLC grants the individual a license to use WorldCat® data available on WorldCat.org for a limited purpose, and in exchange, the individual agrees, among other limitations, not to use the data for commercial use; harvest "material amounts" of data; distribute, display, or disclose the data; or store the data. *Id.*

    **B.    Defendants Illegally Scrape and Harvest OCLC's WorldCat® Data from WorldCat.org and Distribute the Data for Free Bulk Download.**

Beginning in the fall of 2022, OCLC began to experience persistent cyberattacks on WorldCat.org and OCLC's servers that significantly affected the speed and operations of WorldCat.org, other OCLC products and services, and OCLC's servers and network infrastructure. *Id.* ¶¶ 9, 75, PageID 3, 13. Through these attacks, hackers harvested WorldCat® data by scraping WorldCat.org and calling (or "pinging") OCLC's servers to harvest data directly, stealing proprietary, enriched, and aggregated data that is unavailable to an individual from the WorldCat.org user interface. *Id.* ¶¶ 76–78, PageID 14. Hackers also obtained a member library's credentials to harvest data from a member's website with a subscription-based variation of WorldCat.org that is available only to a member's patrons. *Id.* ¶¶ 79–80. This hacking method resulted in the harvesting of some of OCLC's most proprietary fields of WorldCat® data. *Id.* ¶ 80.

In October 2023, OCLC learned that Anna's Archive, the world's largest pirate or shadow library, and the individual Defendants who run it anonymously, were behind the cyberattacks on OCLC and WorldCat.org. *Id.* ¶¶ 10, 86, PageID 3, 15. Anna's Archive is an online pirate library search engine that distributes and makes available for free download through file torrents materials online in violation of copyright laws. *Id.* ¶ 67, PageID 12. Anna's Archive published a blog post boasting, "[o]ver the past year, we've meticulously scraped all WorldCat records" by taking advantage of "security flaws" OCLC allegedly had in its "backend systems." *Id.* ¶¶ 86, 89, PageID 15–16. Anna's Archive explained that it stole 2.2 terabytes ("TB") of WorldCat® data—what Anna's Archive describes as "700 million unique actual records," and that it did so to further its scheme to hack and harvest WorldCat® data to "create a TODO list of remaining books to preserve," *i.e.*, to pirate. *Id.* ¶¶ 87–91, PageID 16. Though Defendants acknowledge OCLC's WorldCat® data and records are proprietary, they have since made OCLC's WorldCat® data available *en masse* and for free and are actively encouraging its visitors to make use of the data in "interesting" ways through a "mini-competition for data scientists." *Id.* ¶¶ 10, 90, 93–94, PageID 3, 16–17. Defendants have also incorporated WorldCat® data into the Anna's Archive search engine. *Id.* ¶ 95, PageID 17.

OCLC faces substantial and irreparable harm as a result of these actions. *Id.* ¶ 100, PageID 18. When Defendants torrented the 2.2TB of WorldCat® data, OCLC's valuable WorldCat® data was effectively distributed online. *Id.* ¶ 96, PageID 17. This data represents 97.4% of all WorldCat® records. *Id.* ¶ 92. And by encouraging others to participate in the "mini-competition," Defendants have all but ensured that individuals will download OCLC's WorldCat® data, including metadata unique to WorldCat® records and created by OCLC, use it for their own means, and incorporate it into other applications that facilitate its distribution. *Id.* ¶¶ 93, 97.

Moreover, current and future customers may download and copy the data, foregoing OCLC's services, including WorldCat® and other products and services that benefit from WorldCat® records. *Id.* ¶ 100, PageID 18. The negative impact of Defendants' hacking, harvesting, and distribution of WorldCat® data could have significant consequences for every aspect of OCLC's operations. *Id.* ¶¶ 100–06, PageID 18–19.

### C. Defendants Rely on Sophisticated Technology and Online Practices to Conceal their Identities.

Defendants understand that their pirate library enterprise and related activities, here, hacking and harvesting OCLC's WorldCat® records, are illegal. *Id.* ¶¶ 11, 65, PageID 3, 11. Defendants admit that they are engaging in and facilitating mass copyright infringement, stating, "[w]e deliberately violate the copyright law in most countries." *Id.* ¶ 67 PageID 12. In another blog post, Defendants noted that their activities could lead to arrest and "decades of prison time."[1] Defendants have also recognized that their hacking and distribution of OCLC's data is improper, acknowledging that WorldCat® is a "proprietary database," that OCLC's "business model requires protecting their database," and that Defendants are "giving it all away. :-)." Compl. ¶ 90, Dkt. 1 at PageID 16.

Because Defendants understand their actions infringe on copyright laws, amongst others, Defendants go to great lengths to remain anonymous to ensure both that Anna's Archive's domains are not taken down and to avoid the legal consequences of their actions, including civil lawsuits where parties like OCLC seek to vindicate their rights, as well as criminal and regulatory enforcement actions undertaken by government entities. None of Anna's Archive's domains or

---

[1] *How to become a pirate archivist*, Anna's Blog (Oct. 17, 2022), https://annas-blog.org/blog-how-to-become-a-pirate-archivist.html.

its online blog provide a business address, business contact, or other contact information that would be found on a legitimate entity's website. *See* Kim Decl.¶ 9, attached here as Exhibit 1.

Defendants have explained in a blog post that they are "being very careful not to leave any trace [of their online activities], and having strong operational security."[2] For instance, Anna's Archive utilizes a VPN with "[a]ctual court-tested no-log policies with long track records of protecting privacy."[3] Each of the Anna's Archive domains are registered using foreign hosts, registrars, and registrants in order to conceal the identity of the site operators. Kim Decl. ¶¶ 7–8. Additionally, Defendants rely on multiple proxy servers to maintain anonymity.[4] Defendants also use a free version of Cloudflare, a top-level hosting provider, so that they do not have to provide any payment or other identifying information.[5] *See also* Kim Decl. ¶ 6. Defendants selected Cloudflare because they claim Cloudflare has resisted requests to take down websites for copyright infringement.[6] The individuals behind Anna's Archive also use usernames as pseudonyms to mask their identities online. Compl. ¶ 65, Dkt. 1 at PageID 11.

Through the work of a cyber security and digital forensic investigation firm, OCLC was able to identify one of the individuals behind Anna's Archive by name and locate a United States address, Defendant Maria Dolores Anasztasia Matienzo.[7] However, the physical address and contact information of Anna's Archive and the identities and contact information of the John Does

---

[2] *See supra*, note 1.
[3] *Id.*
[4] *How to run a shadow library: operations at Anna's Archive*, Anna's Blog (Mar. 19, 2023), https://annas-blog.org/how-to-run-a-shadow-library.html.
[5] *Id.*
[6] *See supra*, note 4.
[7] On January 16, 2024, OCLC sent Defendant Matienzo a copy of all filings and the summons via email and U.S. mail and requested that Ms. Matienzo waive service of process pursuant to Federal Rule of Civil Procedure 4(d) and Local Rule 4.2. OCLC will serve Defendant Matienzo in the normal course should she choose not to waive service.

remain unknown. *See id.* ¶ 6–11. It is highly likely that Anna's Archive is a non-domestic, foreign entity, based on the findings from OCLC's investigator, as set forth below. *See id.*

### III.   ARGUMENT

OCLC seeks permission to serve Anna's Archive by alternative means, here, email, pursuant to Federal Rule of Civil Procedure 4(h)(2) and (f)(3). Rule 4(h)(2) provides that a "foreign corporation, or a partnership or other unincorporated association that is subject to suit under a common name, must be served," if outside the United States, "in any manner prescribed by Rule 4(f) for serving an individual, except for personal delivery under (f)(2)(C)(i)." Fed. R. Civ. P. 4(h)(2). Rule 4(f) provides three methods of service on individuals in foreign country, generally: (1) "by any internationally agreed means of service that is reasonably calculated to give notice," (2) "as prescribed by the foreign country's law for service," "as the foreign authority directs in response to a letter rogatory or letter of request," or by personal or mail service, and (3) "by other means not prohibited by international agreement, as the court orders." Fed. R. Civ. P. 4(f)(1)–(3).

Rule 4(f)(3) is the only avenue available to OCLC for serving Anna's Archive. It is worth noting that this Court and others have observed that plaintiffs do not need to "first exhaust the methods contemplated by Rule 4(f)(1) and (2) before petitioning the Court for permission to use alternative means under Rule 4(f)(3)." *L.J. Star Inc. v. Steel & O'Brien Mfg., Inc.*, No. 2:19-cv-4527, 2020 WL 1957155, at *5 (S.D. Ohio Apr. 23, 2020) (quoting *Lexmark Int'l, Inc. v. Ink Techs. Printer Supplies, LLC*, 295 F.R.D. 259, 260 (S.D. Ohio 2013) ("*Lexmark II*")); *see also*; *Lexmark II*, 295 F.R.D. at 260 ("Rule 4(f)(3) is 'neither a "last resort" nor "extraordinary relief." It is merely one means among several which enables service of process on an international defendant.'" (quoting *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1015 (9th Cir. 2002))). Service cannot be accomplished under Rule 4(f)(1) because the physical address of the Anna's Archive

headquarters is not known, meaning the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, also known as the Hague Service Convention, does not apply.  *L.J. Star*, 2020 WL 1957155, at \*6 (citing Art. 1, *Convention Done at the Hague Nov. 15, 1965*, T.I.A.S. No. 6638 (Feb. 10, 1969)).  OCLC also cannot serve Anna's Archive pursuant to Rule 4(f)(2) because the Rule requires knowledge of a defendant's country of residence, which Anna's Archive has concealed.  *See* Rule 4(f)(2)(A)–(C) (turning on "the foreign country's law" and "the foreign authority" of the foreign country).

Rule 4(f)(3) has "only two requirements for service":  "(1) it must be directed by the court, and (2) it must not be prohibited by international agreement."  *Lexmark Int'l, Inc. v. Ink Techs. Printer Supplies, LLC*, 291 F.R.D. 172, 174 (S.D. Ohio 2013) ("*Lexmark I*"); *see also* Fed. R. Civ. P. 4(f)(3); *Chanel, Inc. v. Song Xu*, No. 2:09-cv-02610-cgc, 2010 WL 396357, at \*3 (W.D. Tenn. Jan. 27, 2010).  An alternative method of service must also "comport[] with constitutional notions of due process, namely that the service of process be 'reasonably calculated, under all the circumstances, to apprize interested parties of the pendency of the action and afford them an opportunity to present their objections.'"  *Lexmark II*, 295 F.R.D. at 261 (citation omitted); *L.J. Star*, 2020 WL 1957155, at \*5; *see also Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 314, 314 (1950)).  Whether to permit a plaintiff to serve process upon a defendant under Rule 4(f)(3) within the discretion of the district court.  *Lexmark II*, 295 F.R.D. at 261.  At least three federal courts have permitted email service under Rule 4(f)(3) under comparable circumstances with pirate libraries. Walker Decl. ¶ 21, Exh. K, attached here as Exhibit 2, (Memo. Endorsement, *Cengage Learning, Inc. v. Does 1–50*, No. 1:23-cv-8136-CM (S.D.N.Y. Oct. 10, 2023)); *id.* ¶ 22,  Exh. L (Order, *American Chem. Society v. SCI-HUB*, No. 1:17-cv-00726-LMB-JFA (E.D. Va. July 17, 2017)); *id.* ¶ 23,  Exh. M (Order, *Elsevier, Inc. v. Sci-Hub*, No. 15 Civ. 4282 (RWS) (S.D.N.Y.

June 18, 2015)).  OCLC should also be permitted to serve Anna's Archive by email under Rule 4(f)(3) because Anna's Archive is likely a foreign entity, email service is not prohibited by international agreement, and email service is consistent with due process.

It is highly likely that Anna's Archive is a foreign entity located abroad.  Anna's Archive purports to be a non-profit (Compl. ¶ 18, Dkt. 1 at PageID 5) and is thus a "foreign corporation, or a partnership or other unincorporated association that is subject to suit under a common name," Rule 4(h).  Anna's Archive is likely a foreign entity for four reasons.  First, neither Anna's Archive, Pirate Library Mirror, nor PiLiMi appear in databases of domestic non-profits, corporations, or other entities.  Kim Decl. ¶¶ 9–10; *see also* Walker Decl. ¶ 19.  Second, the vast majority of the twenty-three domains associated with Anna's Archive resolve to a foreign registrar, registrant, and/or host.  Kim Decl. ¶¶ 4, 7–8, Exh. B.  These entities are named in the registrations of Anna's Archive's online domains and constitute the only information available that indicates any geographical location for Anna's Archive.  *See id.* ¶¶ 7–8.  These hosts, registrars, and registrants are located in Bulgaria, Canada, Finland, France, Germany, Iran, Japan, the Netherlands, St. Kitts and Nevis, Turkey, and Ukraine.  *Id.* ¶ 7, Exh. B.  Given the volume of foreign entities and the fact that these entities have taken part in Anna's Archive's domain registrations, it is likely Anna's Archive is also a foreign entity, or, at the very least, that Anna's Archive has chosen these entities to stand in its place to register the domains that form the crux of its online activities and this lawsuit.  Third, Anna's Archive uses domains with country codes for Switzerland and Georgia.  *Id.* ¶ 5.  Fourth, OCLC's investigator determined that most of the unknown and unverified individuals potentially associated with Anna's Archive are outside the United States, including potentially Brazil, Israel, and Germany.  *Id.* ¶¶ 8, 11.

Next, email service is not prohibited by international agreement, such as the Hague Convention. This Court and others have held that "email service is not prohibited by the Hague Convention." *L.J. Star*, 2020 WL 1957155, at *5 (quoting *Eversole v. Durrani*, No. 1:18-cv-856, 2019 WL 5846974, at *2 (S.D. Ohio Apr. 16, 2019)); *Lexmark I*, 291 F.R.D. at 174 (collecting cases); *see also Lexmark I*, 291 F.R.D. at 175 (noting that even when a country objects to certain provisions of the Hague Convention, courts have concluded email service is not prohibited and collecting cases).

Finally, email service comports with due process principles. To satisfy the Due Process Clause, service of process must be "reasonably calculated, under all the circumstances, to apprize interested parties of the pendency of the action and afford them an opportunity to present their objections." *Lexmark II*, 295 F.R.D. at 261 (citation omitted). Courts consider several factors when evaluating whether email service is constitutional, such as whether, despite the plaintiff's diligence in its investigative efforts, it is not possible "to arrange for formal service" on the defendant at a physical address. *E.g.*, *L.J. Star*, 2020 WL 1957155, at *5; *Celgene Corp. v. Blanche Ltd.*, No. 16-501 (SDW) (LDW), 2017 WL 1282200, at *2 (D.N.J. Mar. 9, 2017). Courts also assess whether the defendant's primary activities, businesses, or communications, are online, and whether a defendant provides an email address to contact them at on their website. *See, e.g.*, *Lexmark II*, 295 F.R.D. at 262; *BBK Tobacco & Foods, LLP v. Gooshelly*, 613 F. Supp. 3d 1012, 1015 (E.D. Mich. 2020); *Popular Enters., LLC v. Webcom Media Grp., Inc.*, 225 F.R.D. 560, 562–63 (E.D. Tenn. 2004); *Chanel*, 2010 WL 396357, at *4; *Philip Morris USA Inc. v. Veles Ltd.*, No. 06 CV 2988 (GBD), 2007 WL 725412, at *2–3 (S.D.N.Y. Mar. 12, 2007) (holding fax and email service was valid). It is also important that the email address proposed for service of process is valid and does not result in a "bounce-back" error message, indicating an email is undeliverable.

*E.g.*, *L.J. Star*, 2020 WL 1957155, at *5; *FKA Distrib. Co., LLC v. Yisi Tech. Co.*, No. 17-cv-10226, 2017 WL 4129538, at *2 (E.D. Mich. Sept. 19, 2017).

The Ninth Circuit's analysis in *Rio Properties, Inc.*, 284 F.3d 1007, is instructive. When the plaintiff was unable to serve the defendant "by conventional means," the plaintiff moved for alternative service by email. *Rio Props.*, 284 F.3d at 1016. The Ninth Circuit concluded email service was constitutionally appropriate because the defendant had "structured its business such that it could be contacted *only* via its email address. [The defendant] listed no easily discoverable street address . . . . Rather, on its website and print media, [the defendant] designated its email address as its preferred contact information." *Id.* at 1018. For these reasons, the court observed that email service "was the method of service most likely to reach [the defendant]" and thus constitutional. *Id.* at 1017.

Email service is reasonably calculated to notify Anna's Archive. Despite its diligence, OCLC has been unable to locate a physical address for Anna's Archive, (Kim Decl. ¶ 9), because Anna's Archive and the individuals behind it have taken extreme measures to conceal any identifying information about Anna's Archive and themselves, *see supra* Part II.C. The fact that OCLC was able to identify even one individual—Defendant Matienzo—is evidence of OCLC's diligence. As in *Rio Properties*, Anna's Archive has structured its activities and operations so that they occur exclusively online; Anna's Archive is a digital pirate library, and its associated activities also include computer hacking and data scraping. Moreover, email is the only reliable method of contacting it and the preferred method of contacting it because it is the only possible method of contacting Anna's Archive.

Anna's Archive itself has provided three emails and noted that email is the way to contact it, as in *Rio Properties*. On the main domains associated with Anna's Archive, Anna's Archive

has provided the email addresses AnnaArchivist@proton.me and AnnaDMCA@proton.me under the "Stay in touch" section on the homepage.  Walker Decl.  ¶ 4.  Anna's Archive also provides the email address AnnaDMCA@proton.me for the express purpose of reporting complaints under the Digital Millennium Copyright Act of 1998 and other copyright laws.  *Id.* ¶ 11.  Finally, Anna's Archive also provides the email address AnnaArchivist+security@proton.me so that users may report security flaws in Anna's Archive's systems to Anna's Archive.  *Id.* ¶ 12.  For each of these three emails, Anna's Archive has provided the email addresses, invited the public to contact it at those addresses, and has a motivating interest in monitoring those emails, whether the email addresses are the primary form of communication, raise legal issues that may result in the domains being taken down, or raise security issues Anna's Archive would desire to resolve in order to continue its operations.  *See id.* ¶¶ 4, 11–12.

Service at the email provided for the domain registration of annas-archive.org is also constitutionally appropriate as an additional point of contact.  In order to conceal the ultimate site operator(s) of annas-archive.org, Anna's Archive selected Tucows, Inc. to serve as its proxy for registering the domain.  *See id.* ¶ 13.  When Tucows, Inc. registered the domain, it provided the email address, domainabuse@tucows.com.  *See id.*  Anna's Archive thus relied on Tucows, Inc. as its agent to supply an email address.  *See id.*  Under circumstances like this, federal courts have permitted email service at the registration email.  *E.g.*, *Chanel*, 2010 WL 396357, at *2, 5; Walker Decl. ¶ 20, Exh. J at 4–6 (Memo. of Law in Support of Pl.'s Mot. to Serve Defs. By Email, *Cengage Learning, Inc. v. Does 1–50*, No. 1:23-cv-8136-CM (S.D.N.Y. Oct. 9, 2023) (identifying registrant emails)); Walker Decl. ¶ 21, Exh. K (Memo. Endorsement, *Cengage Learning, Inc. v. Does 1–50*, No. 1:23-cv-8136-CM (S.D.N.Y. Oct. 10, 2023) (granting motion to serve by email)).

Importantly, there is other evidence that these email addresses are valid.  OCLC's counsel has sent emails to each of these addresses without receiving any bounce-back or other delivery error messages.  Walker Decl. ¶¶ 6, 17, 18.  Counsel also received an automated message from the email@tucows.com address, confirming the email was received.  *Id.* ¶ 18.  Additionally, after counsel sent Anna's Archive a copy of its cease and desist letter by email at AnnaArchivist@proton.me, Anna's Archive took down its X account (formerly known as Twitter) and has not posted the results of the "mini-competition" for the best use of OCLC's WorldCat® data that Anna's Archive stated it would announce after the close of the competition on December 1, 2023.  *Id.* ¶¶ 7, 9.  These facts raise the reasonable inference that Anna's Archive was acting in response to OCLC's cease and desist letter, demonstrating that it received and read the correspondence from counsel that was sent to the email address.  For these reasons, service upon Anna's Archive at these four email addresses is reasonably calculated to apprize Anna's Archive of the lawsuit against it and give it the opportunity to object, and thus comports with notions of due process.

When dealing with online wrongdoers wielding modern technology to cloak their identities and flout the consequences of their actions, courts have the discretion and flexibility under Rule 4(f)(3) to permit email service.  Indeed, "email may be the only means of effecting service of process" on such a "scofflaw."  *Rio Props.*, 284 F.3d at 1018.  Under these circumstances, federal courts have refused to let a defendant "evade service by confining himself to modern technological methods of communication not specifically mentioned in the Federal Rules.  Rule 4(f)(3) appears to be designed to prevent such gamesmanship by a party."  *In re Int'l Telemedia Assocs., Inc.*, 245 B.R. 713, 722 (Bankr. N.D. Ga. 2000).  In fact, Rule 4(f)(3) "is expressly designed to provide courts with broad flexibility in tailoring methods of service to meet the needs of particularly

difficult cases. Such flexibility necessarily includes the utilization of modern communication technologies to effect service when warranted by the facts." *Popular Enters.*, 225 F.R.D. at 562; *Fed. Trade Comm'n v. Repair All PC, LLC*, No. 1:17 CV 869, 2017 WL 2362946, at *3 (N.D. Ohio May 31, 2017) ("Rule 4(f)(3) empowers the court with flexibility and discretion to fit the manner of service utilized to the facts and circumstances of the particular case."). Such discretion would be appropriately exercised here.

## IV.    CONCLUSION

For the reasons above, Plaintiff OCLC, Inc. respectfully requests that this Court grant its Motion to Serve Defendant Anna's Archive by Email.

Respectfully submitted,

Dated: January 24, 2024                    /s/ *Jeffrey M. Walker*

Jeffrey M. Walker (0096567), Trial Attorney
Traci L. Martinez (0083989)
Kathryn M. Brown (0100426)
Brittany Silverman (0102263)
SQUIRE PATTON BOGGS (US) LLP
2000 Huntington Center
41 South High Street
Columbus, Ohio  43215
Telephone: +1 614 365 2700
Facsimile: +1 614 365 2499
traci.martinez@squirepb.com
jeffrey.walker@squirepb.com
kathryn.brown@squirepb.com
brittany.silverman@squirepb.com

*Attorneys for Plaintiff, OCLC, Inc.*

**CERTIFICATE OF SERVICE**

On January 24, 2024, this document and the accompanying exhibits were filed electronically with the Clerk of the United States District Court for the Southern District of Ohio, Eastern Division and will be served upon Defendant Matienzo at the following address:

Maria Matienzo
5127 S. Holly St.
Seattle, WA  98118

Additionally, a courtesy copy of this document and the accompanying exhibits were sent via email to Defendant Anna's Archive at the following email addresses:

AnnaArchivist@proton.me
AnnaDMCA@proton.me
AnnaArchivist+security@proton.me
domainabuse@tucows.com

/s/ *Jeffrey M. Walker*
One of the Attorneys for Plaintiff