IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**OCLC, INC.,**

      **Plaintiff,**

      vs.

**ANNA'S ARCHIVE,** *et al.,*

      **Defendants.**

Case No. 2:24-cv-144

Judge Michael H. Watson
Magistrate Judge Elizabeth P. Deavers

## OPINION AND ORDER

This matter is before the Court for consideration of Plaintiff OCLC, Inc.'s ("OCLC") Motion to Serve Defendant Anna's Archive by Email.  (ECF No. 9.)  For the following reasons, Plaintiff's Motion is **GRANTED.**

OCLC, a non-profit library service and research organization, filed this action seeking declaratory and injunctive relief and damages on January 12, 2024, naming as Defendants Anna's Archive f/k/a Pirate Library Mirror ("Anna's Archive"), Maria Dolores Anasztasia Matienzo ("Matienzo"), and John Does 1-20.  (ECF No. 1.)  On January 16, 2024, summons was issued as to Matienzo at an address in Seattle, Washington.  (ECF No. 8.)  On January 26, 2024, a waiver of service was returned executed by counsel located in Columbus, Ohio, indicating a service date of January 16, 2024.  (ECF No. 10.)   Following a stipulated extension of time, Matienzo has until April 8, 2024, to file an Answer or otherwise respond to the Complaint.  (ECF No. 13.)

In its Complaint, OCLC alleges that Defendants illegally hacked and harvested the data of its proprietary website, WorldCat.org.  OCLC describes its WorldCat® database as the "premiere bibliographic record and cataloging product for libraries" and WorldCat.org as "the world's largest library catalog website, and its search engine queries the WorldCat® database for bibliographic records, connecting individuals to the library holdings at their local libraries." (ECF No. 1, ECF No. 9 at 3.)  OCLC further alleges that "the individual Defendants own, operate, and/or control Defendant Anna's Archive, the world's largest shadow or pirate library." (*Id.*)  According to OCLC, as an online pirate library search engine, Anna's Archive "distributes and makes available for free download through file torrents materials in violation of copyright laws."  (*Id.*; ECF No. 9 at 6.)  OCLC explains that, in the fall of 2022, it began to experience persistent cyberattacks and learned in October 2023 that Defendants were behind these attacks. Following these attacks, OCLC asserts that Defendants have "torrented" 2.2TB of WorldCat® data, representing 97.4 of all WorldCat® records.

OCLC further contends that Defendants do not dispute either their actions or the illegality of those actions.  To this point, OCLC cites a blog post published by Anna's Archive boasting that it "meticulously scraped all WorldCat records" and detailing its efforts.  For this reason, OCLC explains, Defendants go to great lengths to remain anonymous, with none of Anna's Archives domains or its online blog providing a business address, business contact, or other contact information.  OCLC maintains that, despite its diligent efforts, it has been unable to uncover such information.

To demonstrate its diligence, OCLC has submitted a declaration from Catarina Kim, the Managing Director & Global Practice Leader for the Intelligence Group within Stroz Friedberg, an Aon company ("Aon").  (Declaration of Catarina Kim, ECF No. 9-1, "Kim Decl.")  In

connection with this litigation, Plaintiff's counsel engaged Aon, a consulting firm providing services across cyber security, digital forensics and incident response, investigations and risk management. (*Id.* at ¶¶ 1, 2.) Ms. Kim details the results of her research as follows.

Anna's Archive currently utilizes at least twenty-three unique or rerouting domains or website addresses. (Kim Decl., ECF No. 9-1 at ¶ 4.) Anna's Archive publicizes three main domains, annas-archive.org, annasarchive..se, and annas-archive.gs, two of which use foreign country countries—Sweden ("se") and South Georgia and the South Sandwich Islands (".gs."). (*Id.* at ¶ 5.) While Anna's Archive uses some domestic top-level hosting providers, such as Cloudflare, this does not indicate that Anna's Archive is located in the United States. (*Id.* at ¶ 6.) Based on a blog post published on March 19, 2023, Ms. Kim understands Anna's Archive selected Cloudflare as a top-level host for the primary purpose of obscuring any physical location or other identifying information. Anna's Archive uses mostly foreign hosts, registrars and registrants. (*Id.* at ¶ 7.) These hosts, registrars, and registrants are located in Bulgaria, Canada, Finland, France, Germany, Iran, Japan, the Netherlands, St. Kitts and Nevis, Turkey, and Ukraine. (*Id.* ¶ 7, Exhibit B.) Anna's Archive engaged registrant proxies to avoid disclosing their identifiers when registering their various domains. (*Id.*) Entities serving as a registrant, in turn, use proxy services to protect, redact, or obfuscate registrant information and contact details in domain records. (*Id.*) The registrant entities also use proxy servers to conceal the end user's IP address, webpage servers, and/or identity from the internet. (*Id.*)

Ms. Kim further states that, based on her research and investigation, the majority of individuals and entities associated with Anna's Archive are likely foreign, located outside the United States. (Kim Decl., ECF No. 9-1 at ¶ 8.) She explains that Anna's Archive and the individual defendants that own, operate, and/or control Anna's Archive rely heavily on foreign

3

intermediaries to operate the sites associated with Anna's Archive.  (*Id.*)  Thus, the individual defendants have also sought to conceal their identities when registering the Anna's Archive domain names; including by using proxy services, proxy servers, and a reverse-proxy servers to anoriymize and conceal their personally identifying information.  (*Id.*)

According to Ms. Kim, Aon attempted to locate a physical address for Anna's Archive and the individuals behind it by reviewing Anna's Archive's known websites, domain records, and Domain Name System (`"DNS") data points.  (Kim Decl., ECF No. 9-1 at ¶ 9.)  However, Anna's Archive's domain records use privacy protection features to redact details about its registrants and their physical location.  (*Id.*)  Thus, none of the domains provide registrant information such as formal business name, contact name, business address, or telephone number nor do these sites provide a "contact us" page that provides contact information that can be attributed to a real person.  (*Id.*)  Further, Aon relied on commercial databases containing domain records, United States public aggregators, a Brazilian public records database, and databases that index the deep and dark web.  (*Id*. at ¶ 10.)  Aon, however, was unable to locate a physical address associated with Anna's Archive.  (*Id.*)

Citing the above testimony, OCLC contends that Anna's Archive "likely" is a foreign entity.  (ECF No. 9 at 4.)  Further, OCLC alleges that Anna's Archive purports to be a non-profit (Complaint, ECF No. 1 at ¶ 18) and is thus a "foreign corporation, or a partnership or other unincorporated association that is subject to suit under a common name," as contemplated by Fed.R.Civ.P. 4(h).  Rule 4(h)(2) provides that a "foreign corporation, or a partnership or other unincorporated association that is subject to suit under a common name, must be served," if outside the United States, "in any manner prescribed by Rule 4(f) for serving an individual, except for personal delivery under (f)(2)(C)(i)."  Fed. R. Civ. P. 4(h)(2).  OCLC, relying solely

4

on Rule 4(f)(3) here, contends that email service is the only "likely" and reliable way to effectuate service. (ECF No. 9 at 4.)

Initially, the Court notes that Rule 4(f) provides three avenues for service on individuals in a foreign country, generally: (1) "by any internationally agreed means of service that is reasonably calculated to give notice," (2) "as prescribed by the foreign country's law for service," "as the foreign authority directs in response to a letter rogatory or letter of request," or by personal or mail service, and (3) "by other means not prohibited by international agreement, as the court orders." Fed.R.Civ.P. 4(f)(1)–(3). OCLC, in identifying Rule 4(f)(3) as the only avenue available for service on Anna's Archive, asserts that it is not required to exhaust the other methods contemplated by Rule 4(f) prior to seeking to use alternative means under that subsection. The Court agrees that such exhaustion is not required. *See Lexmark Int'l, Inc. v. Ink Techs. Printer Supplies, LLC*, 295 F.R.D. 259, 261 (S.D. Ohio 2013) ("Notably, courts have consistently found that there is not a hierarchy among the subsections of Rule 4(f) … As such, a plaintiff is not required to first exhaust the methods contemplated by Rule 4(f)(1) and (2) before petitioning the Court for permission to use alternative means under Rule 4(f)(3).") (collecting cases).

Under the plain language of Rule 4(f)(3), "there are only two requirements for service: (1) it must be directed by the court, and (2) it must not be prohibited by international agreement." *Lexmark Int'l*, 295 F.R.D. at 174. Here, OCLC seeks the Court's permission to serve by email. If the Court grants OCLC's request, the first element is met. *AmaTech Grp. Ltd. v. Fed. Card Servs., LLC*, No. 1:21-CV-00406, 2021 WL 3674821, at *3 (S.D. Ohio Aug. 19, 2021). Thus, the Court's focus here is on the second element – whether the service requested here is prohibited by international agreement.

"As this Court has recognized, courts have repeatedly found that email service is not prohibited by the Hague Convention." *Eversole v. Durrani*, No. 1:18-cv-856, 2019 WL 5846974, at *2 (S.D. Ohio Apr. 16, 2019) (citing *Medical Protective Co. v. Center for Advanced Spine Tech., Inc.*, No. 1:14-cv-005, 2014 WL 12653861, at *2 (S.D. Ohio Jan. 13, 2014)). Of course, in so stating, "the Court assumes that the Hague Convention applies." *AmaTech Grp.*, 2021 WL 3674821, at *3. As noted above, however, OCLC asserts only that "it is highly likely that Anna's Archive is a non-domestic foreign entity." (ECF No. 9 at 9.) Thus, Plaintiff has not identified a specific foreign country in which Anna's Archive may be residing.

This circumstance "might seem to jeopardize the Court's ability to determine whether an international agreement 'prohibits' a particular form of service for Rule 4(f)(3) purposes." *AmaTech Grp.*, 2021 WL 3674821, at *3. Case law, however, "suggests that the serving party need only 'make reasonably diligent efforts to learn the defendant's mailing address' for Rule 4(f) purposes." *Id.* (quoting *Luxottica Grp. S.p.A. v. P'ships and Unincorporated Assocs. Identified on Schedule A*, 391 F. Supp. 3d 816, 822 (N.D. Ill. 2019)). Here, OCLC undertook such efforts as detailed above and supported by Ms. Kim's declaration. Thus "any mystery about [Anna's Archive's] current country of residence does not derail Plaintiff's request for substitute service under Rule 4(f)(3)." *Kuhlman v. McDonnell*, No. 1:20-CV-00510, 2021 WL 306468, at *2 (S.D. Ohio Jan. 29, 2021). However, "Rule 4(f)(3) only permits service by "'means not prohibited by international agreement,' so there is a possibility [Anna's Archive] might be residing in a country that prohibits international email service." *Id.* (citing *Luxottica*, 391 F.Supp.3d at 827).

Nevertheless, the lack of "surefire evidence" of a defendant's country of residence does not necessarily prohibit email service for purposes of Rule 4(f)(3). *Kuhlman*, at *2; *see also*

6

*AmaTech*, 2021 WL 3674821, at *3 ("it appears that a well-founded belief that a party is residing in a country that does not prohibit email service suffices for purposes of Rule 4(f)(3) (both citing *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1013 (9th Cir. 2002)). In *Rio*, the appeals court addressed circumstances where reliance on service under Rule 4(f)(3) is appropriate. One such instance is when a moving party can demonstrate that the facts and circumstances necessitate district court intervention "in the face of an 'inability to serve an elusive international defendant, striving to evade service of process.'" *AmaTech*, at *3 (quoting *Rio* at 1016). That appears to be the situation here. As Ms. Kim's declaration suggests, Anna's Archive "seems to be striving, either actively or passively to evade [OCLC's] efforts to serve [it]." *Id*. at *4.

This conclusion, however, does not end the Court's analysis. Instead, Plaintiff also must demonstrate that "the chosen method comports with constitutional notions of due process, namely that the service of process be 'reasonably calculated, under all the circumstances, to apprize interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Lexmark Int'l,* 295 F.R.D. at 261 (quoting *Studio A Entm't, Inc. v. Active Distrib., Inc.,* No. 1:06-cv-2496, 2008 WL 162785, at *2–3 (N.D. Ohio Jan. 15, 2008)). On this issue, OCLC has submitted a declaration from its counsel Jeffrey M. Walker. (Declaration of Jeffrey M. Walker, ECF No. 9-2, "Walker Decl.")

According to Mr. Walker's declaration, the primary domains utilized by Anna's Archive "provide an anonymized, principal email address, annaarchivist@proton.me, under a "Stay in touch" section toward the bottom of the primary domains' home pages, … indicat[ing] that Anna's Archive is actively monitoring this email address for general inquiries (Walker Decl. at ¶ 4, Exhibit A.) Mr. Walker further states that, "[o]n October 26, 2023, [he] sent a cease-and-desist letter on behalf of OCLC to Anna's Archive at this principal email address, requesting that

7

Anna's Archive immediately stop the misuse and distribution of the WorldCat® data that Defendants had illegally hacked, scraped, and harvested." (*Id*. at ¶ 5, Exhibit B.) The letter included a request that Anna's Archive take down from its websites all links to OCLC's data, delete copies of the data, and cease its encouragement of others to engage in similar behavior. (*Id*.) Mr. Walker received no bounce-back or other error messages in connection with this email. (*Id.* at ¶ 6.) Between October 26, 2023, and November 13, 2023, Anna's Archive deleted its X account (formerly Twitter), indicating that Anna's Archive had received OCLC's cease-and- desist letter and was taking actions in response to the letter. (*Id*. at ¶ 7.)

Mr. Walker states that, in the October 3, 2023, blog post publicizing its illegal hacking, data scraping, and harvesting of WorldCat.org, Anna's Archive announced that it was a hosting a "mini-competition to analyze these data" and that "[t]he 3 best submissions by 2023-12-01 will win a year-long membership of Anna's Archive." (Walker Decl. at ¶ 8, Exhibit C.) To date, Anna's Archive has not announced any winners of this "mini-competition" on its blog or other domains, indicating that Anna's Archive received OCLC's cease-and-desist letter and was taking actions in response to the letter. (*Id*. at ¶ 9.)

Mr. Walker further explains that, through its Primary Domains, Anna's Archive provides another email address, AnnaDMCA@proton.me, also under the "Stay in touch" section on the websites' home pages. (Walker Decl. at ¶ 10, Exhibit A.) Anna's Archive holds this email address out as the address where users can lodge complaints under the Digital Millennium Copyright Act of 1998 ("DCMA") with Anna's Archive or troubleshoot issues with Anna's Archive's "DCMA/Copyright Claim Form." According to Mr. Walker, this indicates that Anna's Archive is actively monitoring this email address in order to respond to legal issues related to the DCMA and other copyright laws. (*Id*. at ¶ 11, Exhibit D.) Anna's Archive also

8

provides the email address AnnaArchivist+security@proton.me on a webpage dedicated to security issues. (*Id.* at ¶ 12.) On this webpage, Anna's Archive invites "security researchers" to "[c]ontact us" with "vulnerabilities in our systems." (*Id.*) In Mr. Walker's view, this statement demonstrates that Anna's Archive is actively monitoring this email address in order to rectify security issues on the systems critical for its operations. (*Id.*)

Finally, Mr. Walker asserts that the domain registration for annas-archive.org belongs to Tucows, Inc., an entity that offers domain name services so that an individual or entity can obscure their identity and identifying information, which must be provided when a domain name is purchased and registered with the Internet Corporation for Assigned Names and Numbers ("ICANN"). The only email address for reporting domain abuse on the ICANN registration for annas-archive.org is domainabuse@tucows.com. (*Id*. at ¶ 13.)

Based on the detailed information set forth in Mr. Walker's declaration, the Court is satisfied that serving Anna's Archive via email comports with due process. Accordingly, OCLC may serve Anna's Archive via email pursuant to Rule 4(f)(3).

For these reasons, Plaintiff's Motion to Serve Defendant Anna's Archive by Email (ECF No. 9) is **GRANTED.** Plaintiff is authorized to serve Defendant Anna's Archive at the following email addresses:

 AnnaArchivist@proton.me,
 AnnaDMCA@proton.me,
AnnaArchivist+security@proton.me, and
domainabuse@tucows.com.

Plaintiff shall present to the Office of the Clerk summons directed to Defendant Anna's Archive at these email addresses. Plaintiff shall serve the Complaint, summons, and the other case-initiating documents upon Defendant Anna's Archive. Plaintiff's counsel shall file a declaration of proof of service in lieu of a signed receipt.

9

**IT IS SO ORDERED.**

**DATED:  March 22, 2024**

/s/ *Elizabeth A. Preston Deavers*
**ELIZABETH A. PRESTON DEAVERS**
**UNITED STATES MAGISTRATE JUDGE**