UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

OCLC, Inc.,

    Plaintiff,

v.

Anna's Archive, f/k/a
Pirate Library Mirror, *et al.*,

    Defendants.

Case No. 2:24-cv-144

Judge Michael H. Watson

Magistrate Judge Deavers

## OPINION AND ORDER

This case is about data scraping.[1] Plaintiff Online Computer Library Center, Inc. ("OCLC") is a non-profit organization that helps libraries organize and share resources. In collaboration with its member libraries, OCLC created and maintains WorldCat—the most comprehensive database of library collections worldwide. OCLC alleges that a "pirate library"[2] named Anna's Archive along with Maria Matienzo, and other unknown individuals (collectively, "Defendants") scraped WorldCat's data. OCLC claims that, in doing so, Defendants violated Ohio law. Specifically, OCLC invokes causes of action

---

[1] "Data scraping" is the process of retrieving and copying website data using a program that sends tailored queries to websites (the programs are called "bots," "spiders," or "web crawlers"). *See* Andrew Sellars, *Twenty Years of Web Scraping and the Computer Fraud and Abuse Act*, 24 B.U. J. Sci. & Tech. L. 372, 373, 381–88 (2018); *see also Screen-Scraping*, Black's Law Dictionary (11th ed. 2019) ("[t]he practice of extracting data directly from one website and displaying it on another website.")

[2] A "pirate library" is an online database that provides free access to content that is otherwise not widely accessible to the public. *See generally* Compl. ¶¶ 60–74. This includes standard library content (books, academic articles, software, film, videos, or audio files). *See id.*

arising under the Ohio common law of tort, contract, and property, as well as a provision of the Ohio criminal code.[3]

But whether Ohio law prohibits the data scraping alleged here poses "novel and unsettled" issues. No Ohio court has ever applied its law as OCLC would have this Court do (as far as the Court is aware).[4] Nor have courts uniformly applied analogous laws of other jurisdictions that way.[5] So, to resolve this case, the Court would need to answer "novel and unsettled" questions about Ohio law.

When that is true—when a federal court faces "novel and unsettled" state-law issues—the federal court may certify those issues to the state's high court. Unwilling to sleepwalk into a drastic expansion of Ohio law, this Court thus resolves to certify the issues presented here.

---

[3] OCLC relies on diversity jurisdiction to bring its claims here. Compl. ¶ 21, ECF No. 1.

[4] *But cf. generally Snap-on Bus. Sols. Inc. v. O'Neil & Associates, Inc.*, 708 F. Supp. 2d 669 (N.D. Ohio 2010) (data scraping case arising under Ohio law).

[5] *Cvent, Inc. v. Eventbrite, Inc.*, 739 F. Supp. 2d 927, 937 (E.D. Va. 2010) (no contract); *Andersen v. Stability AI Ltd.*, 744 F. Supp. 3d 956, 971–73 (N.D. Cal. 2024) (no unjust enrichment); *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1194–1202 (9th Cir. 2022) (no crime); *Intel Corp. v. Hamidi*, 71 P.3d 296, 308–11 (2003) (no trespass to chattels); *Healthcare Advocates, Inc. v. Harding*, 497 F. Supp. 2d 627, 650 (E.D. Pa. 2007) (no trespass to chattels or conversion).

## I. BACKGROUND

### A. OCLC brings twelve claims against Defendants.

Count I claims breach of contract. Compl. ¶¶ 122–27, ECF No. 1. To support this claim, OCLC alleges that Defendants breached WorldCat.org's Terms and Conditions ("Terms") by scraping its data; using that data for their own commercial purposes; displaying, distributing, and disclosing that data; and permanently storing it. *See id.*

Count II claims unjust enrichment. *Id.* ¶¶ 128–34. To support this claim, OCLC alleges that Defendants retained the benefit of WorldCat's data for free, knowing it was beneficial. *See id.* Defendants' retention was "unjust" and "in bad faith," according to OCLC, because Defendants "gave away" what they knew was proprietary data. *See id.* ¶ 132.

Counts III–VI claim tortious interference. *Id.* ¶¶ 135–67. To support Count III, OCLC alleges that, when Defendants scraped and distributed WorldCat's data, they knowingly and unjustifiably made it more difficult for OCLC to fulfill its customer agreements and made it more likely that current customers would cancel those agreements. *See id.* ¶¶ 135–42. To support Count V, OCLC alleges the same for prospective customers. *See id.* ¶¶ 151–58. Counts IV and VI allege that, to tortiously interfere with these current and prospective contracts, Defendants conspired. *Id.* ¶¶ 143–50, 159–67.

Counts VII and VIII claim a criminal violation. *See id.* ¶¶ 168–81. To support Count VII, OCLC alleges that, in scraping WorldCat's public and

subscriber-only data, Defendants violated Ohio Revised Code § 2913.04(B), which states:

> No person, in any manner and by any means, including, but not limited to, computer hacking, shall knowingly gain access to, attempt to gain access to, or cause access to be gained to any computer, computer system, computer network, cable service, cable system, telecommunications device, telecommunications service, or information service without the consent of, or beyond the scope of the express or implied consent of, the owner of the computer, computer system, computer network, cable service, cable system, telecommunications device, telecommunications service, or information service or other person authorized to give consent.

Based on Defendants' alleged criminal hack, OCLC seeks civil recovery under Ohio Revised Code § 2307.60. Compl. ¶¶168–73, ECF No. 1. Count VIII alleges that, to criminally hack WorldCat, Defendants conspired. *Id.* ¶¶ 174–81.

Counts IX and X claim trespass to chattels. *Id.* ¶¶ 182–97. To support Count IX, OCLC alleges that Defendants intentionally "intermeddled" with WorldCat's data and servers, thereby impairing WorldCat's data and damaging OCLC's servers. *See id.* ¶¶ 182–89. Count X alleges that, to "intermeddle" with WorldCat's data, Defendants conspired. *Id.* ¶¶ 190–97.

Counts XI and XII claim conversion. *Id.* ¶¶ 198–213. To support Count XI, OCLC alleges that, by scraping WorldCat's data, Defendants "exercised control and dominion over" and thereby "substantially and unreasonably interfered with" OCLC's property rights. *See id* at ¶¶ 198–205. Count XII alleges that, to convert OCLC's property, Defendants conspired. *Id.* ¶¶ 206–13.

**B. After Anna's Archive failed to participate, OCLC moved for default judgment on all twelve of its claims.**

OCLC filed its Complaint on January 12, 2024. The Court permitted OCLC to serve Anna's Archive by email, ECF No. 4, but Anna's Archive has thus far failed to respond to the Complaint or otherwise participate. The Clerk accordingly awarded OCLC an entry of default on June 28, 2024. ECF No. 39. OCLC then moved for default judgment against Anna's Archive. ECF No. 40. Uncertain about the legal propriety of data scraping, the Court requested additional briefing on whether OCLC's well-pleaded factual allegations state a claim for relief. ECF No. 42. OCLC submitted the requested supplemental brief, and the Court has reviewed it. ECF No. 46.

## II. DISCUSSION

**A. Federal law permits, and Ohio law invites, federal courts to certify questions—especially new, unsettled, and determinative questions—to the Supreme Court of Ohio.**

A federal court's normal course, when presented with an issue of state law, is to "make an *Erie* guess to determine how [a state supreme court], if presented with the issue, would resolve it." *Conlin v. Mortg. Elec. Registration Sys., Inc.*, 714 F.3d 355, 358–59 (6th Cir. 2013). Federal courts do "not trouble our sister state courts every time an arguably unsettled question of state law comes across our desks." *State Auto Prop. & Cas. Ins. v. Hargis*, 785 F.3d 189, 194 (6th Cir. 2015) (internal citation and quotation omitted). Instead, "[w]hen we see a reasonably clear and principled course, we will seek to follow it ourselves";

"[t]he state court need not have addressed the exact question, so long as well-established principles exist to govern a decision." *Id.*

That said, through "certification," a federal court may (in its sound discretion) request that a state's highest court answer a state-law question *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974). Federal courts may do so sua sponte. *See, e.g., Elkins v. Moreno*, 435 U.S. 647, 662 (1978); *Planned Parenthood of Cincinnati Region v. Strickland*, 531 F.3d 406, 408 (6th Cir. 2008). As the Supreme Court of Ohio recognizes, "[c]ertification ensures that federal courts will properly apply state law." *Scott v. Bank One Tr. Co.*, 577 N.E.2d 1077, 1081 (Ohio 1991) (per curiam); *see also id.* at 1080 ("[A]nswering certified questions serves to further the state's interests and preserve the state's sovereignty."). And, as federal courts recognize, this mechanism not only preserves "time, energy, and resources" but also furthers "cooperative judicial federalism." *Lehman Bros.*, 416 U.S. at 391.

To these ends, federal courts routinely certify new, unsettled, and determinative state-law questions. *See, e.g., In re Natl. Prescription Opiate Litig.*, 82 F.4th 455 (6th Cir. 2023), *certified question accepted sub nom. Natl. Prescription Opiate Litig. v. Purdue Pharma, L.P.*, 222 N.E.3d 661 (Ohio 2023), *and certified question answered*, 2024-Ohio-5744.

Parallel with the federal "new, unsettled, and determinative" standard, the Supreme Court of Ohio's Rules of Practice provide that

> The Supreme Court [of Ohio] may answer a question of law certified to it by a court of the United States . . . if the certifying court, in a proceeding before it, issues a certification order finding there is a question of Ohio law that may be determinative of the proceeding and for which there is no controlling precedent in the decisions of Supreme Court [of Ohio].

Ohio S. Ct. Prac. R. 9.01(A). This Court makes that finding here.

### B. OCLC's data-scraping claims pose many new and unsettled questions of Ohio law.

Data scraping's status under the common law is an "enigma."[6] No doubt established property, tort, and contract causes of action "*may* be available" to self-described "victims of data scraping." *hiQ Labs*, 31 F.4th at 1201–02 (emphasis added). But are they available? If so, which? And under what circumstances? Ohio law provides no settled answers. Without these answers, the Court remains uncertain whether OCLC's well-pleaded factual allegations state any claim for relief. The Court elaborates on its uncertainty below for each of OCLC's causes of action.

---

[6] Benjamin L.W. Sobel, *A New Common Law of Web Scraping*, 25 LEWIS & CLARK L. REV. 147, 150 (2021); *see also* Sellars, *supra*, note 1, at 377, 377 n.38 ("Most often the legal status of scraping is characterized as something just shy of unknowable, or a matter entirely left to the whims of courts, plaintiffs, or prosecutors."); Jeffrey K. Hirschey, *Symbiotic Relationships: Pragmatic Acceptance of Data Scraping*, 29 BERKLEY TECH. L.J. 897, 897, 926 (2014) (describing the "uncertain legal background of scraping case law" and observing that the "legal doctrines involved in scraping suits are in flux").

1. **OCLC's contract claim raises "new and unsettled" questions about adhesive "browserwrap" contracts and preemption.**

    a. **When browserwrap contracts are enforceable under Ohio law is an open question.**

To establish a breach of contract claim, OCLC must (of course) identify a contract between it and Defendants. OCLC points to WorldCat.org's Terms. Compl. ¶ 123, ECF No. 1. Those Terms prohibit WorldCat.org users from: scraping material amounts of data; distributing, displaying, or disclosing that data; storing that data long-term; or using that data for commercial use. Compl. Ex. B, ECF No 1-2 at PAGEID # 46–51. Accepting OCLC's well-pleaded factual allegations as true, Defendants no doubt violated these Terms. *See, e.g.*, Compl. ¶¶ 86–95, ECF No. 1.

But did the Terms bind Defendants? Ohio law provides no answer because WorldCat.org's Terms are "browserwrap."

Contracts on the internet roughly divide into clickwrap and browserwrap. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014). Clickwrap requires a website user to manifest assent to terms (usually by clicking an "I agree" box) before the user can access the portion of the site to which the terms apply. *Id.* Browserwrap, by contrast, does not require a user to manifest assent to a website's terms before the user can access the site. *Id.* Rather, Browserwrap assumes assent to the site terms based on mere use of the site. *Id.* Websites often make browserwrap terms available on a dedicated page, accessible via a hyperlink at the bottom of the screen. *Id.* WorldCat.org makes

its Terms available this way (on a separate page, accessible via a hyperlink at the bottom of the screen). Its Terms are therefore browserwrap.

Courts often decline to enforce browserwrap. *See id.* at 1178–79; *CollegeSource, Inc. v. AcademyOne, Inc.*, No. 10-3542, 2012 WL 5269213, at *10 (E.D. Pa. Oct. 25, 2012); *Cvent, Inc.*, 739 F. Supp. 2d at 937. Under the prevailing standard, courts enforce browserwrap terms only if the website user had "actual or constructive knowledge of a site's terms and conditions prior to using the site." *Snap-on*, 708 F. Supp. 2d at 681 (internal citations and quotations omitted). *Snap-on* recognized that "Ohio courts have not specifically discussed the enforceability of browserwrap agreements as contracts" but applied the prevailing standard anyway. *Id.* at 681–83.

If this Court followed *Snap-on* in applying the "actual or constructive knowledge" standard for browserwrap enforceability, this Court would likely decline to enforce WorldCat.org's Terms. OCLC does not plead that Defendants had constructive (or actual) knowledge of WorldCat.org's Terms. So OCLC has not adequately pleaded its contract claim, assuming Ohio courts would apply the "actual or constructive knowledge" standard as *Snap-on* did.

But the Court will not rest on this assumption. Again, Ohio courts have never settled on the "actual or constructive knowledge" standard for browserwrap enforceability. They might do so. Or they might adopt a more stringent standard and require actual knowledge. Different still, they might adopt a less stringent standard and require less than constructive knowledge. Whatever standard Ohio

courts choose, the blast radius will reach all browserwrap contracts, stretching far beyond terms on data scraping. The detonation of that blast belongs to Ohio courts, not this Court.

      **b.    Alternatively, federal copyright law may preempt WorldCat.org's data-scraping Terms, depending on the state-law interest that OCLC's contract suit serves.**

Under a conflict preemption doctrine, federal statutes preempt state-common-law claims "to the extent of any conflict." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (citing U.S. Const. art. VI, cl. 2).

At least one federal court has applied conflict preemption principles to dismiss a data-scraping contract claim. *X Corp. v. Bright Data Ltd.*, 733 F. Supp. 3d 832, 852–53 (N.D. Cal. 2024); *cf. Snap-on*, 708 F. Supp. 2d at 680–81 (unjust enrichment claim preempted). *Bright Data* held that the Copyright Act preempted X's data-scraping-based contract claim because that claim "'amount[s] to little more than camouflage for an attempt to exercise control over the exploitation of a copyright.'" 733 F. Supp. 3d at 853 (quoting *In re Jackson*, 972 F.3d 25, 38 (2d Cir. 2020)).

The same might be said here; OCLC, like X, primarily contends that "improper scraping . . . interferes with [its] own sale of [its] data through a . . . subscription service[.]" *Id.* (internal citations and quotations omitted). And so the Copyright Act may preempt OCLC's contract claim too.

If, however, OCLC can show that its contract claim serves a state-law interest "outside the sphere of congressional concern in the [copyright] laws[,]"

then copyright law does not preempt it. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 155 (1989). Whether OCLC's claim might promote such an interest is as much a question for OCLC as it is for Ohio courts. If a state court's answer to a state-law question might "materially change" the nature of a federal constitutional problem, then certifying that question is warranted. *Bellotti v. Baird*, 428 U.S. 132, 147 (1976)). What state interests OCLC's common-law contract claim serves would "materially" change the preemption problem here. So this Court would like the Supreme Court of Ohio to weigh in on those interests before this Court conducts its full preemption analysis.

> 2. **OCLC's unjust enrichment claim raises "new and unsettled questions" about "unjust retention" and preemption.**
>
>> a. **When retaining scraped data is "unjust" under Ohio law is an open question.**

To establish its unjust enrichment claim, OCLC must adequately plead that Defendants retained the benefit of WorldCat's data "under circumstances in which it was unjust to do so without payment." *See Bunta v. Superior VacuPress, LLC*, 218 N.E.3d 838, 848 (Ohio 2022).

Candidly, the Court does not know how to begin evaluating whether "unjust circumstances" are present here. Is it ever unjust to retain publicly available data? If so, when? The Court presumes that it may sometimes be unjust to retain *private* data, but the Court imagines that the line between public and private data is not easy to draw. For example, is it unjust for someone with a properly obtained password to scrape data from the password-protected parts of

a site? What if they terminate their subscription? Ohio law has yet to even suggest answers to these questions. So, rather than draw the lines itself, the Court will look to the Supreme Court of Ohio for guidance on the contours of an unjust enrichment claim based on data scraping.

### b. Federal copyright law may preempt OCLC's unjust enrichment claim, for the same reasons that it may preempt OCLC's contract claim.

The only court to have applied Ohio common law to data scraping held that federal copyright law preempted a claim for unjust enrichment. *Snap-on*, 708 F. Supp. 2d at 680–81. Courts considering unjust enrichment claims that arise under other states' laws have reached the same conclusion. *See, e.g., Andersen*, 744 F. Supp. 3d at 971–73; *but see Digital Drilling Data Sys., L.L.C. v. Petrolink Services, Inc.*, 965 F.3d 365, 377–82 (5th Cir. 2020) (no preemption). As with OCLC's contract claim, whether federal copyright law preempts its unjust enrichment claim depends on the state-law interests that claim serves. So the Court will invite OCLC and the Supreme Court of Ohio to elaborate on those interests.

### 3. OCLC's tortious interference claims, though inadequately pleaded, raise "new and unsettled" questions on "justification"

#### a. OCLC's tortious interference claims fail because OCLC identifies no actual present or future contracts.

A claim for tortious interference with a contract "requires the plaintiff to prove, as an element, an actual breach of contract." *Lamson & Sessions Co. v. Peters*, 576 F. App'x 538, 542 (6th Cir. 2014) (citing *Fred Siegel Co., L.P.A. v.*

*Arter & Hadden*, 707 N.E.2d 853, 858 (Ohio 1999)). In its Complaint, OCLC neglects to allege any actual breach. *See* Compl. ¶¶120, 135–42, ECF No. 1. OCLC has thus failed to state a claim for tortious interference with contract.

The same goes for OCLC's prospective business relations claim. Under Ohio law, "[a] vague assertion that a party interfered with certain unspecified business relationships is insufficient to state a claim." *BCG Masonic Cleveland, LLC v. Live Nation Ent., Inc.*, 570 F. Supp. 3d 552, 559 (N.D. Ohio 2021) (internal citations and quotations omitted). But vague assertions are all OCLC offers in its Complaint. *See* Compl. ¶¶ 120, 152, ECF No. 1 ("Upon information and belief, as a result of Defendants' plan, one or more OCLC WorldCat® customers or potential WorldCat® customers has or will opt to forego OCLC services, including WorldCat®."). OCLC neglects to specify any particular customers it lost, for example. *See BCG Masonic Cleveland*, 570 F. Supp. 3d at 559 ("[Plaintiff] identifies no musical acts, bands, or tours that [Defendant] prevented [Plaintiff] from booking"). OCLC has thus failed to state a claim for tortious interference with prospective business relationships.

### b. Assuming OCLC can correct this deficiency, the Court will certify a question about "justification."

"Only *improper* interference with a contract is actionable, as reflected in the ['without justification'] element." *Fred Siegel Co*, 707 N.E.2d at 858 (emphasis added). The Court questions when data scraping would be "improper" enough for tortious interference, just as it questions when data scraping would be "unjust"

enough for unjust enrichment (the Court finds little daylight between "improper" and "unjust"). So, as it vowed to do for unjust enrichment, the Court will look to the Supreme Court of Ohio for guidance on the contours of tortious interference claims based on data scraping.

### 4. OCLC's § 2307.60 claims raise "new and unsettled" questions about how § 2913.04 applies to data scraping.

OCLC brings a claim under Ohio Revised Code § 2307.60, which permits civil actions for monetary damages based on Ohio criminal law violations. Defendants violated Ohio criminal law by scraping WorldCat's data, OCLC asserts, pointing to Ohio Revised Code § 2913.04.

Ohio Revised Code § 2913.04 is analogous to the federal Computer Fraud and Abuse Act ("CFAA"). Both criminalize roughly the same conduct: accessing computer property without authorization. *Compare* Ohio Rev. Code § 2913.04(b) ("gain access to . . . a computer . . . without the consent of . . . [a] person authorized to give consent") *with* 18 U.S.C. § 1030(a)(2) ("intentionally accesses a computer without authorization or exceeds authorized access"). The case law applying the CFAA to data scraping is mainly what inspired the "legal enigma" label above. It should therefore come as no surprise that Ohio's CFAA analog, § 2913.04, poses "new and unsettled" questions of Ohio law.

In fact, compared to the CFAA, § 2913.04's application to data scraping is even newer and less settled. While countless federal courts have wrestled with how to apply the CFAA to data scraping, no Ohio courts have done the same

with § 2913.04. OCLC cites zero § 2913.04 cases—on data scraping or otherwise. Instead, OCLC rests on raw statutory interpretation. *See* Supp. Br. 13–14, ECF No. 46. Put simply, when (if ever) § 2913.04 criminalizes data scraping is an Ohio statutory interpretation issue of first impression.

This novel state-law-interpretative issue is not for this Court to resolve. State statutory interpretation issues of first impression are quintessential subject matter for certification. *See, e.g., Baird*, 428 U.S. at 147 (collecting cases). This Court will thus certify § 2913.04's interpretation to the Supreme Court of Ohio.

### 5. OCLC's trespass to chattels claims raise "new and unsettled" questions going to "dispossession" and "deprivation," plus preemption.

#### a. When scraping "dispossesses" or "deprives" a website owner of chattels is an open question under Ohio law.

To make a claim for trespass, OCLC must show it had a possessory interest in a chattel and that Defendants (1) dispossessed OCLC of the chattel; (2) impaired the chattel's condition, quality, or value; (3) deprived OCLC of the chattel's use for a substantial time; or (4) harmed OCLC or something in which OCLC had a legally protected interest. *See Snap-on*, 708 F. Supp. 2d at 678.

In its Complaint, OCLC identifies servers and data as the chattels that Defendants "damaged." Compl. ¶¶ 184–86, ECF No. 1. But it does not elaborate on how Defendants' data scraping "dispossessed" or "deprived" OCLC of its chattels. That Defendants never dispossessed or deprived OCLC of WorldCat's servers or data would ordinarily doom OCLC's trespass claim.

To be sure, data scraping may dispossess or deprive enough to support trespass sometimes. For example, if data scraping crashes a website's servers or deletes its data, then a trespass may lie. *See Snap-on*, 708 F. Supp. 2d at 679–80 (crashing servers); *Thyroff v. Nationwide Mut. Ins.*, 864 N.E.2d 1272, 1278 (N.Y. 2007) (deleting data). That makes sense: crashing servers and deleting data dispossesses and deprives a website owner of their servers or data.

But absent a crash, data loss, or a similar catastrophe, the Court struggles to see how data scraping can constitute a trespass. *See, e.g.*, *Hamidi*, 71 P.3d at 308–11. After all, scraping generally involves nothing more than querying a website's server and duplicating its data. Querying a server hardly deprives or dispossesses the website owner of the server (ordinary web traffic generates the same kind of queries). And duplicating data hardly deprives or dispossesses the website owner of the data (who still holds the original version). OCLC does not allege a crash or data deletion. The Court therefore doubts that Defendants' data scraping constitutes trespass.[7]

But the levels of "dispossession" and "deprivation" necessary to sustain a trespass to chattels claim are ultimately questions for Ohio courts. And Ohio courts have yet to answer those questions in a data-scraping case. So this Court will pose that question to the Supreme Court of Ohio.

---

[7] *See generally* Laura Quilter, *The Continuing Expansion of Cyberspace Trespass to Chattels*, 17 BERKELEY TECH. L.J. 421 (2002).

### b. Federal copyright law may preempt OCLC's trespass claims, for the same reasons that it may preempt OCLC's contract and unjust enrichment claims.

Even if OCLC adequately pleaded trespass to chattels, federal copyright law might still preempt the claim. *See Harding*, 497 F. Supp. 2d at 650 (holding that the Copyright Act of 1976 preempted a trespass to chattels claim predicated on reproduction, display, and distribution of archived images of plaintiff's website). As with contract and unjust enrichment, this preemption issue likely depends on whether OCLC's trespass claims serves state-law interests distinct from those served by federal copyright law. The Court will thus also certify a question about the state interests underlying trespass to chattels.

### 6. OCLC's conversion claims raise "new and unsettled" questions about "exclusion" and preemption.

### a. When data scraping "excludes" a website owner from their property is an open question under Ohio law.

Under Ohio law, "[c]onversion is the wrongful exercise of dominion over property *to the exclusion of the rights of the owner*." *Dana Ltd. v. Aon Consulting, Inc.*, 984 F. Supp. 2d 755, 768 (N.D. Ohio 2013) (quoting *State ex rel. Toma v. Corrigan*, 752 N.E.2d 281, 285 (Ohio 2001)) (emphasis added).

In its Complaint, OCLC alleges that Defendants converted WorldCat's servers and its data. Again though, it does not elaborate on how Defendants' scraping *excluded* OCLC: OCLC never alleges that it ever lost dominion over its servers or data. And, for essentially the same reasons it struggles to see dispossession or deprivation, the Court struggles to see how Defendants' alleged

scraping could have excluded OCLC from its servers or data. Seeing no exclusion, the Court doubts that Defendants' data scraping constitutes conversion.

But, as with trespass, the level of "exclusion" necessary to sustain a conversion claim is ultimately a question for Ohio courts. Ohio courts have yet to answer that question in a data scraping case. So this Court will pose the question to the Supreme Court of Ohio.

### b. Federal copyright law may preempt OCLC's conversion claims, for the same reasons that it may preempt many of OCLC's other common-law claims.

Even if OCLC adequately pleaded conversion, federal copyright law might still preempt the claim. *See Harding*, 497 F. Supp. 2d at 650 (holding that the Copyright Act of 1976 preempted a conversion claim predicated on reproduction, display, and distribution of archived images of plaintiff's website). As with the other common-law claims above, this preemption issue likely depends on whether OCLC's conversion claims serve state-law interests distinct from those served by federal copyright law. The Court will thus also certify a question about the state interests underlying conversion.

### III. CONCLUSION

The Court is sympathetic to OCLC's situation: a band of copyright scofflaws cloned WorldCat's hard-earned data, gave it away for free, and then ignored OCLC when it sued them in this Court. But mindful that bad facts

sometimes make bad law, the Court requests that an Ohio court intervene before this Court makes any new state tort, contract, property, or criminal law.

The Court resolves to **CERTIFY** the novel Ohio-law issues identified above to the Supreme Court of Ohio. Plaintiff's counsel and Matienzo's counsel are **ORDERED** to propose an order containing all the information Ohio Supreme Court Practice Rule 9.02 requires by **April 11, 2025**. The parties may file their proposed orders separately, or, if they so choose, they may file one joint proposed order. The Court will finalize a certification order afterward.

OCLC's motion for default judgment is **DENIED without prejudice**. *See Lammert v. Auto-Owners (Mut.) Ins.*, 286 F. Supp. 3d 919, 928–29 (M.D. Tenn. 2017) (adopting this same disposition). Because the answers to the certified questions may also determine Matienzo's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), ECF No. 21, the Court **DENIES without prejudice** that motion too. *See id.* The Court invites the parties to reraise their motions after the certification proceeding.[8] *See id.*

---

[8] As an aside, the Court also wonders whether the intracorporate conspiracy doctrine bars OCLC's conspiracy claims. Under that doctrine, an agreement between agents of the same legal entity is not an unlawful conspiracy. *See Ziglar v. Abbasi*, 582 U.S. 120, 152–55 (2017); *Hawes v. Downing Health Technologies L.L.C.*, 2022 WL 1573737, at \*10 (Ohio App. 8 Dist., 2022). OCLC's conspiracy counts allege, in effect, that Matienzo is an agent of Anna's Archive who conspired with other agents of Anna's Archive to scrape WorldCat's data. If Anna's Archive is a legal entity, then OCLC may have alleged an intracorporate conspiracy. The Court pulls this thread no further (because it decides to certify). But, after the certification proceeding, the Court expects the parties will brief whether the intracorporate conspiracy doctrine applies here.

The Court also grants OCLC leave to amend its Complaint to correct any of the above-identified pleading deficiencies.

The Clerk shall terminate ECF Nos. 21 and 40.

**IT IS SO ORDERED.**

*/s/ Michael H. Watson*
**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**