**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **OCLC, Inc.** | **Case No. 2:24-cv-00144-MHW-EDP** |
| **Plaintiff,** | **ORAL ARGUMENT REQUESTED** |
| **v.** | **Judge Michael H. Watson** |
| **ANNA'S ARCHIVE, f/k/a PIRATE LIBRARY MIRROR, et al.,** | **Magistrate Judge Elizabeth A. Preston Deavers** |
| **Anna's Archives.** | |

---

### PLAINTIFF OCLC, INC.'S RENEWED MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANT ANNA'S ARCHIVE

---

Pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure and this Court's October 17, 2025 order (Dkt. 56), Plaintiff OCLC, Inc. ("OCLC") respectfully renews its motion for a default judgment on its Complaint against Defendant Anna's Archive, f/k/a Pirate Library Mirror ("Anna's Archive"). OCLC duly obtained an Entry of Default from the Clerk and moved for default judgment, which this Court denied without prejudice. Op. & Order, Dkt. 47. The Court also certified two questions of Ohio law to the Ohio Supreme Court (Certification Order, Dkt. 54), though the Ohio Supreme Court declined to grant OCLC's petition on those questions.[1]

Now, OCLC renews its motion for default judgment and seeks default judgment for declaratory and injunctive relief upon its breach of contract, unjust enrichment, tortious interference of contract, and trespass claims. Anna's Archive has knowingly failed to answer or otherwise respond to the Complaint and has decided to refrain from appointing counsel or

---

[1] Case Announcements, Supreme Court of Ohio, at 10 (Oct. 1, 2025), https://www.supremecourt.ohio.gov/rod/docs/pdf/0/2025/2025-Ohio-4537.pdf.

otherwise participating in this case, both before this Court and the Ohio Supreme Court. Accordingly, entry of default judgment against Anna's Archive for OCLC is warranted.

OCLC does not renew its motion for default judgment as to its claims of tortious interference of prospective business relationships, conversion, violation of Ohio Revised Code § 2913.04, and civil conspiracy. OCLC also does not seek monetary damages on this Renewed Motion. If the Court grants this motion, OCLC will voluntarily dismiss these claims.

A Memorandum in Support of this Renewed Motion is attached. This Renewed Motion is also supported by the declaration of OCLC's Chief Financial Officer and Treasurer, William Rozek (Dkt. 40-1), and the other facts and arguments set forth in OCLC's Application for Entry of Default (Dkt. 38), OCLC's Motion for Default Judgment (Dkt. 40), OCLC's Additional Memorandum (Dkt. 46), OCLC's Motion for Reconsideration (Dkt. 49), and OCLC's petition to the Ohio Supreme Court (Ex. A), all of which are incorporated here by reference.

Respectfully submitted,

*/s/ Jeffrey M. Walker*
Jeffrey M. Walker (0096567), Trial Attorney
Traci L. Martinez (0083989)
Kathryn M. Brown (0100426)
Brittany N. Silverman (0102263)
SQUIRE PATTON BOGGS (US) LLP
2000 Huntington Center
41 South High Street
Columbus, Ohio 43215
Telephone: +1 614 365 2700
Fax: +1 614 365 2499
jeffrey.walker@squirepb.com
traci.martinez@squirepb.com
kathryn.brown@squirepb.com
brittany.silverman@squirepb.com

*Attorneys for Plaintiff OCLC, Inc.*

## MEMORANDUM IN SUPPORT

OCLC spent hundreds of millions of dollars over decades to create the largest bibliographic record catalog in the world, called "WorldCat." WorldCat.org provides the public with free access to part of the catalog, and the world's libraries subscribe to WorldCat itself to receive additional, non-public data. Anna's Archive is an international group of hackers seeking to make all information "free"—especially works protected by copyright law. Prior to August 2022, Anna's Archive was looking for vulnerabilities in WorldCat.org. In fall 2022, Anna's Archive used a variety of hacking methods to "scrape" the public-facing data from WorldCat.org. But that was not all: Anna's Archive also stole the credentials of a subscribing library to access additional data protected behind a paywall. And Anna's Archive used other hacking methods on WorldCat.org to obtain non-public WorldCat data—again, data reserved only for subscribing libraries. Compl. ¶ 78 (data was "harvested directly from OCLC's servers, including enriched data *not available through the WorldCat.org user interface*." (emphasis added)); *id*. ¶¶ 79–80 (similar).

Anna's Archive's hacking and scraping has caused damage to OCLC by overwhelming and slowing OCLC's servers and has harmed OCLC's ability to operate WorldCat and its other products and services. OCLC was forced to purchase 60 new servers due to the damage and strain caused by the hacking attacks, at a cost of over $1.5 million. Rozek Decl., Dkt. 40-1, ¶ 54. Other hardware and services were physically impaired or harmed by the hacking attacks. OCLC's employees spent over 27,000 hours working around the clock from August 2022 to October 2023 to keep WorldCat operational and prevent further outages. OCLC also had to hire third-party companies to assist in preventing the attacks and repairing OCLC's network infrastructure. *Id.* ¶¶ 45, 47. Anna's Archive then posted for download the data it had taken from OCLC without compensating OCLC, while also seeking financial contributions from its users and supporters.

Accordingly, OCLC renews its motion for default judgment. OCLC seeks default judgment on only four of its twelve claims and is only seeking declaratory and injunctive relief. OCLC hopes to take the judgment to website hosting services so that OCLC's WorldCat data will be removed from Anna's Archive's websites.[2] For the reasons that follow, OCLC respectfully requests that the Court enter default judgment.

**LAW AND ARGUMENT**

The Court should enter default judgment in favor of OCLC for three reasons. First, the claims on which OCLC renews its motion for default judgment are well pleaded. Second, these claims are not preempted by federal law. Third, declaratory and injunctive relief is appropriate.[3]

## I.     The claims OCLC seeks default judgment on are well-pled.

"Once the default has been entered, the well-pleaded facts of the complaint relating to liability must be accepted as true." *United States v. Cunningham*, No. 07-cv-212, 2009 WL 112831, at *3 (S.D. Ohio Jan. 15, 2009). There must be at least a sufficient basis in the pleadings so that there are unchallenged facts that constitute a legitimate cause of action. *See New London Tobacco Mkt., Inc. v. Ky. Fuel Corp.*, 44 F.4th 393, 410 (6th Cir. 2022). Now that the Ohio Supreme Court declined to certify any state-law questions, there is no obstacle to this Court determining that the claims upon which OCLC seeks default judgment are well pled.

### A.  Breach of Contract

OCLC states a claim for contractual breach of the Terms and Conditions against Anna's

---

[2] Enforcing a judgment in this manner would not be uncommon or unexpected as far as Anna's Archive is concerned. Recently, Google removed over 749 million Anna's Archive URLs from its search results to stem Anna's Archive's large-scale copyright infringement. Van der Sar, Ernesto, "Google Removed 749 Million Anna's Archive URLs from its Search Results (Nov. 10, 2025), https://torrentfreak.com/google-removed-749-million-annas-archive-urls-from-its-search-results/.

[3] Because this Court is well-acquainted with the facts of this case, OCLC incorporates its prior factual statements by reference. *See* Dkts. 38, 40, 46, 49. OCLC also incorporates its prior procedural analysis of Rule 55. Mot., Dkt. 40 at # 760.

Archive. The elements for a breach of contract claim under Ohio law are "(1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff as a result of the breach." *Asset Mgmt. One LLC v. U.S. Bank Nat'l Ass'n*, 569 F. App'x 438, 441 (6th Cir. 2014) (citation omitted). Anna's Archive breached at least four provisions of the Terms and Conditions, which Anna's Archive agreed to when it accessed WorldCat.org. Compl. ¶ 58; Murphy Decl. ¶ 7, Dkt. 30-1; Rozek Decl. ¶ 31. First, it scraped and harvested material amounts of WorldCat data in violation of §3(A)(iv) of the Terms and Conditions. Terms & Conditions, Dkt. 1-2 at # 46. Second, it "distribut[ed], display[ed], or disclos[ed]" WorldCat data when it made the data available for mass download and encouraged users to set up torrents to facilitate further distribution in violation of §3(A)(v). *Id.*; Compl. ¶¶ 93–94; Rozek Decl. ¶ 32. Third, by maintaining the data on its website, Anna's Archive has engaged in "long-term storage" of WorldCat data violation of §3(A)(vi). Terms & Conditions, Dkt. 1-2 at # 46; Compl. ¶¶ 93–94; Rozek Decl. ¶ 32; *see also* ¶ 86 (noting data has been posted since October 2023). Finally, Anna's Archive violated §3(A)(i) by encouraging users to sign up for subscriptions and thereby using the data for commercial use, meaning Anna's Archive receives a fee for a service relying on WorldCat data. Terms & Conditions, Dkt. 1-2 at # 46; *see also id.* at # 47 (defining "Commercial Use" as the use of the data "as part of or to facilitate a service for which You receive a fee"); Compl. ¶¶ 72–73; Rozek Decl. ¶ 32.

OCLC properly alleges the other contractual breach elements. The Terms and Conditions is a valid and binding contract. When Anna's Archive went to WorldCat.org to hack, scrape, and harvest, it became a "user" of WorldCat.org and agreed to the Terms and Conditions in exchange for a limited-use license from OCLC. Rozek Decl. ¶¶ 31, 32. OCLC provided Anna's Archive this limited-use license and access to WorldCat.org, thus fully performing its obligations under the

Terms and Conditions. Compl. ¶¶ 77, 86, 124; Rozek Decl. ¶ 32; Murphy Decl. ¶ 10. OCLC also suffered immediate and irreparable injury and incurred damages. Mot., Dkt. 40 at # 761–71; *see also* Compl. ¶¶ 9, 81, 83–85, 100–104, 126–127; Murphy Decl. ¶ 12; Rozek Decl. ¶ 44.

This Court has expressed concerns over the appropriate standard for this claim, stating that Ohio courts have not decided whether browsewrap agreements are enforceable or whether actual or constructive knowledge is required. Op. & Order, Dkt. 47 at # 873–74. As an initial matter, Ohio courts do enforce browsewrap agreements, and usually without analysis of the user's knowledge (constructive or otherwise) where the user repeatedly uses the website to access services or products. *See Valentine v. Cedar Fair, L.P.*, 202 N.E.3d 704, 183, 186 (Ohio 2022) (enforcing the "terms and conditions" that "were available on the website where customers purchased their season passes"); *Qualls v. Wright Patt Credit Union*, 174 N.E.3d 874, 896 (Ohio Ct. App. 2021) ("By continuing to maintain his account, pursuant to the 'Acceptance of Terms' provision, Qualls manifested his assent to the arbitration provision, as well as by his continued use of online banking."); *GigSmart, Inc. v. AxleHire, Inc.*, 226 N.E.3d 1073, 1084 (Ohio Ct. App. 2023) ("Courts have held that an agreement to such terms and conditions by creating an account or visiting a website is enforceable where the terms and conditions were conspicuous and reasonably communicated to the user."); *Ranazzi v. Amazon.com, Inc.*, 46 N.E.3d 213, 218 (Ohio Ct. App. 2025) (user "accepted the terms" of a website agreement "by registering for an Amazon account and placing orders").

The Ohio General Assembly has also weighed in on the side of contract formation in relation to browsewrap agreements in the Uniform Electronic Transactions Act with language that applies to parties that use automation to scrape websites. *See* Ohio Rev. Code § 1306.13(A) (providing that online contracts can be formed merely by "the interaction of electronic agents of

the parties, even if no individual … reviewed … the resulting terms and agreements."). This Court can resolve this issue by applying this Ohio law on contract formation through electronic agents.

In any case, OCLC adequately alleges that Anna's Archive had at least constructive knowledge of the WorldCat.org Terms and Conditions. OCLC's Complaint establishes that Anna's Archive is an organization of experienced hackers who are intimately familiar with WorldCat.org. They took a deep dive into all parts of the WorldCat.org website and service, analyzed its vulnerabilities over a long period, and then spent a year picking apart and scraping over 97% of the data both on the website and behind the public-facing interface of the website. Compl. ¶¶ 9–10, 75–80, 90–92. It is implausible that professional hackers could spend months analyzing WorldCat.org and yet miss the Terms and Conditions. *See X Corp. v. Bright Data Ltd.*, 733 F. Supp. 3d 832, 847 (N.D. Cal. 2024) (data scraper was bound by the website's terms and conditions because it was a "sophisticated party"). And they continued to scrape after receiving a cease-and-desist letter, after the filing of the lawsuit, and after their public acknowledgment of the lawsuit.[4] Compl. ¶¶ 86 n.13; Mot. to Reconsider, Dkt. 49 at # 903–04. Anna's Archive's own actions demonstrate that it clearly understood that it violated the Terms and Conditions. And it is now using the theft of the WorldCat data to facilitate further crimes. Such facts are more than sufficient to constitute knowledge of the Terms and Conditions under Ohio law.

Cases discussing what an average consumer would understand or know are inapplicable to cases where sophisticated parties engage in large-scale scraping. Ohio plaintiffs should not have to provide proof that hackers (who are certainly aware that hacking a website is not permissible) carefully read their terms and conditions when those terms are linked in plain sight at the bottom

---

[4] In fact, Anna's Archive continues to engage in wrongdoing and to actively encourage others to mass download the pirated WorldCat records and data from its website. *WorldCat editions and holdings release*, Anna's Blog (Sept. 11, 2025), https://annas-archive.org/blog/worldcat-editions-and-holdings.html (last visited Nov. 17, 2025).

of a webpage, especially when those hackers are destroying plaintiffs' servers and copying their database. Anna's Archive had actual knowledge of the Terms and Conditions, or at the very least would have readily expected that scraping WorldCat.org and bypassing the public interface to access non-public data (both by pinging OCLC's servers and using stolen user credentials) was in violation of the Terms and Conditions—but Anna's Archive still decided to proceed. These facts should create a reasonable inference that Anna's Archive had sufficient knowledge of the Terms and Conditions to support a contract claim by OCLC under Ohio law.

### B.  Unjust Enrichment

In the alternative to its breach of contract claim, OCLC requests default judgment on its unjust enrichment claim, which it has also sufficiently pled. *See Gascho v. Glob. Fitness Holdings, LLC*, 863 F. Supp. 2d 677, 699 (S.D. Ohio 2012) (citing *Resource Title Agency, Inc. v. Morreale Real Estate Services, Inc.*, 314 F.Supp.2d 763, 772 (N.D. Ohio 2004)). An unjust enrichment claim "requires a showing that (1) a benefit was conferred by the plaintiff on the defendant, (2) the defendant had knowledge of the benefit, and (3) the defendant retained the benefit under circumstances in which it was unjust to do so without payment." *Bunta v. Superior VacuPress, LLC*, 218 N.E.3d 838, 848 (Ohio 2022). Here, Anna's Archive improperly benefitted from OCLC's WorldCat data, specifically, Anna's Archive took WorldCat data without a license or compensating OCLC. Compl. ¶¶ 77, 86, 129; Murphy Decl. ¶ 10.

Anna's Archive also knew of this benefit—expressly acknowledging how valuable WorldCat data is in a blog post and thanking OCLC for its work. Compl. ¶¶ 13, 130; Rozek Decl. ¶ 42. Additionally, OCLC has alleged that it would be unjust for Anna's Archive to benefit from stealing public and non-public, or subscriber-only, WorldCat data because Anna's Archive not only avoided paying for a full WorldCat membership by hacking WorldCat.org, which would have

granted it access to the WorldCat data it improperly obtained, but Anna's Archive is also offering others access to the data who are not WorldCat subscribers. Compl. ¶¶ 86, 93, 131; Murphy Decl. ¶ 14. There is also no real question whether Anna's Archive has unjustly retained the benefit of OCLC's WorldCat.org data, as Anna's Archive acted in bad faith by exploiting its access to WorldCat data—which it admitted is proprietary—with the specific intent to hack OCLC, scrape data, and give it away for "free" to Anna's Archive's subscribers. Compl. ¶¶ 10, 12, 70, 86, 90, 132; Murphy Decl. ¶ 14.

Previously, the Court questioned whether scraping public data can ever be unjust. Op. & Order, Dkt. 47 at # 876–77. Notably, other courts have recognized unjust enrichment claims in connection with data scraping. *See Digital Drilling Data Sys. v. Petrolink Servs.*, 965 F.3d 365, 379–80, 383–84 (5th Cir. 2020) (upholding unjust enrichment claim that turns on whether a data scraping program wrongfully, unethically, or unjustly caused other companies to violate the terms of their licenses); *Meta Platforms, Inc., v. Ekrem ATES*, No. 22-cv-03918-TSH, 2023 WL 4035611, at *6 (N.D. Cal. May 1, 2023) (defendant "profited from his unauthorized use of Meta's computers and scraping of Instagram" and "Meta had to expend significant resources to investigate and mitigate his illegal conduct"). And just because OCLC allows the public to perform searches via WorldCat.org through some of the data in WorldCat, that does not mean that OCLC has left all its data up for grabs online. This is especially true for the data Anna's Archive hacked, as OCLC only permits paid WorldCat subscribers to access the additional data behind WorldCat.org. Simply put, there is a critical and significant difference between individual searches of public data and the wholesale copying and hacking to access data beyond what is publicly available and then posting the data online for free to destroy OCLC's business. OCLC's allegations demonstrate the unjust circumstances necessary for an unjust enrichment claim.

### C.  Tortious Interference of Contract

OCLC's Complaint also states a claim for tortious interference of contract, which requires "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages." *Fred Siegel Co., LPA v. Arter & Hadden*, 707 N.E.2d 853, 858 (Ohio 1999).

First, OCLC has adequately pled the existence of contracts. OCLC has current contractual relationships with its WorldCat customers and member libraries, which provides that OCLC will provide the WorldCat services. Compl. ¶ 136. The operative contract is called the WorldCat Rights and Responsibilities. *Id.* ¶ 138.

Second, Anna's Archive knew of OCLC's contracts and relationships. OCLC specifically pled that Anna's Archive knew about these relationships, publicly acknowledged that WorldCat data is proprietary, and knew that data it stole is not available for mass download without a subscription and that certain data is not publicly available on WorldCat.org. *Id.* ¶¶ 90, 114, 137, 153; Murphy Decl. ¶ 14.

Third, Anna's Archive's interference is intentional. Interference is intentional if the defendant (1) "acted with the purpose or desire to interfere with the performance of the contract" or (2) "knew that interference was certain or substantially certain to occur as a result of its actions." *Horter Invest. Mgmt. LLC v. Cutter*, 257 F. Supp. 3d 892, 924 (S.D. Ohio 2017) (citation omitted). When Anna's Archive hacked WorldCat.org and OCLC's servers to scrape and distribute WorldCat data for free, Anna's Archive was, *at a minimum*, substantially certain that OCLC would face material difficulties in fulfilling its obligations under the WorldCat Rights and Responsibilities. Compl. ¶¶ 118, 138; Murphy Decl. ¶ 14; *see United States v. Buckingham Coal Co.*, No. 2:11–cv–383, 2013 WL 1818611, at *8 (S.D. Ohio Apr. 29, 2013) (collecting cases). This

is a fundamental breach of customers' agreements with OCLC. *See* WorldCat Rights & Responsibilities (incorporated by reference in the Complaint).[5] Further, by widely distributing the pirated data, Anna's Archive was substantially certain that current or future OCLC customers would choose to cancel memberships or forego joining OCLC's cooperative or paying for OCLC data since libraries could obtain the misappropriated data for free from Anna's Archive. *Id.* ¶¶ 70, 138, 154.

Finally, Anna's Archive's hacking lacks legitimate justification. *See Havensure, LLC v. Prudential Ins. Co. of Am.*, 595 F.3d 312, 315–16 (6th Cir. 2010) (listing the factors Ohio courts consider to determine if a defendant's interference lacks justification). To determine whether a defendant acted without legitimate justification, courts consider the following factors:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Fred Siegel*, 707 N.E.2d at 855–56 (citation omitted).

Every *Fred Siegel* factor favors the finding that Anna's Archive acted unjustly and improperly. The "conduct" of Anna's Archive was devastating—stealing the heart of OCLC's business. Its "motive" for the hacking was, if anything, worse: to facilitate the copyright infringement of billions of privately-owned works. Compl. ¶¶ 70, 86, 90, 139, 155. OCLC's interests in conducting its business are strongly aligned with Ohio's interests, and Ohio has no interest in protecting hacking and stealing. The defendant's actions directly harmed OCLC, and its only communication to OCLC was a blog post with a mocking "apology" for misappropriating OCLC's decades of investment and hard work. OCLC invested hundreds of millions of dollars to

---

[5] https://www.oclc.org/en/worldcat/cooperative-quality/policy.html (last visited Nov. 17, 2025).

create the WorldCat database. With the purpose of facilitating copyright infringement, Anna's Archive forcefully hacked OCLC's servers and scraped WorldCat data. Their actions overloaded OCLC's servers and interfered with OCLC's WorldCat-related services to its customers. Anna's Archive then offered OCLC's data on its own website, asking for donations to support its work. Anna's Archive's conduct has no legitimate justification.

### D. Trespass to Chattels

OCLC also states a claim for trespass to chattels. A trespass to chattel may be committed by intentionally "using or intermeddling with a chattel in the possession of another." *Mercer v. Halmbacher*, 44 N.E.3d 1011, 1017 (Ohio Ct. App. 2015). A plaintiff has a possessory interest in their computer system and networks, such that intermeddling with those systems and networks via transmission of electronic signals that burden the efficiency of those systems support a trespass cause of action. *See CompuServe Inc. v. Cyber Promotions, Inc.*, 962 F. Supp. 1015, 1021–22 (S.D. Ohio 1997). A trespass occurs when a party's use exceeds the limits of consent to use. *See eBay, Inc.*, 100 F. Supp. 2d 1058, 1070 (N.D. Cal. 2000); *CouponCabin, LLC v. Savings.com, Inc.*, No. 2-14-CV-39-TLS, 2017 WL 83337, at *3 (N.D. Ind. Jan. 10, 2017) (holding a trespass to chattels claim was sufficiently alleged where "[d]efendants circumvented the Plaintiff's security measures once it had blocked their access in order to engage in data scraping-related activities").

Here, Anna's Archive intentionally intermeddled with OCLC's data, computer systems and networks when it hacked and scraped the data from WorldCat.org and OCLC's servers beyond the limits imposed by the Terms and Conditions. Compl. ¶¶ 85–86, 90, 184. Anna's Archive intermeddled with OCLC's proprietary data when it used and accessed the WorldCat data and made the data publicly available for download on its website. *Id.* ¶¶ 86, 90, 185. Anna's Archive's trespass on the data, computer systems, and networks impaired their "condition, quality, or value."

*See CompuServe*, 962 F. Supp. at 1022 (holding that defendant's use of plaintiff's servers diminished the value of plaintiff's computer equipment by draining the computers' processing power and harmed plaintiff's reputation with customers); *Snap-on Bus. Sols. Inc. v. O'Neil & Assocs., Inc.*, 708 F. Supp. 2d 669, 678–80 (N.D. Ohio 2010) (finding defendant's potentially unauthorized access to plaintiff's servers impaired the servers' condition, quality, or value as the scraper program crashed the website and caused slow run times).

Even further, Anna's Archive's intermeddling materially and physically damaged OCLC's servers and infrastructure. For instance, its attacks substantially affected the performance of OCLC's systems and servers, requiring around-the-clock efforts from November 2022 to March 2023 to prevent services outages and maintain the production systems' performance for customers. Compl. ¶ 81; Murphy Decl. ¶ 12. Nevertheless, OCLC's customers experienced significant disruptions to service due to the attacks. Compl. ¶ 82; Rozek Decl. ¶ 56; Murphy Decl. ¶ 12. OCLC suffered immediate and irreparable injury and incurred damages. Mot., Dkt. 40 at # 761–71; *see also, e.g.*, Compl. ¶¶ 9, 81, 83–86, 90, 100–104, 126–127, 185.

This Court's prior order appeared to conclude that only dispossessions like crashing a website or causing a data loss are sufficient for a trespass to chattels claim, though it did not cite any specific Ohio law limiting common-law trespass in such a way. Op. & Order, Dkt. 47 at # 881. Ohio law does not require complete dispossession for trespass. A trespass to chattel may also be committed by simply "using or intermeddling with a chattel in the possession of another." *Mercer*, 44 N.E.3d at 1017. A trespass of an electronic database thus occurs when a defendant's use exceeds the limits of consent. *See eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1070 (N.D. Cal. 2000) ("[T]he electronic signals sent by BE to retrieve information from eBay's computer system are also sufficiently tangible to support a trespass cause of action[.]"); *CouponCabin*, 2017 WL

11

83337, at *3 (trespass occurs where defendants "circumvented" "security measures" to "engage in data scraping-related activities"). Anna's Archive's abuse of the access OCLC offers to the public qualifies as an unauthorized and forbidden trespass under Ohio law. *CompuServe*, 962 F. Supp. at 1027 ("Defendants' intentional use of plaintiff's proprietary computer equipment exceeds plaintiff's consent and, indeed, continued after repeated demands that defendants cease. Such use is an actionable trespass[.]"). Anna's Archive's trespass impaired the "condition, quality, or value" of OCLC's data, computer systems, and networks. *See id.* at 1022 (data scraping drains processing power and harms the reputation with customers); *Snap-on*, 708 F. Supp. 2d at 678–80 (defendants impaired the condition, quality, or value as the data scraping crashed plaintiff's website and caused slow run times).

Moreover, the trespass in this case goes far beyond normal web-scraping—Anna's Archive had a harmful effect on OCLC's servers and infrastructure, overwhelming the existing services and infrastructure and causing substantial delays and interruptions. Rozek Decl. ¶¶ 38, 44, 54, 56. It substantially degraded the performance of OCLC's chief service for months, requiring around-the-clock efforts from November 2022 to March 2023 to prevent services outages. Compl. ¶ 81; Murphy Decl. ¶ 12. Anna's Archive's attacks also forced OCLC to purchase 60 new servers to maintain service at a cost of $1.5 million. Rozek Decl. ¶ 54. OCLC's customers experienced significant disruptions for months. Compl. ¶ 82; Rozek Decl. ¶ 56; Murphy Decl. ¶ 12. To illustrate, the direct injuries to OCLC from this data-scraping trespass exceed $5 million. Compl. ¶¶ 9, 81, 83–86, 90, 100–04, 126–27, 185. This is sufficient dispossession under Ohio law.

## II.    OCLC's claims are not preempted.

In its earlier opinion, the Court suggested that OCLC's claims may be preempted. Op. & Order, Dkt. 47 at # 875. In that opinion, the Court relied on two cases, one referring to express

preemption under the Copyright Act and one involving conflict preemption under the Copyright Act, *X Corp. v. Bright Data Ltd.*, 733 F. Supp. 3d 832 (N.D. Cal. 2024), and *Snap-on Business Solutions Inc. v. O'Neil & Assocs., Inc.*, 708 F. Supp. 2d 669 (N.D. Ohio 2010), respectively. *Id.* Neither type of preemption applies to OCLC's claims.

**A. OCLC's claims are not expressly preempted.**

Express preemption requires the Court to find that the explicit language of a federal statute says that state law is preempted. *See Tyrrell v. Norfolk S. Ry. Co.*, 248 F.3d 517, 522 (6th Cir. 2001). Under § 301(a) of the Copyright Act, courts apply a two-part test to determine if a state-law claim is expressly preempted: (1) does the at-issue work come "within the scope of the 'subject matter of copyright' as set forth in Sections 102 and 103 of the Copyright Act"; and (2) are "the rights granted under state law [the] equivalent to any of the exclusive rights within the scope of federal copyright protection." *E.g.*, *Stromback v. New Line Cinema*, 384 F.3d 283, 300 (6th Cir. 2004). The equivalency requirement asks whether the state-law claim "assert[s] rights that are 'equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106[.]'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 456 (6th Cir. 2001).

OCLC's four state-law claims are not expressly preempted by § 301(a). The first step of the test is easy. OCLC does not claim that WorldCat.org or WorldCat are within the subject matter of the Copyright Act. Neither Worldcat.org nor the underlying WorldCat database are original works of authorship under § 102. To create WorldCat and its records, OCLC applies its own enhancements to bibliographic data, none of which is original authorship but is instead factual data. OCLC's work ensures that its data and records are higher quality with fewer duplicates, better information, and more searchable records. WorldCat is a service, procedure, process, or system that makes the data and records far more useful and accessible for WorldCat customers. Such a

database has been carved out from copyright protection. *See* 17 U.S.C. § 201(b) (copyright protection does not extend to "any idea, procedure, process, system, [or] method of operation"). Neither WorldCat.org nor the WorldCat database are derivatives of an original work under §103. This is why OCLC does not allege any Copyright Act violations in the instant matter.

But even if WorldCat data fell within the subject matter of federal copyright law, OCLC's contract breach, unjust enrichment, tortious interference of contract, and trespass claims do not meet the second prong of the § 301(a) analysis because they are not mere equivalents of federal copyright claims. Section 106 of the Copyright Act, as relevant here, prohibits the reproduction of, preparation of derivative works from, and distribution of copyrighted works. *Id.* at § 106. Each claim for which OCLC now requests default judgment requires additional elements besides the reproduction of, preparation of derivative works from, and distribution of OCLC's WorldCat records and data. *See Wrench*, 256 F.3d at 456 (noting "an extra element" is required to demonstrate an action "is qualitatively different from a copyright infringement claim").

***Contractual Breach.*** OCLC's contract claim requires proof of an offer and acceptance of the WorldCat.org Terms and Conditions. Section 106 contains no such elements. Notably, in *Snap-on*, the court did not raise preemption of the plaintiff's contractual breach claim. 708 F. Supp. 2d at 681–83. The Sixth Circuit has held that the Copyright Act does not expressly preempt contract claims. *See Wrench*, 256 F.3d at 456–57; *Lynn v. Sure-Fire Music Co., Inc.*, 237 F. App'x 49, 54 (6th Cir. 2007); *Cincom Sys., Inc. v. Novelis Corp.*, 581 F.3d 431, 437 (6th Cir. 2009).

***Unjust Enrichment.*** As an alternative to contractual breach, OCLC's unjust enrichment claim is not preempted. Here OCLC does not allege injury from Anna's Archive based only on its copying and distribution of WorldCat.org data from scraping; OCLC further alleges that Anna's Archive stole login credentials from an OCLC member and used those credentials to take

WorldCat data beyond that which is publicly accessible. Compl. ¶¶ 78–80. This information in particular is protected by subscriptions and is gated off from the public. *Id.* ¶¶ 44, 52, 106. Accordingly, OCLC's unjust enrichment claims involve elements beyond the copying and distribution of WorldCat data—it also includes Anna's Archive's improper and unlawful access to a subscription-protected variant of WorldCat records and data. *Id.* ¶¶ 78–80; *cf. Snap-on*, 708 F. Supp. 2d at 681 (observing that not all unjust enrichment claims are preempted by the Copyright Act). The Copyright Act does not pertain to hacking or the theft of user credentials to access portions of a website that are unavailable without a subscription.

**Tortious Interference of Contract.** OCLC's tortious interference of contract claim is also not expressly preempted by the Copyright Act. Though tortious interference claims are sometimes preempted under § 301(a), *see, e.g.*, *Stromback*, 384 F.3d at 306, OCLC's claim against Anna's Archive contains an extra element that changes the character of the claim. Here, OCLC alleges that Anna's Archive's hacking and scraping prevented OCLC from protecting its customers' data and impeded OCLC's ability to operate, which impeded *OCLC* from providing services for a time to its customers in violation of the WorldCat Policy. Compl. ¶¶ 82–83; William Rozek Decl. ¶¶ 55–56. OCLC thus alleges that Anna's Archive's hacking and scraping caused *OCLC* to breach its contractual obligations owed to its customers. Compl. ¶¶ 119, 138. This is a distinct, additional element of proof that distinguishes OCLC's tortious interference of contract claim from other tortious interference claims that rely exclusively on the copying and distributing information or works. *See Jedson Eng'g, Inc. v. Spirit Constr. Servs., Inc.*, No. 1:08CV413, 2010 WL 11538008, at *3 (S.D. Ohio Mar. 17, 2010) (soliciting information is an element distinct from reproducing, distributing, or displaying information).

**Trespass to Chattels.** OCLC's trespass to chattels claim is also not preempted. OCLC

alleges that Anna's Archive's hacking and scraping interfered with and damaged not only WorldCat.org and WorldCat data and records, but also OCLC's *physical servers and networks*. Compl. ¶¶ 81-82; Rozek Decl. ¶¶ 44–54. When scraping has damaged or slowed physical servers and networks, courts (including federal courts in Ohio) have found trespass to chattels. *See CompuServe*, 962 F. Supp. at 1021–22 (defendant's use of plaintiff's servers diminished the value of plaintiff's computer equipment by draining the computers' processing power and harmed plaintiff's reputation with customers); *Snap-on*, 708 F. Supp. 2d at 678–80 (defendant's access to plaintiff's servers impaired the servers' condition, quality, or value as the scraper program crashed the website and caused slow run times). In *Snap-on*, the Northern District of Ohio highlighted that contacts with a physical computer server that damaged the server and temporarily deprived the plaintiff of the use of the servers amount to physical trespass, although the damage and deprivation was not physical damage to the server. 708 F. Supp. 2d at 679–80. This component of interference with a physical object is fundamentally different than the elements of a Copyright Act violation.

**B. OCLC's claims are not subject to conflict preemption.**

Conflict preemption, a type of implied preemption, occurs "to the extent [state law] actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Fenner v. Gen. Motors, LLC*, 113 F.4th 585, 594 (6th Cir. 2024).

There is no conflict preemption here. Anna's Archive can certainly comply with the Copyright Act while complying with Ohio state law. Anna's Archive can easily avoid copying, distributing, and creating derivative works that are copyrighted while not hacking and scraping WorldCat.org, the basis of OCLC's claims for which it seeks reconsideration. Indeed, if Anna's

16

Archive had not scraped or hacked WorldCat.org, Anna's Archive would not have violated either Ohio or federal law as to OCLC's WorldCat.org.

This leaves only obstacle preemption. The Sixth Circuit has been reluctant to apply obstacle preemption, holding that "[t]here is a 'high threshold' for" an argument that a state-law claim is "obstacle preempted," *id.* (citation omitted), and observing that "[s]everal justices [of the United States Supreme Court] view obstacle preemption with more skepticism because, unlike other types of preemption, it doesn't require an express statutory basis or a clear legal conflict," *Dayton Power & Light Co. v. Fed. Energy Reg. Comm'n*, 126 F.4th 1107, 1128 (6th Cir. 2025).

Ohio's common-law claims for breach of contract, tortious interference of contract, trespass to chattels, and unjust enrichment do not stand as obstacles to the accomplishment of the full purposes and objectives of Congress when it enacted the Copyright Act. These foundational common-law claims are traditionally within state purview, and so this Court's preemption analysis must be narrowly confined. *See Fenner*, 113 F.4th at 593–94 ("[I]mplied preemption analysis does not justify a freewheeling judicial inquiry into whether a state statute [or other state law] is in tension with federal objectives; such an endeavor would undercut that principle that it is Congress rather than the courts that preempts state law." (cleaned up)). OCLC's claims are premised on the hacking of OCLC's servers and access to WorldCat data with credentials that Anna's Archive wrongfully obtained, *and* on the scraping of data that is *not* within the subject matter of the Copyright Act. For this reason, OCLC's state-law claims do not conflict with federal copyright claims—both may exist simultaneously because the subject of OCLC's claims does not pertain to copyrightable works. Because WorldCat data and records, as well as hacking, are well beyond the subject matter of the Copyright Act, OCLC's claims cannot be an obstacle to any congressional objectives memorialized in the Copyright Act.

Importantly, OCLC's claims vindicate Ohio's interests in several key respects. These state-law claims guard Ohio residents' data that is protected by contract (not copyright), protect the integrity of residents' computer and server infrastructure (which provides services to other residents), and ensures that Ohio does not become a safe haven for online hackers seeking to ruin Ohio businesses.

The Court previously cited to *X Corp.*, a non-binding opinion, to conclude that OCLC's data scraping claims may be preempted by federal contract law (leading to a final step of the obstacle preemption analysis whether there is a separate state-law interest in the state claims), but *X Corp.'s* facts are too different to be applicable. *X Corp.* involved a social media website full of posts of original works that were subject to copyright protection, such as pictures and videos. *See* 733 F. Supp. 3d at 851–52. There, users posted the material that X Corp. sought to contractually protect, though the users' posts were intended to be public. *Id.* at 848–49. The analysis in *X Corp.* expressly turns on the existence of copyright-protected works to conclude obstacle preemption applied, specifically, interference with copyright owners' exclusive rights and the fair use doctrine. *Id.* at 851–52. And X Corp. sought to claim rights over user created content, like posts. *Id.*

This case involves a database of bibliographic records enhanced and improved by OCLC. In contrast to *X Corp.*, the WorldCat database does not contain any records or data that are themselves the subject of copyright protections. WorldCat records *en masse* are not intended for public consumption without a paid subscription, unlike *X Corp.* And the WorldCat records that Anna's Archive hacked and scraped contain data that would ***not*** otherwise be available to a member of the public searching WorldCat.org. Compl. ¶¶ 76–80, 106.

OCLC does not claim ownership over user created or contributed content. Instead, OCLC seeks to protect WorldCat records and data, which is the product of OCLC's enhancements,

enrichments, and organization of underlying bibliographic data, some of which OCLC itself creates. OCLC has no ownership claim to the underlying bibliographic data supplied by customers; libraries retain all rights, title, and interest in their contributed bibliographic data. *See id.* ¶¶ 34, 37; Terms & Conditions, Dkt. 1-2. OCLC's WorldCat.org Terms and Conditions do not even provide a license to use underlying bibliographic data; rather, they grant users a non-exclusive license to use OCLC's WorldCat records and data, which are the product of OCLC's enhancements, improvements, and modifications. Compl. ¶ 58.

Importantly, *X Corp.* does not hold that obstacle preemption applies to a non-copyrightable database like WorldCat. *X Corp.* concluded that the claims interfered with Congress's intent to have certain data be "free from restraint" because X Corp. claimed a "de facto copyright" in the form of a non-exclusive license to use data from users. 733 F. Supp. 3d at 851–52. (The WorldCat.org Terms and Conditions do not operate in the same manner.) Applying the *X Corp.* court's result to this case, to hold that all information and data that is *not* copyrighted is still preempted by the Copyright Act, would lead to an absurd result. In fact, no court in the Sixth Circuit has applied obstacle preemption to the Copyright Act in this manner.

Such an interpretation would, in any case, be contrary to Sixth Circuit precedent. As noted *supra*, the Sixth Circuit only sparingly applies obstacle preemption due to the high threshold required by the Court's precedent. *Fenner*, 113 F.4th at 594. Conflict preemption "should be narrow and precise, to prevent the diminution of the role Congress reserved to the States while at the same time preserving the federal role." *Downhour v. Somani*, 85 F.3d 261, 266 (6th Cir. 1996) (citations omitted). *X Corp.* does not apply the Sixth Circuit's "high threshold," nor does it discuss whether Congress intended, through the Copyright Act, to so thoroughly obliterate all state-law contractual or tort claims that deal at all with the use, distribution, copying, etc. of information—

copyrightable or otherwise. Though Congress did not grant copyright protection to every form of information, there is also no indication that Congress intended to foreclose all common-law relief to non-copyrightable information. This Court should hold that OCLC's claims are not barred by obstacle preemption.

**III.    OCLC's request for injunctive and declaratory relief should be granted.**

OCLC has also suffered damage to its reputation, business, and customer goodwill that are impossible to financially quantify and can only be addressed through equitable relief. Anna's Archive's flagrantly illegal actions have damaged and continue to irreparably damage OCLC. As such, issuance of a permanent injunction is necessary to stop any further harm to OCLC. OCLC is seeking a permanent injunction prohibiting Anna's Archive: from scraping or harvesting WorldCat data from WorldCat.org or OCLC's servers; from using, storing, or distributing the WorldCat data on Anna's Archive websites; from encouraging others to scrape, harvest, use, store, or distribute WorldCat data; and requiring the deletion of all copies of WorldCat data in possession of, or easily accessible to, Anna's Archive, including all torrents. Accordingly, OCLC incorporates its prior arguments on the propriety of injunctive and declaratory relief into this brief. Mot., Dkt. 40 at #763–771.

**CONCLUSION**

OCLC respectfully prays that default judgment be entered in its favor and against defendant Anna's Archive on its breach of contract, unjust enrichment, tortious interference of contract, and trespass to chattels claims for declaratory and injunctive relief so that OCLC may take the judgment to website hosting services to remove WorldCat data from Anna's Archive's websites.

Respectfully submitted,

Date: November 17, 2025                    _/s/ Jeffrey M. Walker_____
                                           Jeffrey M. Walker (0096567), Trial Attorney

Traci L. Martinez (0083989)
Kathryn M. Brown (0100426)
Brittany N. Silverman (0102263)
SQUIRE PATTON BOGGS (US) LLP
2000 Huntington Center
41 South High Street
Columbus, Ohio 43215
Telephone: +1 614 365 2700
Fax: +1 614 365 2499
jeffrey.walker@squirepb.com
traci.martinez@squirepb.com
kathryn.brown@squirepb.com
brittany.silverman@squirepb.com

*Attorneys for Plaintiff OCLC, Inc.*

## CERTIFICATE OF SERVICE

On November 17, 2025 this document and the accompanying attachment was filed electronically with the Clerk of the United States District Court for the Southern District of Ohio, Eastern Division, which will electronically serve a copy of the foregoing on all counsel of record for all parties, and will be served upon Anna's Archive at the following email addresses:

AnnaArchivist@proton.me
AnnaDMCA@proton.me
AnnaArchivist+security@proton.me
domainabuse@tucows.com

*/s/ Jeffrey M. Walker*
Jeffrey M. Walker

*An Attorney for Plaintiff OCLC, Inc.*