# Exhibit A

# IN THE SUPREME COURT OF OHIO

| | |
|---|---|
| OCLC, Inc. | Case No. 2025-0691 |
|     **Plaintiff-Petitioner,** | **On a Certified Question of State Law from the U. S. District Court, Southern District of Ohio, Eastern Division** |
|     **v.** | |
| **ANNA'S ARCHIVE, f/k/a PIRATE LIBRARY MIRROR, et al.,** | **Case No: 2:24-cv-00144-MHW-EDP** |
|     **Defendants-Respondents.** | |

## MERITS BRIEF OF PLAINTIFF-PETITIONER OCLC, INC.

Colter L. Paulson (081903)
Lauren S. Kuley (0089764)
SQUIRE PATTON BOGGS (US) LLP
201 E. Fourth Street, Suite 1900
Cincinnati, OH 45202
Telephone: 513 361 1200
Fax: 513 361 1201
colter.paulson@squirepb.com
lauren.kuley@squirepb.com

Jeffrey M. Walker (0096567)
  *Counsel of Record*
Traci L. Martinez (0083989)
Kathryn M. Brown (0100426)
Brittany N. Silverman (0102263)
SQUIRE PATTON BOGGS (US) LLP
2000 Huntington Center
41 South High Street
Columbus, Ohio 43215
Telephone: 614 365 2700
Fax: 614 365 2499
jeffrey.walker@squirepb.com
traci.martinez@squirepb.com
kathryn.brown@squirepb.com
brittany.silverman@squirepb.com

*Counsel for Plaintiff-Petitioner OCLC, Inc.*

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ................................................................................ iv

INTRODUCTION ............................................................................................ 1

STATEMENT OF FACTS ................................................................................ 3

    A.    Anna's Archive hacks and scrapes OCLC's WorldCat database. ........... 3
    B.    Anna's Archive claims responsibility for the attacks and uses the WorldCat database to fundraise its own efforts. ................................... 6
    C.    OCLC files suit raising claims based on its user agreements and the theft of its proprietary database .......................................................... 7
    D.    The district court certifies two important questions of Ohio law .......... 9

ARGUMENT .................................................................................................. 12

    Proposition of Law #1: A party that engages in data scraping of a website presumptively has constructive or implied knowledge of the contractual terms of service presented as a condition for access to that website. ................................................................................................... 12

I.    This Court should resolve the uncertainty in Ohio law regarding enforcing website terms and conditions against malicious hackers and scrapers. ........ 12

    A.    Despite the ubiquity of terms of service for websites, Ohio courts are confused about the standards for their enforceability ................... 13
    B.    Ohio law should recognize that data scraping operations presumptively have implied or constructive knowledge of a website's terms of service. ....................................................................... 16
    C.    Anna's Archive had both actual and constructive notice of OCLC's terms and conditions. .............................................................. 19

    Proposition of Law #2: Because privately-owned databases are considered property under Ohio law, a tort occurs when a party scrapes that database to create its own copy without permission. .............................. 21

II.    Ohio Law protects proprietary databases from data scaping and provides important remedies in tort against hackers and scrapers. ............................. 21

III.    This Court's answer to the above questions will answer the district court's questions related to federal preemption. ........................................................ 28

CONCLUSION ............................................................................................... 29

CERTIFICATE OF SERVICE

## <u>TABLE OF CONTENTS</u>

**Page(s)**

APPENDIX

Opinion and Order of the U.S. District Court (Mar. 21, 2025)........................A-001

Opinion and Order of the U.S. District Court (Apr. 22, 2025)........................A-021

Opinion and Order of the U.S. District Court (May 15, 2025)........................A-028

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bush v. Signals Power & Grounding Specialists, Inc.*,
  2009-Ohio-5095 (5th Dist.)....................................................................27

*Cairo, Inc. v. Crossmedia Servs., Inc.*,
  2005 WL 756610 (N.D.Cal. Apr. 1, 2005) .............................................17

*Carnival Cruise Lines, Inc. v. Shute*,
  499 U.S. 585 (1991) ...............................................................................15

*In re Clearview AI, Inc. Consumer Priv. Litig.*,
  585 F.Supp.3d 1111 (N.D.Ill. 2022) ......................................................28

*CompuServe Inc. v. Cyber Promotions, Inc.*,
  962 F.Supp.1015 (S.D.Ohio 1997)...................................................26, 27

*Couponcabin LLC v. Savings.com, Inc.*,
  2016 WL 3181826 (N.D.Ind. June 8, 2016) .....................................17, 18

*Cvent, Inc. v. Eventbrite, Inc.*,
  739 F.Supp.2d 927 (E.D.Va. 2010)........................................................16

*Digital Drilling Data Sys. v. Petrolink Servs.*,
  965 F.3d 365 (5th Cir. 2020) ..................................................................23

*eBay, Inc. v. Bidder's Edge, Inc.*,
  100 F.Supp.2d 1058 (N.D.Cal. 2000) ....................................................26

*Eysoldt v. ProScan Imaging*,
  2011-Ohio-2359 (1st Dist.) ..............................................................22, 27

*Fred Siegel Co., L.P.A. v. Arter & Hadden*,
  1999-Ohio-260.........................................................................................23

*Gibbs v. Firefighters Cmty. Credit Union*,
  2021-Ohio-2679 (8th Dist.).....................................................................14

*GigSmart, Inc. v. AxleHire, Inc.*,
  2023-Ohio-3807 (1st Dist.) .....................................................................13

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  639 F.Supp.3d 944 (N.D.Cal. 2022) .......................................................20

*Integrated Direct Mktg., LLC v. May*,
    143 F.Supp.3d 418 (E.D.Va. 2015)..................................................... 28

*Key Realty, Ltd. v. Hall*,
    2021-Ohio-1868 (6th Dist.), *aff'd*, 2022-Ohio-1199 ............................... 22

*Mercer v. Halmbacher*,
    2015-Ohio-4167 (9th Dist.)............................................................ 26

*Meta Platforms, Inc., v. Ekrem ATES*,
    2023 WL 4035611 (N.D.Cal. May 1, 2023) ......................................... 24

*Meyer v. Uber Techs., Inc.*,
    868 F.3d 66 (2d Cir. 2017)............................................................. 18

*Nguyen v. Barnes & Noble Inc.*,
    763 F. 3d 1171 (9th Cir. 2014). ....................................................... 16

*PNH, Inc. v. Alfa Laval Flow, Inc.*,
    2011-Ohio-4398........................................................................ 29

*Pollstar v. Gigmania, Ltd.*,
    170 F.Supp.2d 974 (E.D.Cal. 2000).................................................. 18

*Qualls v. Wright Patt Credit Union*,
    2021-Ohio-2055 (2nd Dist.) ........................................................... 13

*Ranazzi v. Amazon.com, Inc.*,
    2015-Ohio-4411 (6th Dist.)............................................................ 14

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2nd Cir. 2004).......................................................... 18

*Reis, Inc. v. Spring11 LLC*,
    2016 WL 5390896 (S.D.N.Y. Sept. 26, 2016)...................................... 18

*Rudolph v. Wright Patt Credit Union*,
    2021-Ohio-2215 (2nd Dist.) ........................................................... 13

*Snap-on Bus. Sols. Inc. v. O'Neil & Assocs., Inc.*,
    708 F.Supp.2d 669 (N.D.Ohio 2010) ................................................ 27

*Sw. Airlines Co. v. BoardFirst, LLC*,
    2007 WL 4823761 (N.D.Tex. Sept. 12, 2007)...................................... 18

*Valentine v. Cedar Fair, L.P.*,
    2022-Ohio-3710........................................................................ 13

*Walker v. Nautilus, Inc.*,
    541 F.Supp.3d 836 (S.D.Ohio 2021) ........................................................ 14

*X Corp. v. Bright Data Ltd.*,
    733 F.Supp.3d 832 (N.D.Cal. 2024) ................................................... 20, 29

**Statutes**

R.C. 1306.01(F) ........................................................................................ 15

R.C. 1306.04(B) .................................................................................... 2, 16

R.C. 1306.13(A) ........................................................................................ 15

R.C. 2307.60 ............................................................................................... 8

R.C. 2913.01 ........................................................................................ 24, 25

R.C. 2913.04 ................................................................ 8, 21, 24, 25, 29

**Other Authorities**

Sam S. Han, *Predicting the Enforceability of Browse-Wrap Agreements*
    *in Ohio*, 36 Ohio N.U. L. Rev. 31, 48 (2010) ........................................ 14

## **INTRODUCTION**

This case raises novel questions of Ohio law of considerable importance to anyone in Ohio with an online business. As the district court summarized, "a band of copyright scofflaws cloned WorldCat's hard-earned data" and "gave it away for free." Appx. at A-018. But the court declined to grant relief because it was not sure if Ohio law protects proprietary databases or enforces the terms on which access to those databases is conditioned. This Court should accept the certified questions and hold that Ohio law protects Ohioans from hackers and "scofflaws" that destroy their property and businesses.

OCLC spent hundreds of millions of dollars over decades to create the largest bibliographic catalog in the world, or "WorldCat." It provides the public with free access to part of the catalog, and the world's libraries subscribe to receive additional, non-public data. Anna's Archive is an international group of hackers seeking to make all information "free"—especially proprietary data created by businesses or items protected by copyright. Prior to August 2022, Anna's Archive was looking for vulnerabilities in OCLC's website. In the fall of that year, Anna's Archive then used a variety of hacking methods to "scrape" the public-facing data from WorldCat.org. This scraping was done via methods that caused millions of dollars of damage to OCLC by overwhelming OCLC's servers and harming OCLC's ability to operate WorldCat and its other products and services. These actions constituted the theft of OCLC's database and violated the site's terms for access to WorldCat.

That was not all: Anna's Archive also stole the credentials of a university that paid for a subscription to access additional data. In addition, Anna's Archive used other hacking methods to scrape the non-public modifications and improvements created by OCLC. These actions caused additional damage, service slowdowns, and significant interruptions to OCLC's operations. Anna's Archive then placed the hundreds of millions of WorldCat records on its own website, without compensating OCLC while seeking donations from its supporters.

Ohio law on these issues is unsettled. State and federal courts are confused about the knowledge standard for enforcing a website's terms and conditions. The General Assembly has legislated that online contract formation depends on "the context and surrounding circumstances, including the parties' conduct." R.C. 1306.04(B). But courts sometimes overlook that instruction and apply protections for naïve consumers to benefit sophisticated hackers and data scrapers like Anna's Archive. Courts are also sometimes unsure about whether proprietary databases are protectable "property" when they are made available for limited purposes to customers or to the public. Judges are reticent to apply standards for torts for physical property to digital property that exists on servers and computers. Without intervention from this Court, cases against online thieves and hackers may become harder—or even impossible to pursue.

Ohio must not become a haven for destructive online piracy. The district court has sought guidance from this Court on how Ohio law would enforce terms and conditions of a privately-owned database against hackers, and whether the malicious

data scraping of the database constituted a tort (any tort) under Ohio law. Those two critical issues were certified to this Court, which should now clarify that Ohio law protects online businesses, institutions, and nonprofits. Other countries are sanctioning and blocking Anna's Archive because of its illegal pirate activities, and publishers around the world are continually fighting Anna's Archive wherever it appears. Ohio law should join that fight.[1]

## STATEMENT OF FACTS

### A.    Anna's Archive hacks and scrapes OCLC's WorldCat database.

An Ohio nonprofit, OCLC creates digital infrastructure for 30,000 libraries across the globe, providing the most correct and comprehensive library catalog in the world. That worldwide catalog (called "WorldCat") includes 550 million bibliographic records and billions of other items. WorldCat allows its users to find anything available at libraries around the world.

OCLC and its member-libraries create and add records to WorldCat, and OCLC adds connections between related records, creates categorizations for user searches, corrects errors, eliminates duplicates, differentiates by edition, and makes a host of other substantive additions to record entries. OCLC also adds metadata and makes technical improvements that are not visible to public users.

---

[1] This case does not address the use of public information to train artificial intelligence models. In this case, Anna's Archive performed invasive hacking, destructive scraping, and wholesale theft of a proprietary database—then made the database available through its own website.

OCLC has 820 employees at its headquarters in Dublin, Ohio, and employs 500 others worldwide. Rozek Decl., Dkt. 40-1, ¶ 65. OCLC has invested $162 million dollars in enhancing the WorldCat records and metadata in just the past five years. *Id*. ¶ 17.

When an individual accesses WorldCat.org, she agrees to a browsewrap agreement that grants a limited license to use the WorldCat data. WorldCat also offers paid subscriptions to OCLC's members which allow them to access enhanced data through WorldCat. A paid subscriber must agree to further contractual limitations on the use of the WorldCat data. In exchange for using WorldCat, *all* users agree not to harvest "material amounts" of data, not to store, distribute, or display the data, nor use the data for commercial purposes.

Anna's Archive is, in many ways, the exact opposite of OCLC. It is the world's largest library catalog for accessing pirated works. It first allows users to search for pirated works. It then connects users to sites where they can download copyrighted books, media, and other content without the consent of the owners and creators. It seeks to create an "archive" of all data in the world, free to anyone regardless of ownership. As Anna's Archive has boasted: "[w]e deliberately violate the copyright law in most countries." The U.K. High Court of Justice recently ordered internet service providers to block access to the internet domains of Anna's Archive. The Netherlands and Italy have done the same to prevent the widescale undermining of intellectual property rights.

In 2022, OCLC's WorldCat database was targeted by hackers for the purpose of creating a TODO list of copyrighted materials to pirate. They used various methods to attack OCLC's servers, including "pinging" attacks in which malformed or malicious pings were sent to disrupt the servers' operations. Compl., Dkt. 1, ¶ 78. This tricked OCLC's servers and bypassed the public user interface, allowing the hackers to steal both the data available to the public on a limited basis and to steal enriched, proprietary, non-public data. They also stole log-in credentials from a legitimate university-level subscriber, and used those credentials to obtain further non-public data. *Id.* ¶ 79. After months of continuous attacks, the hackers claimed, "they were able to harvest, to some extent, 97.4% of unique WorldCat records," including both catalog records available to subscribers and legitimate users and metadata not available outside of OCLC. *Id.* ¶ 92; *id.* ¶ 78 (data was "harvested directly from OCLC's servers, including enriched data not available through the WorldCat.org user interface."); *id.* ¶¶ 79–80 (similar).

These attacks created severe slowdowns and a significant loss of processing power for OCLC's servers, which affected WorldCat and other services. OCLC's customers experienced more than 560 hours of disrupted, degraded, or unavailable services due to the attacks. Rozek Decl., Dkt. 40-1, ¶ 55. OCLC customers entered 600 service tickets between August 2022 and October 2023 due to errors caused by the hacking and scraping. *Id.* ¶ 56. "During this time, customers threatened and likely did cancel their products and services with OCLC due to these disruptions." Compl., Dkt. 1, ¶ 83.

OCLC was forced to purchase 60 new servers due to the strain and service outages caused by the hacking attacks, at a cost of over $1.5 million. Rozek Decl., Dkt. 40-1, ¶¶ 38, 44, 54, 56. Other hardware and services were impaired or harmed by the hacking attacks. OCLC's employees spent over 27,000 hours working around the clock from August 2022 to October 2023 to keep WorldCat operational and prevent further outages. OCLC also had to hire third-party companies to assist in preventing the attacks and repairing OCLC's network infrastructure. *Id*. ¶¶ 45, 47. In total, the hackers caused over $5 million in damage to OCLC—which number does not include losses of goodwill and lost customers. *Id*. ¶ 57.

## B. Anna's Archive claims responsibility for the attacks and uses the WorldCat database to fundraise its own efforts.

Anna's Archive announced that they were behind the hacking, stating that their hackers had been monitoring and investigating WorldCat since at least 2022. And then, when OCLC began an overhaul of its website security and systems, Anna's Archive decided that it would be a good time to attack:

> [O]ver the past year, we've meticulously scraped all WorldCat records. At first, we hit a lucky break. WorldCat was just rolling out their complete website redesign (in Aug 2022). This included a substantial overhaul of their backend systems, introducing many security flaws. We immediately seized the opportunity, and were able scrape hundreds of millions (!) of records….

Compl., Dkt. 1, ¶ 89. Anna's Archive acknowledged that WorldCat is a "proprietary database" in which OCLC "aggregates metadata records from libraries all over the world, in exchange for giving those libraries access to the full dataset, and having them show up in end-users' search results." *Id*. ¶ 90.

Anna's Archive also highlighted its own knowledge that OCLC's business model relies on the proprietary information contained in its WorldCat database: "Even though OCLC is a non-profit, their business model requires protecting their database. Well. We're sorry to say, friends at OCLC, we're giving it all away. :-)." *Id.* ¶90; *see also id.* ¶ 106 (acknowledging the WorldCat data was "locked up" prior to the "liberation"). Anna's Archive thanked OCLC for "the decades of hard work you put into building the collections that we now liberate. Truly: thank you." *Id.* ¶ 13.

In the end, Anna's Archive boasted of stealing over two *terabytes* of data from OCLC between August 2022 and December 2024 to "create a TODO list of remaining books" to pirate. *Id.* ¶ 87. The pirate website incorporated the WorldCat data into its search engine, made the database owned by OCLC available on its own website, and encouraged its users to download and analyze the data by creating a "mini-competition for data scientists." *Id.* ¶ 93.

Anna's Archive also used OCLC's stolen data for fundraising, asking users for donations and subscriptions—which subscriptions allows for faster downloads of stolen materials through Anna's Archive. *Id.* ¶ 94. Anna's Archive has been repeatedly prosecuted and shut down in Europe, but OCLC believes that US-based internet companies are providing it with hosting and other related services.

### C.   OCLC files suit raising claims based on its user agreements and the theft of its proprietary database.

OCLC emailed Anna's Archive a cease-and-desist letter in October 2023, but Anna's Archive continued its hacking. Brown Decl., Dkt. 17, ¶ 5; Oct. 26, 2023 Letter, Dkt. 9-2, PageID 119–20 (warning Anna's Archive that its "activities are ... illegal

and violate OCLC Worldcat.org Services Terms and Conditions"). OCLC served its complaint in federal court in March 2024, seeking a judgment that could be used to convince internet service providers to block the illegal actions of Anna's Archive. Brown Decl., Dkt. 17, ¶¶ 5–9. The lawsuit raised eleven causes of action under Ohio law.

The first was for breach of contract under the terms and conditions posted on WorldCat, under which OCLC grants the user a license to use WorldCat data available on WorldCat.org, and in exchange the user agrees not to harvest "material amounts" of data; to use the data for commercial use; to distribute, display, or disclose the data; or to store the data. Compl., Dkt. 1, ¶ 123. The other claims are torts under Ohio law, namely unjust enrichment for misappropriating OCLC's proprietary database for its own business, tortious interference with OCLC's customers and OCLC's prospective relationships, violations of R.C. 2913.04 that create civil liability under R.C. 2307.60(A)(1), trespass to chattels, conversion, and related conspiracy counts. *Id.* ¶¶ 128–213.

Anna's Archive did not respond to the Complaint or participate in the case, but it did publicly acknowledge the lawsuit on social media in February 2024.[2] Despite

---

[2] "Lawsuit Accused Anna's Archive of Hacking WorldCat, Stealing 2.2 TB Data," Reddit.com ("We're not making any public statements about the lawsuit..."), https://www.reddit.com/r/Annas_Archive/comments/1alglxg/lawsuit_accuses_annas _archive_of_hacking_worldcat/ (last visited July 10, 2025).

this, Anna's Archive continued to attack the WorldCat database – attempting to further scrape and degrade the database – through at least December 2024.[3]

OCLC then moved for default judgment, including money damages and an injunction prohibiting Anna's Archive from storing and distributing the stolen WorldCat records and data on its website and from further scraping from WorldCat. *See* Motion, Dkt. 40 & Rozek Decl., Dkt. 40-1 (giving factual details). The district court, however, was not certain that Ohio law actually prohibited Anna's Archive from scraping and copying OCLC's proprietary database. Order, Dkt. 42. And it explained that the "legal propriety of data harvesting raises 'serious questions going to the merits.'" *Id*. at 2 (citation omitted). Accordingly, OCLC filed a supplementary memorandum addressing the elements of each claim under Ohio law. Supp. Memo., Dkt. 46.

### D. The district court certifies two important questions of Ohio law.

The district court refused to grant default judgment, again questioning "whether Ohio law prohibits the data scraping alleged here." Appx. at A-002. It concluded that "[n]o Ohio court has ever applied its law as OCLC would have this Court do" and that granting OCLC relief might be "a drastic expansion of Ohio law." *Id*. The court stated that "Ohio law provides no settled answers" about "whether OCLC's well-pleaded factual allegations state any claim for relief." *Id*. at A-007.

---

[3] *Anna's Archive,* https://kmr.annas-archive.org/datasets/oclc (last visited July 10, 2025).

Reviewing OCLC's contract-based claims, the court questioned whether WorldCat.org's Terms and Conditions are enforceable in Ohio—even against an organization of hackers that spent months analyzing WorldCat's vulnerabilities and then over a year exploiting and hacking the site to steal billions of proprietary records. *Id.* at A-008–9. It was not sure that Ohio would enforce "browserwrap" agreements at all, even against hackers. *Id.* It believed that Anna's Archive's deep familiarity and exploitation of the website was insufficient to show "actual or constructive" knowledge, but the court acknowledged Ohio courts might impose a less stringent standard in a case like this. *Id.* at A-009. The court worried any decision "will reach all browserwrap contracts, stretching far beyond terms on data scraping." *Id.* at A-010.

When analyzing the tort claims, the court questioned whether Ohio prohibits data scraping and commercial reuse at all, even when the hackers target proprietary and non-public data. *Id.* at A-011–12. For example, it asked:

> Is it ever unjust to retain publicly available data? If so, when? The Court presumes that it may sometimes be unjust to retain private data, but the Court imagines that the line between public and private data is not easy to draw. For example, is it unjust for someone with a properly obtained password to scrape data from the password-protected parts of a site? What if they terminate their subscription? Ohio law has yet to even suggest answers to these questions.

*Id.* The court was not sure whether Ohio law provided relief for destructive data scraping even when it overloaded its servers and caused a significant, months-long degradation of the service for paying customers. *Id.* It similarly asked, "when data scraping would be 'improper' enough for tortious interference." *Id.* at A-013.

The court also doubted whether the hacking and scraping by Anna's Archive constituted a trespass or conversion. *Id.* at A-015–16. It believed that Ohio law would require either "crashing servers" or "deleting data," and that the serious damage to its servers and business alleged by OCLC did not rise to the level considered a trespass. *Id.* But, once again, the court concluded that "the levels of 'dispossession' and 'deprivation' necessary to sustain a trespass to chattels claim are ultimately questions for Ohio courts" through certification. *Id.* at A-016. It similarly wondered whether Anna's Archive committed conversion under Ohio law when it reproduced 2.2 terabytes of WorldCat data (approximately 700 million unique records) on its own website. *Id.* at A-017–18; *see* Compl., Dkt. 1, ¶ 91.

The district court believed that federal preemption might render Anna's Archive invulnerable to Ohio's contract and tort law. Appx. at A-010–11 (contract), 12 (unjust enrichment), 18 (conversion). In its view, preemption depends on whether Ohio claims against Anna's Archive "serve a state-law interest." *Id.* The court explained that "What state interests OCLC's common-law contract claim serves would 'materially' change the preemption problem here." *Id.* at A-011. The Court therefore also wanted "the Supreme Court of Ohio to weigh in on those interests" so that courts could perform that preemption analysis. *Id.*

In the end, the court acknowledged that "a band of copyright scofflaws cloned WorldCat's hard-earned data, gave it away for free, and then ignored OCLC when it sued them in this Court." *Id.* at A-018–19. But the court requested "that an Ohio court

intervene before this Court makes any new state tort, contract, property, or criminal law." *Id.* at A-019. The court therefore certified the following questions to this Court:

1.  What level of knowledge of browsewrap terms must a website user have for those terms to be enforceable against the website user under Ohio law?

2.  Whether and under what circumstances data scraping gives rise to tort claims, such as trespass to chattels, conversion, and tortious interference, under Ohio law.

Appx. at A-033.

## ARGUMENT

**Certified Question #1: What level of knowledge of browsewrap terms must a website user have for those terms to be enforceable against the website user under Ohio law?**

**Proposition of Law #1: A party that engages in data scraping of a website presumptively has constructive or implied knowledge of the contractual terms of service presented as a condition for access to that website.**

I.  **This Court should resolve the uncertainty in Ohio law regarding enforcing website terms and conditions against malicious hackers and scrapers.**

Tens of thousands of Ohio businesses offer services over the internet subject to a "terms and conditions" agreement. Such agreements, usually found at the bottom of a webpage, are ubiquitous and essential to e-commerce. Unfortunately, there is confusion among Ohio courts about the standard for enforcing such agreements against sophisticated parties—especially against malicious and destructive thieves like Anna's Archive. This Court should accept the opportunity to resolve this issue and hold that Ohio law presumes knowledge and enforces website terms and conditions against parties that engage in destructive or tortious scraping.

A.    Despite the ubiquity of terms of service for websites, Ohio courts are confused about the standards for their enforceability.

The leading Ohio cases on the subject are in some tension, though most Ohio cases have enforced terms and conditions agreements against someone that is a frequent user of a website. In *Rudolph v. Wright Patt Credit Union*, 2021-Ohio-2215 (2nd Dist.), an online banking case, the user tried to avoid an arbitration agreement that had been added to his terms. The court explained that constructive notice occurs when the user knows of circumstances that would lead a prudent and reasonable man to inquire about the terms. *Id.* ¶ 43. The court held that when the user "registered for online banking, he had to accept, and did accept, the terms of online banking," which included the "responsibility to review" the terms "posted on its website." *Id.* ¶49. The court rejected arguments that there was no constructive notice because terms were not prominently displayed. *Id.* ¶¶ 50–57.

Most cases enforce the terms and conditions available on a website without much analysis of the user's knowledge, constructive or otherwise, where the user is using the website to access services or products. *See Valentine v. Cedar Fair, L.P.*, 2022-Ohio-3710, ¶¶ 6, 17 (enforcing the "terms and conditions" that "were available on the website where customers purchased their season passes"); *Qualls v. Wright Patt Credit Union*, 2021-Ohio-2055, ¶ 88 (2nd Dist.) ("By continuing to maintain his account, pursuant to the 'Acceptance of Terms' provision, Qualls manifested his assent to the arbitration provision, as well as by his continued use of online banking."); *GigSmart, Inc. v. AxleHire, Inc.*, 2023-Ohio-3807, ¶ 32 (1st Dist.) ("Courts have held that an agreement to such terms and conditions by creating an account or

13

visiting a website is enforceable where the terms and conditions were conspicuous and reasonably communicated to the user."); *Ranazzi v. Amazon.com, Inc.*, 2015-Ohio-4411, ¶ 14 (6th Dist.) (user "accepted the terms" of a website agreement "by registering for an Amazon account and placing orders").

Some courts appear to presume that an ordinary user has not actually read the terms available on a website unless they are prominently displayed—but those cases typically arise in the distinct context of deciding whether an ordinary consumer has agreed to give up its right to bring suit in court and instead can be compelled to arbitration. For example, the court in *Walker v. Nautilus, Inc.*, 541 F.Supp.3d 836, 841 (S.D.Ohio 2021), refused to enforce an arbitration term against a consumer because he was unlikely to have seen it: the hyperlink "appears in small, faint gray letters at the bottom of the webpage" so the user must "scroll the equivalent of eight pages to reach the 'Terms of Use'" link. Likewise, a recent case found that a credit union seeking to compel arbitration based on terms emailed to account holders had not met its burden of establishing an enforceable arbitration agreement. *See, e.g., Gibbs v. Firefighters Cmty. Credit Union*, 2021-Ohio-2679, ¶ 22 (8th Dist.) (surveying out-of-state authority on browsewrap agreements in the context of compelling arbitration).

In contrast, when evaluating and predicting Ohio law on enforceability of ordinary terms of use, one commentator concluded that terms and conditions should be enforceable when placed "at the bottom of the web page" where a user "expects to see" a link. Sam S. Han, *Predicting the Enforceability of Browse-Wrap Agreements in*

*Ohio*, 36 Ohio N.U. L. Rev. 31, 48 (2010). It noted that "font size and font emphasis" and "font color and contrast" were "not significant factors in determining whether there is sufficient notice to uphold enforcement." *Id*. at 49. Among other things, that article looked at the webpages for the Ohio Senate, the Ohio House of Representatives, and other related pages[4] and demonstrated that many such government websites follow this standard format for terms and conditions agreements.[5] *See, e.g.*, *id*. at 44–46. Notably, these website terms are easier to read than the long contracts printed in tiny font on the back of a ticket approved by the U.S. Supreme Court in *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 592 (1991).

The General Assembly has weighed in on the side of contract formation as well, especially with language that applies to parties that use automation to scrape websites. It states that online contracts can be formed merely by "the interaction of electronic agents of the parties, even if no individual … reviewed … the resulting terms and agreements." R.C. 1306.13(A). This statute can apply to hackers that employ automated tools to scrape a website, which tools easily fit within the definition of "electronic agent." R.C. 1306.01(F). When those "electronic agents" scrape a website

---

[4] For example, the House website states that users "agree to hold the General Assembly of Ohio and its agencies harmless from any and all claims, losses, damages … relating to this service." *See* Disclaimer, Ohio House of Representatives (https://ohiohouse.gov/legal/disclaimer. Other websites have similar disclaimers in a link at the bottom of the page, including those for the General Assembly (https://www.legislature.ohio.gov), the Ohio Legislative Service Commission (https://codes.ohio.gov), and the Ohio Senate (https://www.senate.state.oh.us).

[5] *See, e.g.,* U.S. Courts, at www.uscourts.gov/privacy-security-policy ("By using this system or any connected system, users expressly consent to system monitoring and to official access to data reviewed and created by them on the system.").

despite the terms and conditions page, that "interaction" creates a contract between the parties even if the individual hacker never actually reviewed the terms offered by the website in return for access. At the least, the statute ensures that online contract formation is not one-size-fits-all but depends on "the context and surrounding circumstances, including the parties' conduct." R.C. 1306.04(B).

**B.  Ohio law should recognize that data scraping operations presumptively have implied or constructive knowledge of a website's terms of service.**

The district court in this case did not take into account the sophisticated scraping engaged in by Anna's Archive, thinking that the same knowledge standard would likely apply in all "terms of service" cases. Looking at decisions outside of Ohio, the court concluded that other courts "often decline to enforce browserwrap," citing to *Nguyen v. Barnes & Noble Inc.*, 763 F. 3d 1171, 1178–79 (9th Cir. 2014). Appx. at A-018. But those cases usually involve **_consumers_** being forced to arbitration, not organizations that engage in sophisticated scraping attacks and actively evade a website's conditions on use. The *Nguyen* case itself relied on the "traditional reluctance" to enforce website terms "against individual consumers" in holding that an ordinary consumer could not reasonably have been placed on notice that it was giving up its right to court action. *Id*. at 1178 & fn.2 (citation omitted). And *Nguyen*, in fact, noted that "courts have been willing to enforce terms of use against corporations." *Id*. at 1178 fn.2. While some cases do refuse to apply terms to commercial scrapers for lack of knowledge, they usually involve little analysis of the context and circumstances. *See Cvent, Inc. v. Eventbrite, Inc.*, 739 F.Supp.2d 927, 937

16

(E.D.Va. 2010) (finding that business that was scraping website had no constructive notice of its terms because the link to the terms was not sufficiently prominent).

The sophisticated and surreptitious data scraping and destruction presented here requires a different analysis, as most courts recognize. Analyzing and exploiting vulnerabilities to scrape a website's database, as occurred here, requires a sophisticated actor with deep knowledge of that website—not a naïve, innocent consumer who can be presumed ignorant of the website's terms and conditions. Any entity that repurposes a website's data to promote its own business will necessarily be intimately familiar with its target—and with its terms and conditions. And at the very least, that entity would expect the website to place terms and conditions on its use and would know where those agreements are typically found.

Accordingly, most courts agree that terms and conditions are enforceable against data scrapers. For example, *Cairo, Inc. v. Crossmedia Servs., Inc.*, 2005 WL 756610, \*5 (N.D.Cal. Apr. 1, 2005), explained that the "repeated and automated" access to a website to copy information "can form the basis of imputing knowledge" of the site's terms and conditions. And in *Couponcabin LLC v. Savings.com, Inc.*, 2016 WL 3181826, \*7 (N.D.Ind. June 8, 2016), a data-scraping operation argued that the website's terms and conditions were "buried" at the bottom in a low contrast font. The court, however, noted that the defendants had "circumvented the Plaintiff's security measures in order to continue their data scraping activities." *Id.* at \*8. It later noted it was "reasonable to infer" that the defendant "had constructive notice as to the

17

website's Terms and Conditions given that it is a business entity in direct competition with the Plaintiff." *Id*. at *4.

Other courts similarly hold that knowledge of a website's terms and conditions can be assumed for sophisticated entities looking to build their businesses using that website's data. *See Sw. Airlines Co. v. BoardFirst, LLC*, 2007 WL 4823761, *5–7 (N.D.Tex. Sept. 12, 2007) (defendant assented to terms and conditions by repeatedly using plaintiffs' website for its own commercial purposes); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427–30 (2nd Cir. 2004) (defendant accessed website daily, downloaded customer data, and used data for its business); *Pollstar v. Gigmania, Ltd.*, 170 F.Supp.2d 974, 981–82 (E.D.Cal. 2000) (defendant copied data and posted it on its own competing website). The actions of the defendants in seeking to evade the website's controls and conditions can also show knowledge of wrongdoing. For example, *Reis, Inc. v. Spring11 LLC*, 2016 WL 5390896, *13 (S.D.N.Y. Sept. 26, 2016), explained that the defendant likely knew it was violating the terms of service because it used a "masked IP address," asked employees to use different email addresses, and continued to violate the terms of service even after the "action was initiated."

Finally, some courts increasingly consider the prevalence of online services and the experience of the typical online consumer when evaluating notice of terms and conditions, declining to presume ignorance in that context. *See, e.g.*, *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 77–78 (2d Cir. 2017) ("[W]hen considering the perspective of a reasonable smartphone user, we need not presume that the user has never before encountered an app or entered into a contract using a smartphone….[A] reasonably

18

prudent smartphone user knows that text that is highlighted in blue and underlined is hyperlinked to another webpage where additional information will be found."). But this Court need not even go that far: Surely, if ordinary cell phone users understand how apps and online accounts work, then an experienced, sophisticated, and intentional hacker and data scraper would expect that the use of a website's services comes with terms and conditions.

### C. Anna's Archive had both actual and constructive notice of OCLC's terms and conditions.

This Court should hold that the knowledge standard for a terms and conditions agreement is presumptively satisfied under Ohio law when a sophisticated party copies an online database that has a link to the terms on the bottom of the website's landing page. This holding ensures that hackers like Anna's Archive are not – as the district court worried – exempted from consequences under Ohio law.

As explained above, Anna's Archive is an organization of experienced hackers who are intimately familiar with WorldCat. They took a deep dive into all parts of the WorldCat.org website and service, analyzed its vulnerabilities over a long period, and then spent a year picking apart and scraping over 97% of the data both on the website and behind the public-facing interface of the website. And they continued to scrape after receiving a cease-and-desist letter, after the filing of the lawsuit, and after their public acknowledgment of the lawsuit. The idea that the hackers might not know about the terms and conditions because they were placed at the bottom of the WorldCat.org website is nonsensical. Anna's Archives own actions demonstrate

19

that it clearly understood that it violated the terms and conditions of WorldCat.org. And it is now using the theft of the WorldCat data to facilitate further crimes.

This Court should hold such facts are more than sufficient to constitute knowledge of the terms and conditions under Ohio law. Other courts have found constructive knowledge and enforced terms and conditions based solely on a sophisticated party's scraping activities. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 639 F.Supp.3d 944, 962 (N.D.Cal. 2022) ("In sum, hiQ breached LinkedIn's User Agreement both through its own scraping of LinkedIn's site and using scraped data, and through [contractors'] creation of false identities on LinkedIn's platform."); *X Corp. v. Bright Data Ltd.,* 733 F.Supp.3d 832, 847 (N.D.Cal. 2024) (data scraper was bound by the website's terms and conditions because it was a "sophisticated party").

Cases discussing what an average consumer would understand or know are wholly inapplicable to sophisticated parties engaging in large-scale scraping. Ohio defendants should not have to provide proof that hackers carefully read their terms and conditions when those terms are linked in plain sight at the bottom of a webpage, especially when those hackers are destroying their servers and copying their database. Anna's Archive had actual knowledge of the Terms and Conditions, or at the very least would have readily expected that scraping WorldCat.org and bypassing the public interface to access non-public data (both by pinging OCLC's servers and usen stolen user credentials) was in violation of the Terms and Conditions—but Anna's Archive still decided to proceed. These facts should create a reasonable

inference that Anna's Archive had sufficient knowledge of the Terms and Conditions to support a contract claim by OCLC under Ohio law.

**Certified Question #2:** **Whether and under what circumstances data scraping gives rise to tort claims, such as trespass to chattels, conversion, and tortious interference, under Ohio law.**

**Proposition of Law #2:** **Because privately-owned databases are considered property under Ohio law, a tort occurs when a party scrapes that database to create its own copy without permission.**

## II. Ohio law protects proprietary databases from data scaping and provides important remedies in tort against hackers and scrapers.

This Court should hold that Ohio tort law protects online proprietary databases to the same extent as it protects physical property. The district court was not sure whether Ohio law prohibits a hacking organization from copying a proprietary database and then offering the database itself to its users. Appx. at A-011–12. The court similarly asked if it was "unjust" to copy a password-protected database or even whether data scraping can be "improper" under Ohio law at all. *Id.* It believed that Ohio tort law would require either "crashing servers" or "deleting data," and that the serious damage to its servers and business alleged by OCLC did not rise to the level considered unjust, or a trespass or conversion. *Id.*

This Court should hold that these questions about digital property are answered by R.C. 2913.04(A): "No person shall knowingly use or operate the property of another without the consent of the owner or person authorized to give consent." Similarly, R.C. 2913.04(B) states that no person "shall knowingly gain access to" or "cause access to be gained" to any "network" or "information service" that goes "beyond the scope of the express or implied consent" of the owner. In other words,

OCLC is entitled to limit and condition what people can do with its database, even if portions of that database are available for individual searches. Ohio law treats digital assets as equivalent to physical property. *See, e.g., Eysoldt v. ProScan Imaging*, 2011-Ohio-2359, ¶¶ 24–25 (1st Dist.) ("identifiable intangible property rights" including an "account with Go Daddy and its accompanying domain names and e-mail accounts" can "be converted"); *Key Realty, Ltd. v. Hall*, 2021-Ohio-1868, ¶ 94 (6th Dist.), *aff'd*, 2022-Ohio-1199, ¶ 94 (conversion claim based on theft of "Facebook page, email accounts, websites, calendars, and Google Drive resources"). With this equivalence of the digital and physical in mind, the answers to the district court's questions are straightforward.

Nothing about Anna's Archive's conduct, motive, interests, or activity in this case should find support or comfort in Ohio law. This Court should hold, in no uncertain terms, that Ohio does not protect data scrapers that destroy the target's servers and business.

**1. Unjust enrichment and tortious interference**. The district court's objections to applying Ohio law of tortious interference and unjust enrichment were essentially the same**.** It was not sure whether data scraping was "improper" enough for tortious interference and "unjust" enough for unjust enrichment. But this Court has pointed to the following factors as instructive in this inquiry:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

22

*Fred Siegel Co., L.P.A. v. Arter & Hadden*, 1999-Ohio-260, paragraph three of the syllabus (citing Restat. 2d, Torts § 767 (1979)) (improper interference with contract).

Application of these factors to Anna's Archive demonstrates that the malicious data scraping at issue qualifies as both improper and unjust. OCLC worked for decades, investing hundreds of millions of dollars, to create the WorldCat database. With the purpose of facilitating copyright infringement, Anna's Archive forcefully hacked OCLC's servers to scrape WorldCat data. Their actions overloaded OCLC's servers and nearly stopped OCLC's WorldCat-related services to its customers, causing $5 million in direct damages. Anna's Archive then offered OCLC's data on its own website, asking for donations to support its work. Anna's Archive openly bragged about stealing and repurposing OCLC's business of offering the WorldCat data for their own pirate operation.

Every *Fred Siegel* factor favors the finding that Anna's Archive acted unjustly and improperly. The "conduct" of Anna's Archive was nothing short of appalling—stealing the heart of OCLC's business. Its "motive" with the hacking was, if anything, worse: to facilitate stealing billions of privately-owned works. OCLC's interests in conducting its business are strongly aligned with Ohio's interests, while Ohio has little interest in protecting hacking and stealing. The defendant's actions directly harmed OCLC and its only communication to OCLC was a blog post with a mocking "apology" for misappropriating decades of investment and hard work by OCLC.

Other courts have recognized unjust enrichment claims in connection with data scraping. *See Digital Drilling Data Sys. v. Petrolink Servs.*, 965 F.3d 365, 379–

23

80, 383–84 (5th Cir. 2020) (upholding unjust enrichment claim that turns on whether a data scraping program wrongfully, unethically, or unjustly caused other companies to violate the terms of their licenses); *Meta Platforms, Inc., v. Ekrem ATES*, 2023 WL 4035611, \*6 (N.D.Cal. May 1, 2023) (defendant "profited from his unauthorized use of Meta's computers and scraping of Instagram" and "Meta had to expend significant resources to investigate and mitigate his illegal conduct").

The district court worried that data scraping might be legal in Ohio because OCLC allows the public to perform searches via WorldCat.org through some of the data in WorldCat, and allows its paid WorldCat subscribers to access even more of the data. But the damage to OCLC from the hacking aside, there is a vast gulf between individual searches and wholesale copying and posting of data online for free to destroy OCLC's business. That difference was anticipated by the General Assembly, which forbade persons from gaining access to a database that goes "beyond the scope of the express or implied consent." R.C. 2913.04(B). OCLC gave express limits in its terms and conditions. Anna's Archive's duplication of the WorldCat data – which required destructive and sophisticated hacking techniques – exceeds both those express limits and all implied limits as well.

**2. Ohio Revised Code 2307.60.** The district court refused to grant judgment under this section, which authorizes civil damages for criminal acts, because it questioned whether an underlying crime exists under R.C. 2913.04. The court stated that "when (if ever) § 2913.04 criminalizes data scraping is an Ohio statutory interpretation issue of first impression." Appx. at A-015.

24

This Court should hold that R.C. 2913.04 criminalizes data scraping that involves an unauthorized use of a "network" or "information service," and especially when it harms the targeted system. As explained above, R.C. 2913.04(B) forbids anyone from gaining accessing, or giving others access to, any computer "without the consent of, or beyond the express or implied consent of, the owner." And that is exactly what Anna's Archive did by scraping whole swaths of the WorldCat database—far beyond the express consent given to users by OCLC. Anna's Archive's hacking, scraping, and repurposing of WorldCat data is "hacking" as defined in the statute, which includes using a computer "in a manner that exceeds" the owner's permission. R.C. 2913.01(II)(1). Everything done by Anna's Archive was an unauthorized use of the WorldCat network and information service under R.C. 2913.04, and therefore criminal data scraping under Ohio law, giving rise to a cause of action under R.C. 2307.60.

**3. Trespass to chattels and conversion**. The district court believed that Ohio law would require either "crashing servers" or "deleting data" to show that OCLC was dispossessed, deprived, or excluded from its database. Appx. at A-015–16 & A-017–18. It appeared to believe that those causes of action could not apply to data scraping under Ohio law if the owner still has access to the database. *Id*. This Court should clarify that criminal data scraping, as done by Anna's Archive, gives rise to Ohio law claims for trespass to chattels and for conversion.

Ohio law does not require complete dispossession for trespass. A trespass to chattel may also be committed by "using or intermeddling with a chattel in the

possession of another." *Mercer v. Halmbacher,* 2015-Ohio-4167, ¶ 20 (9th Dist.). A trespass of an electronic database thus occurs when a defendant's use exceeds the limits of consent. *See eBay, Inc. v. Bidder's Edge, Inc.*, 100 F.Supp.2d 1058, 1070 (N.D.Cal. 2000) ("[T]he electronic signals sent by BE to retrieve information from eBay's computer system are also sufficiently tangible to support a trespass cause of action[.]"); *CouponCabin*, 2017 WL 83337, at *3 (trespass occurs where defendants "circumvented" "security measures" to "engage in data scraping-related activities"). Anna's Archive's abuse of the access OCLC offers to the public qualifies as an unauthorized and forbidden trespass under Ohio law. *CompuServe Inc. v. Cyber Promotions, Inc.*, 962 F.Supp.1015, 1027 (S.D.Ohio 1997) ("Defendants' intentional use of plaintiff's proprietary computer equipment exceeds plaintiff's consent and, indeed, continued after repeated demands that defendants cease. Such use is an actionable trespass[.]").

The trespass in this case goes far beyond normal web-scraping—Anna's Archive had a harmful effect on OCLC's servers and infrastructure, overwhelming the existing services and infrastructure and causing substantial delays and interruptions. Rozek Decl., Dkt. 40-1, ¶¶ 38, 44, 54, 56. It substantially degraded the performance of OCLC's chief service for *months*, requiring around-the-clock efforts from November 2022 to March 2023 to prevent services outages. Compl., Dkt. 1, ¶ 81; Murphy Decl. Dkt. 30-1, ¶ 12. OCLC also had to purchase 60 new servers to maintain service at a cost of $1.5 million. Rozek Decl., Dkt. 40-1, ¶ 54. OCLC's customers experienced significant disruptions for an extended time. Compl., Dkt. 1, ¶ 82; Rozek

Decl., Dkt. 40-1, ¶ 56; Murphy Decl., Dkt. 30-1, ¶ 12. The direct injuries to OCLC from this data-scraping trespass exceed $5 million. Compl., Dkt. 1, ¶¶ 9, 81, 83–86, 90, 100–04, 126–27, 185.

Anna's Archive's trespass impaired the "condition, quality, or value" of OCLC's data, computer systems, and networks. *See CompuServe Inc.*, at 1022 (data scraping drains processing power and harms the reputation with customers); *Snap-on Bus. Sols. Inc. v. O'Neil & Assocs., Inc.*, 708 F.Supp.2d 669, 678–80 (N.D.Ohio 2010) (defendants impaired the condition, quality, or value as the data scraping crashed plaintiff's website and caused slow run times).

Similarly, Ohio law on conversion does not require that data scraping cause OCLC's exclusion from its own database. Conversion merely requires the "exercise of dominion or control" over the WorldCat data "in a manner inconsistent with the plaintiff's rights of ownership." *Bush v. Signals Power & Grounding Specialists, Inc.*, 2009-Ohio-5095, ¶ 15 (5th Dist.). As such, "identifiable intangible property rights," such as domain names and computer data are subject to conversion. *Eysoldt*, 2011-Ohio-2359, at ¶¶ 24–25 (1st Dist.). Much of the value of the proprietary WorldCat database is that it is proprietary. Subscribers to WorldCat are not so eager to pay for access, let alone to members-only data and bulk downloads, when the database is available for free from Anna's Archive.

The district court failed to understand that while Anna's Archive did not prevent OCLC from accessing WorldCat, the hackers converted much of the value of that database into their own hands by placing their own version online. Although

27

Ohio courts have not addressed a conversion claim involving hacking or scraping, other courts have recognized such claims. *See In re Clearview AI, Inc. Consumer Priv. Litig.*, 585 F.Supp.3d 1111, 1127–28 (N.D.Ill. 2022) (conversion occurs when "defendants scraped their images in violation of the terms of service of the websites on which their images were hosted and without the plaintiffs' consent"); *Integrated Direct Mktg., LLC v. May*, 143 F.Supp.3d 418, 428 (E.D.Va. 2015) (copying electronic files containing confidential and proprietary information can constitute conversion). This Court should hold Anna's Archive's activities are sufficient to allow OCLC to plead claims for trespass to chattels and conversion under Ohio law.

## III. This Court's answer to the above questions will answer the district court's questions related to federal preemption.

In the two issues above, OCLC has asked this Court to hold that Ohio law has a strong and important interest in protecting the contractual rights and proprietary databases of Ohio businesses against criminal data scraping. If this Court agrees with OCLC, it will have answered the district court's questions relating to federal preemption—whether Ohio claims against Anna's Archive "serve a state-law interest." Appx. at A-010–11. The district court explained that an Ohio interest in protecting OCLC's WorldCat database "would 'materially' change the preemption problem here." *Id*. at A-011. Although it did not certify a question of federal preemption, the court did ask this Court "to weigh in on those interests." *Id*.

OCLC does not believe that preemption applies because, among other reasons, OCLC has not claimed in this case that its WorldCat database is within the subject matter of federal copyright law. But a federal preemption analysis can consider a

state's interest in the application of its laws. *See PNH, Inc. v. Alfa Laval Flow, Inc.*, 2011-Ohio-4398, ¶ 17–18; *X Corp.*, 733 F.Supp.3d at 853 ("one must consider whether a state-created right vindicates a substantial state law interest" in preemption). To avoid any doubt, OCLC asks this Court, in addressing the above issues, to explicitly confirm: (i) Ohio has a strong interest in enforcing the valid terms and conditions contracts of Ohio businesses, as exemplified by R.C. 2913.04; and (ii) Ohio has a strong interest in protecting proprietary databases through tort claims, whether or not the databases are copyrightable.

## CONCLUSION

This Court should decide the certified questions submitted by the district court and hold that: (1) A party that engages in data scraping of a website has constructive or implied knowledge of the contractual terms of service presented as a condition for access to that website; and (2) Because privately-owned databases are considered property under Ohio law, a tort occurs when a party scrapes that database to create its own copy without permission.

Respectfully submitted,

*/s/ Jeffrey M. Walker*
Jeffrey M. Walker (0096567)
  *Counsel of record*
Traci L. Martinez (0083989)
Kathryn M. Brown (0100426)
Brittany N. Silverman (0102263)
SQUIRE PATTON BOGGS (US) LLP
2000 Huntington Center
41 South High Street
Columbus, Ohio 43215

Telephone: 614 365 2700
Fax: 614 365 2499
jeffrey.walker@squirepb.com
traci.martinez@squirepb.com
kathryn.brown@squirepb.com
brittany.silverman@squirepb.com

Colter L. Paulson (081903)
Lauren S. Kuley (0089764)
SQUIRE PATTON BOGGS (US) LLP
201 E. Fourth Street, Suite 1900
Cincinnati, OH 45202
Telephone: 513 361 1200
Fax: 513 361 1201
colter.paulson@squirepb.com
lauren.kuley@squirepb.com

*Counsel for Plaintiff-Petitioner
OCLC, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

On July 10, 2025, this document and the accompanying attachment was served

upon Anna's Archive at the following email addresses:

    AnnaArchivist@proton.me
    AnnaDMCA@proton.me
    AnnaArchivist+security@proton.me
    domainabuse@tucows.com

*/s/ Jeffrey M. Walker*

*Counsel for Plaintiff-Petitioner OCLC, Inc.*

## IN THE SUPREME COURT OF OHIO

OCLC, Inc.

      Plaintiff-Petitioner,

      v.

ANNA'S ARCHIVE, f/k/a PIRATE
LIBRARY MIRROR, et al.,

      Defendants-Respondents.

Case No. 2025-0691

On a Certified Question of State
Law from the U. S. District Court,
Southern District of Ohio, Eastern
Division

Case No: 2:24-cv-00144-MHW-EDP

---

### APPENDIX TO MERITS BRIEF OF
### PLAINTIFF-PETITIONER OCLC, INC.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

OCLC, Inc.,

      Plaintiff,

      v.

Anna's Archive, f/k/a
Pirate Library Mirror, *et al.*,

      Defendants.

Case No. 2:24-cv-144

Judge Michael H. Watson

Magistrate Judge Deavers

## OPINION AND ORDER

This case is about data scraping.[1]  Plaintiff Online Computer Library

Center, Inc. ("OCLC") is a non-profit organization that helps libraries organize

and share resources.  In collaboration with its member libraries, OCLC created

and maintains WorldCat—the most comprehensive database of library

collections worldwide.  OCLC alleges that a "pirate library"[2] named Anna's

Archive along with Maria Matienzo, and other unknown individuals (collectively,

"Defendants") scraped WorldCat's data.  OCLC claims that, in doing so,

Defendants violated Ohio law.  Specifically, OCLC invokes causes of action

---

[1] "Data scraping" is the process of retrieving and copying website data using a program
that sends tailored queries to websites (the programs are called "bots," "spiders," or
"web crawlers").  *See* Andrew Sellars, *Twenty Years of Web Scraping and the
Computer Fraud and Abuse Act*, 24 B.U. J. Sci. & Tech. L. 372, 373, 381–88 (2018);
*see also Screen-Scraping*, Black's Law Dictionary (11th ed. 2019) ("[t]he practice of
extracting data directly from one website and displaying it on another website.")

[2] A "pirate library" is an online database that provides free access to content that is
otherwise not widely accessible to the public.  *See generally* Compl. ¶¶ 60–74.  This
includes standard library content (books, academic articles, software, film, videos, or
audio files).  *See id.*

arising under the Ohio common law of tort, contract, and property, as well as a provision of the Ohio criminal code.[3]

But whether Ohio law prohibits the data scraping alleged here poses "novel and unsettled" issues. No Ohio court has ever applied its law as OCLC would have this Court do (as far as the Court is aware).[4] Nor have courts uniformly applied analogous laws of other jurisdictions that way.[5] So, to resolve this case, the Court would need to answer "novel and unsettled" questions about Ohio law.

When that is true—when a federal court faces "novel and unsettled" state-law issues—the federal court may certify those issues to the state's high court. Unwilling to sleepwalk into a drastic expansion of Ohio law, this Court thus resolves to certify the issues presented here.

---

[3] OCLC relies on diversity jurisdiction to bring its claims here. Compl. ¶ 21, ECF No. 1.

[4] *But cf. generally Snap-on Bus. Sols. Inc. v. O'Neil & Associates, Inc.*, 708 F. Supp. 2d 669 (N.D. Ohio 2010) (data scraping case arising under Ohio law).

[5] *Cvent, Inc. v. Eventbrite, Inc.*, 739 F. Supp. 2d 927, 937 (E.D. Va. 2010) (no contract); *Andersen v. Stability AI Ltd.*, 744 F. Supp. 3d 956, 971–73 (N.D. Cal. 2024) (no unjust enrichment); *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1194–1202 (9th Cir. 2022) (no crime); *Intel Corp. v. Hamidi*, 71 P.3d 296, 308–11 (2003) (no trespass to chattels); *Healthcare Advocates, Inc. v. Harding*, 497 F. Supp. 2d 627, 650 (E.D. Pa. 2007) (no trespass to chattels or conversion).

## I.    BACKGROUND

**A.    OCLC brings twelve claims against Defendants.**

Count I claims breach of contract.  Compl. ¶¶ 122–27, ECF No. 1.

To support this claim, OCLC alleges that Defendants breached WorldCat.org's

Terms and Conditions ("Terms") by scraping its data; using that data for their

own commercial purposes; displaying, distributing, and disclosing that data; and

permanently storing it.  *See id.*

Count II claims unjust enrichment.  *Id.* ¶¶ 128–34.  To support this claim,

OCLC alleges that Defendants retained the benefit of WorldCat's data for free,

knowing it was beneficial.  *See id.*  Defendants' retention was "unjust" and "in bad

faith," according to OCLC, because Defendants "gave away" what they knew was

proprietary data.  *See id.* ¶ 132.

Counts III–VI claim tortious interference.  *Id.* ¶¶ 135–67.  To support

Count III, OCLC alleges that, when Defendants scraped and distributed

WorldCat's data, they knowingly and unjustifiably made it more difficult for OCLC

to fulfill its customer agreements and made it more likely that current customers

would cancel those agreements.  *See id.* ¶¶ 135–42.  To support Count V, OCLC

alleges the same for prospective customers.  *See id.* ¶¶ 151–58.  Counts IV and

VI allege that, to tortiously interfere with these current and prospective contracts,

Defendants conspired.  *Id.* ¶¶ 143–50, 159–67.

Counts VII and VIII claim a criminal violation.  *See id.* ¶¶ 168–81.

To support Count VII, OCLC alleges that, in scraping WorldCat's public and

subscriber-only data, Defendants violated Ohio Revised Code § 2913.04(B),

which states:

> No person, in any manner and by any means, including, but not limited to, computer hacking, shall knowingly gain access to, attempt to gain access to, or cause access to be gained to any computer, computer system, computer network, cable service, cable system, telecommunications device, telecommunications service, or information service without the consent of, or beyond the scope of the express or implied consent of, the owner of the computer, computer system, computer network, cable service, cable system, telecommunications device, telecommunications service, or information service or other person authorized to give consent.

Based on Defendants' alleged criminal hack, OCLC seeks civil recovery under

Ohio Revised Code § 2307.60. Compl. ¶¶168–73, ECF No. 1. Count VIII

alleges that, to criminally hack WorldCat, Defendants conspired. *Id.* ¶¶ 174–81.

Counts IX and X claim trespass to chattels. *Id.* ¶¶ 182–97. To support

Count IX, OCLC alleges that Defendants intentionally "intermeddled" with

WorldCat's data and servers, thereby impairing WorldCat's data and damaging

OCLC's servers. *See id.* ¶¶ 182–89. Count X alleges that, to "intermeddle" with

WorldCat's data, Defendants conspired. *Id.* ¶¶ 190–97.

Counts XI and XII claim conversion. *Id.* ¶¶ 198–213. To support Count XI,

OCLC alleges that, by scraping WorldCat's data, Defendants "exercised control

and dominion over" and thereby "substantially and unreasonably interfered with"

OCLC's property rights. *See id* at ¶¶ 198–205. Count XII alleges that, to convert

OCLC's property, Defendants conspired. *Id.* ¶¶ 206–13.

**B.**   **After Anna's Archive failed to participate, OCLC moved for default judgment on all twelve of its claims.**

OCLC filed its Complaint on January 12, 2024.  The Court permitted OCLC to serve Anna's Archive by email, ECF No. 4, but Anna's Archive has thus far failed to respond to the Complaint or otherwise participate.  The Clerk accordingly awarded OCLC an entry of default on June 28, 2024.  ECF No. 39.  OCLC then moved for default judgment against Anna's Archive.  ECF No. 40.  Uncertain about the legal propriety of data scraping, the Court requested additional briefing on whether OCLC's well-pleaded factual allegations state a claim for relief.  ECF No. 42.  OCLC submitted the requested supplemental brief, and the Court has reviewed it.  ECF No. 46.

## II.   DISCUSSION

**A.**   **Federal law permits, and Ohio law invites, federal courts to certify questions—especially new, unsettled, and determinative questions— to the Supreme Court of Ohio.**

A federal court's normal course, when presented with an issue of state law, is to "make an *Erie* guess to determine how [a state supreme court], if presented with the issue, would resolve it." *Conlin v. Mortg. Elec. Registration Sys., Inc.*, 714 F.3d 355, 358–59 (6th Cir. 2013).  Federal courts do "not trouble our sister state courts every time an arguably unsettled question of state law comes across our desks." *State Auto Prop. & Cas. Ins. v. Hargis*, 785 F.3d 189, 194 (6th Cir. 2015) (internal citation and quotation omitted).  Instead, "[w]hen we see a reasonably clear and principled course, we will seek to follow it ourselves";

"[t]he state court need not have addressed the exact question, so long as well-established principles exist to govern a decision." *Id.*

That said, through "certification," a federal court may (in its sound discretion) request that a state's highest court answer a state-law question *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974). Federal courts may do so sua sponte. *See, e.g.*, *Elkins v. Moreno*, 435 U.S. 647, 662 (1978); *Planned Parenthood of Cincinnati Region v. Strickland*, 531 F.3d 406, 408 (6th Cir. 2008). As the Supreme Court of Ohio recognizes, "[c]ertification ensures that federal courts will properly apply state law." *Scott v. Bank One Tr. Co.*, 577 N.E.2d 1077, 1081 (Ohio 1991) (per curiam); *see also id.* at 1080 ("[A]nswering certified questions serves to further the state's interests and preserve the state's sovereignty."). And, as federal courts recognize, this mechanism not only preserves "time, energy, and resources" but also furthers "cooperative judicial federalism." *Lehman Bros.*, 416 U.S. at 391.

To these ends, federal courts routinely certify new, unsettled, and determinative state-law questions. *See, e.g.*, *In re Natl. Prescription Opiate Litig.*, 82 F.4th 455 (6th Cir. 2023), *certified question accepted sub nom. Natl. Prescription Opiate Litig. v. Purdue Pharma, L.P.*, 222 N.E.3d 661 (Ohio 2023), *and certified question answered*, 2024-Ohio-5744.

Parallel with the federal "new, unsettled, and determinative" standard, the

Supreme Court of Ohio's Rules of Practice provide that

> The Supreme Court [of Ohio] may answer a question of law certified
> to it by a court of the United States . . . if the certifying court, in a
> proceeding before it, issues a certification order finding there is a
> question of Ohio law that may be determinative of the proceeding and
> for which there is no controlling precedent in the decisions of Supreme
> Court [of Ohio].

Ohio S. Ct. Prac. R. 9.01(A).  This Court makes that finding here.

**B.  OCLC's data-scraping claims pose many new and unsettled questions of Ohio law.**

Data scraping's status under the common law is an "enigma."[6]  No doubt

established property, tort, and contract causes of action "*may* be available" to

self-described "victims of data scraping."  *hiQ Labs*, 31 F.4th at 1201–02

(emphasis added).  But are they available?  If so, which?  And under what

circumstances?  Ohio law provides no settled answers.  Without these answers,

the Court remains uncertain whether OCLC's well-pleaded factual allegations

state any claim for relief.  The Court elaborates on its uncertainty below for each

of OCLC's causes of action.

---

[6] Benjamin L.W. Sobel, *A New Common Law of Web Scraping*, 25 Lewis & Clark L. Rev. 147, 150 (2021); *see also* Sellars, *supra*, note 1, at 377, 377 n.38 ("Most often the legal status of scraping is characterized as something just shy of unknowable, or a matter entirely left to the whims of courts, plaintiffs, or prosecutors."); Jeffrey K. Hirschey, *Symbiotic Relationships: Pragmatic Acceptance of Data Scraping*, 29 Berkley Tech. L.J. 897, 897, 926 (2014) (describing the "uncertain legal background of scraping case law" and observing that the "legal doctrines involved in scraping suits are in flux").

1.  **OCLC's contract claim raises "new and unsettled" questions about adhesive "browserwrap" contracts and preemption.**

    a.  **When browserwrap contracts are enforceable under Ohio law is an open question.**

To establish a breach of contract claim, OCLC must (of course) identify a contract between it and Defendants. OCLC points to WorldCat.org's Terms. Compl. ¶ 123, ECF No. 1. Those Terms prohibit WorldCat.org users from: scraping material amounts of data; distributing, displaying, or disclosing that data; storing that data long-term; or using that data for commercial use. Compl. Ex. B, ECF No 1-2 at PAGEID # 46–51. Accepting OCLC's well-pleaded factual allegations as true, Defendants no doubt violated these Terms. *See, e.g.*, Compl. ¶¶ 86–95, ECF No. 1.

But did the Terms bind Defendants? Ohio law provides no answer because WorldCat.org's Terms are "browserwrap."

Contracts on the internet roughly divide into clickwrap and browserwrap. *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014). Clickwrap requires a website user to manifest assent to terms (usually by clicking an "I agree" box) before the user can access the portion of the site to which the terms apply. *Id.* Browserwrap, by contrast, does not require a user to manifest assent to a website's terms before the user can access the site. *Id.* Rather, Browserwrap assumes assent to the site terms based on mere use of the site. *Id.* Websites often make browserwrap terms available on a dedicated page, accessible via a hyperlink at the bottom of the screen. *Id.* WorldCat.org makes

its Terms available this way (on a separate page, accessible via a hyperlink at the bottom of the screen). Its Terms are therefore browserwrap.

Courts often decline to enforce browserwrap. *See id.* at 1178–79; *CollegeSource, Inc. v. AcademyOne, Inc.*, No. 10-3542, 2012 WL 5269213, at *10 (E.D. Pa. Oct. 25, 2012); *Cvent, Inc.*, 739 F. Supp. 2d at 937. Under the prevailing standard, courts enforce browserwrap terms only if the website user had "actual or constructive knowledge of a site's terms and conditions prior to using the site." *Snap-on*, 708 F. Supp. 2d at 681 (internal citations and quotations omitted). *Snap-on* recognized that "Ohio courts have not specifically discussed the enforceability of browserwrap agreements as contracts" but applied the prevailing standard anyway. *Id.* at 681–83.

If this Court followed *Snap-on* in applying the "actual or constructive knowledge" standard for browserwrap enforceability, this Court would likely decline to enforce WorldCat.org's Terms. OCLC does not plead that Defendants had constructive (or actual) knowledge of WorldCat.org's Terms. So OCLC has not adequately pleaded its contract claim, assuming Ohio courts would apply the "actual or constructive knowledge" standard as *Snap-on* did.

But the Court will not rest on this assumption. Again, Ohio courts have never settled on the "actual or constructive knowledge" standard for browserwrap enforceability. They might do so. Or they might adopt a more stringent standard and require actual knowledge. Different still, they might adopt a less stringent standard and require less than constructive knowledge. Whatever standard Ohio

courts choose, the blast radius will reach all browserwrap contracts, stretching far beyond terms on data scraping.  The detonation of that blast belongs to Ohio courts, not this Court.

> **b.** **Alternatively, federal copyright law may preempt WorldCat.org's data-scraping Terms, depending on the state-law interest that OCLC's contract suit serves.**

Under a conflict preemption doctrine, federal statutes preempt state-common-law claims "to the extent of any conflict."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (citing U.S. Const. art. VI, cl. 2).

At least one federal court has applied conflict preemption principles to dismiss a data-scraping contract claim.  *X Corp. v. Bright Data Ltd.*, 733 F. Supp. 3d 832, 852–53 (N.D. Cal. 2024); *cf. Snap-on*, 708 F. Supp. 2d at 680–81 (unjust enrichment claim preempted).  *Bright Data* held that the Copyright Act preempted X's data-scraping-based contract claim because that claim "'amount[s] to little more than camouflage for an attempt to exercise control over the exploitation of a copyright.'"  733 F. Supp. 3d at 853 (quoting *In re Jackson*, 972 F.3d 25, 38 (2d Cir. 2020)).

The same might be said here; OCLC, like X, primarily contends that "improper scraping . . . interferes with [its] own sale of [its] data through a . . . subscription service[.]"  *Id.* (internal citations and quotations omitted).  And so the Copyright Act may preempt OCLC's contract claim too.

If, however, OCLC can show that its contract claim serves a state-law interest "outside the sphere of congressional concern in the [copyright] laws[,]"

then copyright law does not preempt it. *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 155 (1989). Whether OCLC's claim might promote such an interest is as much a question for OCLC as it is for Ohio courts. If a state court's answer to a state-law question might "materially change" the nature of a federal constitutional problem, then certifying that question is warranted. *Bellotti v. Baird*, 428 U.S. 132, 147 (1976)). What state interests OCLC's common-law contract claim serves would "materially" change the preemption problem here. So this Court would like the Supreme Court of Ohio to weigh in on those interests before this Court conducts its full preemption analysis.

### 2. OCLC's unjust enrichment claim raises "new and unsettled questions" about "unjust retention" and preemption.

#### a. When retaining scraped data is "unjust" under Ohio law is an open question.

To establish its unjust enrichment claim, OCLC must adequately plead that Defendants retained the benefit of WorldCat's data "under circumstances in which it was unjust to do so without payment." *See Bunta v. Superior VacuPress, LLC*, 218 N.E.3d 838, 848 (Ohio 2022).

Candidly, the Court does not know how to begin evaluating whether "unjust circumstances" are present here. Is it ever unjust to retain publicly available data? If so, when? The Court presumes that it may sometimes be unjust to retain *private* data, but the Court imagines that the line between public and private data is not easy to draw. For example, is it unjust for someone with a properly obtained password to scrape data from the password-protected parts of

a site?  What if they terminate their subscription?  Ohio law has yet to even suggest answers to these questions.  So, rather than draw the lines itself, the Court will look to the Supreme Court of Ohio for guidance on the contours of an unjust enrichment claim based on data scraping.

      **b.    Federal copyright law may preempt OCLC's unjust enrichment claim, for the same reasons that it may preempt OCLC's contract claim.**

The only court to have applied Ohio common law to data scraping held that federal copyright law preempted a claim for unjust enrichment.  *Snap-on*, 708 F. Supp. 2d at 680–81.  Courts considering unjust enrichment claims that arise under other states' laws have reached the same conclusion.  *See, e.g.*, *Andersen*, 744 F. Supp. 3d at 971–73; *but see Digital Drilling Data Sys., L.L.C. v. Petrolink Services, Inc.*, 965 F.3d 365, 377–82 (5th Cir. 2020) (no preemption).  As with OCLC's contract claim, whether federal copyright law preempts its unjust enrichment claim depends on the state-law interests that claim serves.  So the Court will invite OCLC and the Supreme Court of Ohio to elaborate on those interests.

    **3.    OCLC's tortious interference claims, though inadequately pleaded, raise "new and unsettled" questions on "justification"**

      **a.    OCLC's tortious interference claims fail because OCLC identifies no actual present or future contracts.**

A claim for tortious interference with a contract "requires the plaintiff to prove, as an element, an actual breach of contract."  *Lamson & Sessions Co. v. Peters*, 576 F. App'x 538, 542 (6th Cir. 2014) (citing *Fred Siegel Co., L.P.A. v.*

*Arter & Hadden*, 707 N.E.2d 853, 858 (Ohio 1999)). In its Complaint, OCLC neglects to allege any actual breach. *See* Compl. ¶¶120, 135–42, ECF No. 1. OCLC has thus failed to state a claim for tortious interference with contract.

The same goes for OCLC's prospective business relations claim. Under Ohio law, "[a] vague assertion that a party interfered with certain unspecified business relationships is insufficient to state a claim." *BCG Masonic Cleveland, LLC v. Live Nation Ent., Inc.*, 570 F. Supp. 3d 552, 559 (N.D. Ohio 2021) (internal citations and quotations omitted). But vague assertions are all OCLC offers in its Complaint. *See* Compl. ¶¶ 120, 152, ECF No. 1 ("Upon information and belief, as a result of Defendants' plan, one or more OCLC WorldCat® customers or potential WorldCat® customers has or will opt to forego OCLC services, including WorldCat®."). OCLC neglects to specify any particular customers it lost, for example. *See BCG Masonic Cleveland*, 570 F. Supp. 3d at 559 ("[Plaintiff] identifies no musical acts, bands, or tours that [Defendant] prevented [Plaintiff] from booking"). OCLC has thus failed to state a claim for tortious interference with prospective business relationships.

### b. Assuming OCLC can correct this deficiency, the Court will certify a question about "justification."

"Only *improper* interference with a contract is actionable, as reflected in the ['without justification'] element." *Fred Siegel Co*, 707 N.E.2d at 858 (emphasis added). The Court questions when data scraping would be "improper" enough for tortious interference, just as it questions when data scraping would be "unjust"

enough for unjust enrichment (the Court finds little daylight between "improper" and "unjust"). So, as it vowed to do for unjust enrichment, the Court will look to the Supreme Court of Ohio for guidance on the contours of tortious interference claims based on data scraping.

### 4. OCLC's § 2307.60 claims raise "new and unsettled" questions about how § 2913.04 applies to data scraping.

OCLC brings a claim under Ohio Revised Code § 2307.60, which permits civil actions for monetary damages based on Ohio criminal law violations. Defendants violated Ohio criminal law by scraping WorldCat's data, OCLC asserts, pointing to Ohio Revised Code § 2913.04.

Ohio Revised Code § 2913.04 is analogous to the federal Computer Fraud and Abuse Act ("CFAA"). Both criminalize roughly the same conduct: accessing computer property without authorization. *Compare* Ohio Rev. Code § 2913.04(b) ("gain access to . . . a computer . . . without the consent of . . . [a] person authorized to give consent") *with* 18 U.S.C. § 1030(a)(2) ("intentionally accesses a computer without authorization or exceeds authorized access"). The case law applying the CFAA to data scraping is mainly what inspired the "legal enigma" label above. It should therefore come as no surprise that Ohio's CFAA analog, § 2913.04, poses "new and unsettled" questions of Ohio law.

In fact, compared to the CFAA, § 2913.04's application to data scraping is even newer and less settled. While countless federal courts have wrestled with how to apply the CFAA to data scraping, no Ohio courts have done the same

with § 2913.04. OCLC cites zero § 2913.04 cases—on data scraping or otherwise. Instead, OCLC rests on raw statutory interpretation. *See* Supp. Br. 13–14, ECF No. 46. Put simply, when (if ever) § 2913.04 criminalizes data scraping is an Ohio statutory interpretation issue of first impression.

This novel state-law-interpretative issue is not for this Court to resolve. State statutory interpretation issues of first impression are quintessential subject matter for certification. *See, e.g.*, *Baird*, 428 U.S. at 147 (collecting cases). This Court will thus certify § 2913.04's interpretation to the Supreme Court of Ohio.

**5.     OCLC's trespass to chattels claims raise "new and unsettled" questions going to "dispossession" and "deprivation," plus preemption.**

**a.     When scraping "dispossesses" or "deprives" a website owner of chattels is an open question under Ohio law.**

To make a claim for trespass, OCLC must show it had a possessory interest in a chattel and that Defendants (1) dispossessed OCLC of the chattel; (2) impaired the chattel's condition, quality, or value; (3) deprived OCLC of the chattel's use for a substantial time; or (4) harmed OCLC or something in which OCLC had a legally protected interest. *See Snap-on*, 708 F. Supp. 2d at 678.

In its Complaint, OCLC identifies servers and data as the chattels that Defendants "damaged." Compl. ¶¶ 184–86, ECF No. 1. But it does not elaborate on how Defendants' data scraping "dispossessed" or "deprived" OCLC of its chattels. That Defendants never dispossessed or deprived OCLC of WorldCat's servers or data would ordinarily doom OCLC's trespass claim.

To be sure, data scraping may dispossess or deprive enough to support trespass sometimes. For example, if data scraping crashes a website's servers or deletes its data, then a trespass may lie. *See Snap-on*, 708 F. Supp. 2d at 679–80 (crashing servers); *Thyroff v. Nationwide Mut. Ins.*, 864 N.E.2d 1272, 1278 (N.Y. 2007) (deleting data). That makes sense: crashing servers and deleting data dispossesses and deprives a website owner of their servers or data.

But absent a crash, data loss, or a similar catastrophe, the Court struggles to see how data scraping can constitute a trespass. *See, e.g.*, *Hamidi*, 71 P.3d at 308–11. After all, scraping generally involves nothing more than querying a website's server and duplicating its data. Querying a server hardly deprives or dispossesses the website owner of the server (ordinary web traffic generates the same kind of queries). And duplicating data hardly deprives or dispossesses the website owner of the data (who still holds the original version). OCLC does not allege a crash or data deletion. The Court therefore doubts that Defendants' data scraping constitutes trespass.[7]

But the levels of "dispossession" and "deprivation" necessary to sustain a trespass to chattels claim are ultimately questions for Ohio courts. And Ohio courts have yet to answer those questions in a data-scraping case. So this Court will pose that question to the Supreme Court of Ohio.

---

[7] *See generally* Laura Quilter, *The Continuing Expansion of Cyberspace Trespass to Chattels*, 17 BERKELEY TECH. L.J. 421 (2002).

**b. Federal copyright law may preempt OCLC's trespass claims, for the same reasons that it may preempt OCLC's contract and unjust enrichment claims.**

Even if OCLC adequately pleaded trespass to chattels, federal copyright law might still preempt the claim. *See Harding*, 497 F. Supp. 2d at 650 (holding that the Copyright Act of 1976 preempted a trespass to chattels claim predicated on reproduction, display, and distribution of archived images of plaintiff's website). As with contract and unjust enrichment, this preemption issue likely depends on whether OCLC's trespass claims serves state-law interests distinct from those served by federal copyright law. The Court will thus also certify a question about the state interests underlying trespass to chattels.

**6. OCLC's conversion claims raise "new and unsettled" questions about "exclusion" and preemption.**

**a. When data scraping "excludes" a website owner from their property is an open question under Ohio law.**

Under Ohio law, "[c]onversion is the wrongful exercise of dominion over property *to the exclusion of the rights of the owner*." *Dana Ltd. v. Aon Consulting, Inc.*, 984 F. Supp. 2d 755, 768 (N.D. Ohio 2013) (quoting *State ex rel. Toma v. Corrigan*, 752 N.E.2d 281, 285 (Ohio 2001)) (emphasis added).

In its Complaint, OCLC alleges that Defendants converted WorldCat's servers and its data. Again though, it does not elaborate on how Defendants' scraping *excluded* OCLC: OCLC never alleges that it ever lost dominion over its servers or data. And, for essentially the same reasons it struggles to see dispossession or deprivation, the Court struggles to see how Defendants' alleged

scraping could have excluded OCLC from its servers or data. Seeing no exclusion, the Court doubts that Defendants' data scraping constitutes conversion.

But, as with trespass, the level of "exclusion" necessary to sustain a conversion claim is ultimately a question for Ohio courts. Ohio courts have yet to answer that question in a data scraping case. So this Court will pose the question to the Supreme Court of Ohio.

### b. Federal copyright law may preempt OCLC's conversion claims, for the same reasons that it may preempt many of OCLC's other common-law claims.

Even if OCLC adequately pleaded conversion, federal copyright law might still preempt the claim. *See Harding*, 497 F. Supp. 2d at 650 (holding that the Copyright Act of 1976 preempted a conversion claim predicated on reproduction, display, and distribution of archived images of plaintiff's website). As with the other common-law claims above, this preemption issue likely depends on whether OCLC's conversion claims serve state-law interests distinct from those served by federal copyright law. The Court will thus also certify a question about the state interests underlying conversion.

## III. CONCLUSION

The Court is sympathetic to OCLC's situation: a band of copyright scofflaws cloned WorldCat's hard-earned data, gave it away for free, and then ignored OCLC when it sued them in this Court. But mindful that bad facts

sometimes make bad law, the Court requests that an Ohio court intervene before this Court makes any new state tort, contract, property, or criminal law.

The Court resolves to **CERTIFY** the novel Ohio-law issues identified above to the Supreme Court of Ohio. Plaintiff's counsel and Matienzo's counsel are **ORDERED** to propose an order containing all the information Ohio Supreme Court Practice Rule 9.02 requires by **April 11, 2025**. The parties may file their proposed orders separately, or, if they so choose, they may file one joint proposed order. The Court will finalize a certification order afterward.

OCLC's motion for default judgment is **DENIED without prejudice**. *See Lammert v. Auto-Owners (Mut.) Ins.*, 286 F. Supp. 3d 919, 928–29 (M.D. Tenn. 2017) (adopting this same disposition). Because the answers to the certified questions may also determine Matienzo's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), ECF No. 21, the Court **DENIES without prejudice** that motion too. *See id.* The Court invites the parties to reraise their motions after the certification proceeding.[8] *See id.*

---

[8] As an aside, the Court also wonders whether the intracorporate conspiracy doctrine bars OCLC's conspiracy claims. Under that doctrine, an agreement between agents of the same legal entity is not an unlawful conspiracy. *See Ziglar v. Abbasi*, 582 U.S. 120, 152–55 (2017); *Hawes v. Downing Health Technologies L.L.C.*, 2022 WL 1573737, at *10 (Ohio App. 8 Dist., 2022). OCLC's conspiracy counts allege, in effect, that Matienzo is an agent of Anna's Archive who conspired with other agents of Anna's Archive to scrape WorldCat's data. If Anna's Archive is a legal entity, then OCLC may have alleged an intracorporate conspiracy. The Court pulls this thread no further (because it decides to certify). But, after the certification proceeding, the Court expects the parties will brief whether the intracorporate conspiracy doctrine applies here.

The Court also grants OCLC leave to amend its Complaint to correct any of the above-identified pleading deficiencies.

The Clerk shall terminate ECF Nos. 21 and 40.

**IT IS SO ORDERED.**

**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

OCLC, Inc.,

  Plaintiff,

v.

Anna's Archive, f/k/a
Pirate Library Mirror, *et al.*,

  Defendants.

Case No. 2:24-cv-144

Judge Michael H. Watson

Magistrate Judge Deavers

## OPINION AND ORDER

Plaintiff Online Computer Library Center, Inc. ("OCLC") sued "pirate library" Defendant Anna's Archive, alleging that Anna's Archive scraped OCLC's public and private data in violation of Ohio law. *See generally* ECF No. 1. Because data scraping implicates complex novel state-law issues, this Court resolved to certify questions about data scraping to the Ohio Supreme Court. ECF No. 47.

OCLC now asks this Court to reconsider that decision. ECF No. 49. OCLC argues that the Court should resolve whether federal law preempts any of its Ohio-law claims before certifying. *Id.* at 2–11. And OCLC regurgitates its view on the sufficiency of its allegations. *Id.* at 11–20.

Because certification may avoid constitutional questions of preemption, and because OCLC presents nothing new or groundbreaking on the sufficiency of its allegations, the Court **DENIES** OCLC's motion to reconsider.

## I.    LEGAL STANDARD

Federal Rule of Civil Procedure 60(b) allows trial courts to relieve a litigant

from a prior Order in only six circumstances:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

"A party must establish that the facts of its case are within one of the enumerated

reasons contained in Rule 60(b) that warrant relief from judgment." *Lewis v.*

*Alexander*, 987 F.2d 392, 396 (6th Cir. 1993) (citation omitted).

OCLC's arguments sound in Rules 60(b)(1) and 60(b)(2).

Rule 60(b)(1) provides relief in only two situations: (1) when a party has

made an excusable mistake or an attorney has acted without authority, or

(2) when the judge has made a substantive mistake of law or fact in the final

judgment or order. *United State v. Reyes*, 307 F.3d 451, 455 (6th Cir. 2002)

(citing *Cacevic v. City of Hazel Park*, 226 F.3d 483, 490 (6th Cir. 2000)).

Under Rule 60(b)(2), evidence is considered "newly discovered" only if it

was previously unavailable. *GenCorp, Inc. v. Am. Intern. Underwriters*, 178 F.3d

804, 834 (6th Cir. 1999).  And, to warrant relief under Rule 60(b)(2), the new

evidence must be "material and controlling" such that it "clearly would have

produced a different result if presented before the original judgment."  *HDC, LLC

v. City of Ann Arbor*, 675 F.3d 608, 615 (6th Cir. 2012) (quoting *Good v. Ohio

Edison Co.*, 149 F.3d 413, 423 (6th Cir. 1998)).

## II.    ANALYSIS

### A.    Under the constitutional avoidance doctrine, certification must precede preemption here.

Federal courts practice "constitutional avoidance" whenever practicable.

*See Spector Motor Serv., Inc. v. McLaughlin*, 323 U.S. 101, 103 (1944) ("If there

is one doctrine more deeply rooted than any other in the process of constitutional

adjudication, it is that we ought not pass on questions of constitutionality . . .

unless such adjudication is unavoidable."); *see also Ashwander v. Tenn. Valley

Auth.*, 297 U.S. 288, 345–48 (1936) (Brandeis, J., concurring).

The constitutional avoidance doctrine often manifests as a "last resort"

rule, according to which federal courts "will not decide a constitutional question if

there is some other ground upon which to dispose of the case."  *Bond v. United

States*, 572 U.S. 844, 855 (2014) (citing *Escambia Cnty. v. McMillan*, 466 U.S.

48, 51 (1984), and *Ashwander*, 297 U.S. at 347 (Brandeis, J., concurring)).

Unclear state law supplies fertile ground for this "last resort" rule; that is,

federal courts routinely practice constitutional avoidance by certifying unclear

questions of state law.  *See, e.g., Planned Parenthood of Cincinnati Region v.

*Strickland*, 531 F.3d 406, 410–11 (6th Cir. 2008); *see also Spector*, 323 U.S. at 103 ("[F]ederal courts do not decide questions of constitutionality on the basis of preliminary guesses regarding [state or] local law"); *Jones v. Coleman,* 848 F.3d 744, 754 (6th Cir. 2017).

When the answer to an unresolved question of state law might avoid a preemption issue, constitutional avoidance principles push federal courts to certify those unresolved questions. *See, e.g.*, *Glover v. Bausch & Lomb Inc.*, 6 F.4th 229, 236–41, 43–44 (2d Cir. 2021) (certifying a question on the applicability of a state-law tort before analyzing whether it was preempted). Preemption is a constitutional doctrine, emanating from the Supremacy Clause, after all. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (citing U.S. Const. art. VI, cl. 2).

This Court is correct to certify before conducting a preemption analysis here. By certifying whether data scraping gives rise to any Ohio tort law claims, the Court may avoid the preemption issue altogether. If data scraping does not give rise to any tort, then the Court need not undertake any preemption analysis. But even if data scraping does give rise to some tort or torts but not others, then the Court need only undertake a preemption analysis for the subset of applicable torts. Thus, the Court's certification-before-preemption approach ensures that its preemption analysis will be no broader than necessary. The Court therefore concludes it did not make "a substantive mistake of law or fact" in its last Opinion

and Order by forgoing a preemption analysis. Nor does any other Rule 60(b) reason justify relief from the Court's Opinion and Order on this point.

In sum, fidelity to the doctrine of constitutional avoidance compels this Court to certify now and (if necessary) analyze preemption later.

**B.  OCLC offers no "newly discovered" "controlling" evidence establishing the sufficiency of its breach of contract allegations.**

Anna's Archive admitted to scraping WorldCat.org again in December 2024, after OCLC sued but before this Court resolved to certify. OCLC argues this fact is "newly discovered" evidence that warrants reconsideration. But it does not because that evidence is neither "new" nor "controlling."

The evidence is not new because it was not "previously unavailable." *See, e.g.*, *N.E. Ohio Coalition for the Homeless v. Brunner*, 652 F. Supp. 2d 871, 881 (S.D. Ohio 2009). The December 2024 post was available for months before this Court published its March Opinion and Order.

Even if the evidence were new, it would not "control" the sufficiency of OCLC's breach of contract claim. Without guidance from the Supreme Court of Ohio on the "knowledge" standard to apply to browsewrap terms, OCLC's new evidence would control only if it would satisfy any conceivable standard. The December 2024 post does not. Rather, the post supports a mere propensity inference: if Anna's Archive was willing to knowingly breach OCLC's terms in December 2024, then it more likely did the same before. But the post hardly shows that Anna's Archive had knowledge of OCLC's terms in the past. OCLC's

purported "new evidence" thus does not prove that, under any possible standard, Anna's Archive had knowledge of OCLC's browsewrap terms.  Nor do OCLC's other allegations.  The Court thus finds no "new evidence" or "substantive mistake of law or fact" warranting reconsideration of the Court's prior Opinion on OCLC's contract claim.  So the Court will still invite the Supreme Court of Ohio to set the "knowledge" standard before this Court evaluates the sufficiency of OCLC's breach of contract allegations.

**C.  Nor did the Court err in resolving to certify questions on the sufficiency of OCLC's unjust enrichment, tortious interference, and trespass to chattels claims.**

For its unjust enrichment, tortious interference, and trespass to chattels claims, OCLC rehashes old arguments—which this Court considered and rejected in resolving to certify.  Yet, "a motion for reconsideration is not properly used as a vehicle to re-hash old arguments[.]"  *Smith ex rel. Smith v. Mt. Pleasant Pub. Schools*, 298 F. Supp. 2d 636, 637 (E.D. Mich. 2003) (citing *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir.1998)); *State Farm Mut. Automobile Ins. Co. v. Angelo*, 95 F.4th 419, 435 (6th Cir. 2024) ("Motions for reconsideration are 'not an opportunity to re-argue a case,' and 'should not be used liberally to get a second bite at the apple'" (citations omitted)), *cert. denied*, 145 S. Ct. 264 (2024).  Seeing no manifest error, the Court concludes that nothing warrants reconsideration of its prior Opinion on these claims.  The Court will invite the Supreme Court of Ohio to set the standards before this Court evaluates the sufficiency of OCLC's allegations.

## III.    CONCLUSION

The Court **DENIES** OCLC's Motion for Reconsideration.  The Court maintains its resolve to certify questions to the Supreme Court of Ohio. The Clerk shall terminate ECF No. 49.

In its Motion to Reconsider, OCLC notes that it is willing to withdraw its Motion for Default Judgment on its statutory and conversion claims.  Mot. 12 n.2; ECF No. 49.  But the mere withdrawal of the request for default judgment will not impact the Court's resolve to certify questions about those claims.  So long as OCLC presses these claims, their resolution will require certification.

OCLC also requests leave to amend its Complaint.  The Court **GRANTS** OCLC that leave, and **ORDERS** OCLC to file its Second Amended Complaint, if it so chooses, by **April 25, 2025.**

The Court will then certify questions to the Supreme Court of Ohio.

**IT IS SO ORDERED.**

**MICHAEL H. WATSON, JUDGE
UNITED STATES DISTRICT COURT**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

OCLC, Inc.,

  Plaintiff,

  v.

Anna's Archive, f/k/a
Pirate Library Mirror, *et al.*,

  Defendants.

Case No. 2:24-cv-144

Judge Michael H. Watson

Magistrate Judge Deavers

## OPINION AND ORDER

The Court certifies two questions of Ohio law to the Supreme Court of Ohio. To comply with Ohio Supreme Court Rule of Practice 9.01, the Court provides the following information.

## I.  NAME OF THE CASE

*OCLC, Inc. v. Anna's Archive, et al.*, Case No. 2:24-cv-00144-MHW-EDP, United States District Court for the Southern District of Ohio.

## II.  STATEMENT OF FACTS

OCLC provides the digital infrastructure and services for libraries to create and share bibliographic records through WorldCat—the world's most comprehensive database of information about library collections, built by OCLC and thousands of library members. Compl. ¶¶ 1–2, 30, 33–34, ECF No. 1.

OCLC's members must purchase a subscription to use WorldCat.  *Id.* ¶ 44.

Members must also agree to OCLC's contractual requirements, including the

WorldCat Rights and Responsibilities.  *Id.* ¶ 42.  In turn, OCLC agrees to

maintain the WorldCat data, enrich the data, make it available in WorldCat.org for

discovery purposes, and otherwise "use member-contributed data to support its

public purposes and to benefit the cooperative."  *Id.* ¶ 43.

     WorldCat.org is the world's largest library catalog website.  *Id.* ¶ 46.

Individuals use the WorldCat.org search engine to query library holdings

represented in the WorldCat database.  *Id.* ¶ 46–47.  According to OCLC's

Complaint, when an individual accesses WorldCat.org, the individual agrees to a

browsewrap agreement—OCLC's WorldCat.org Services Terms and Conditions

("Terms and Conditions").  *Id.* ¶ 58.  Through acceptance of the Terms and

Conditions, OCLC grants the individual a license to use WorldCat data available

on WorldCat.org for a limited purpose, and, in exchange, the individual agrees,

among other limitations, not to use the data for commercial use; not to harvest

"material amounts" of data; not to distribute, display, or disclose the data; and not

to store the data.  *Id.*

     On January 12, 2024, OCLC filed this action against Defendants Anna's

Archive, Maria Matienzo, and John Does #1–20 after a series of "cyberattacks"

on OCLC's WorldCat.org in 2022 and 2023.  Compl., ECF No. 1.  As alleged in

OCLC's Complaint, through these "attacks," a group of "hackers" harvested

WorldCat data by scraping WorldCat.org and calling OCLC's servers to harvest

"proprietary, enriched, and aggregated" data. *Id.* ¶¶ 76–78. The "hackers" also

obtained a member's login credentials, which they used to steal WorldCat data

from a member university's subscription-based version of WorldCat.org. *Id.*

¶¶ 79–80. The "hackers" again pinged OCLC's Ohio servers, but this time, they

could authenticate these requests with member credentials. *Id.* OCLC asserts

that the "hacking" materially affected OCLC's production systems and servers,

requiring around-the-clock efforts from November 2022 to March 2023 to attempt

to limit service outages and slowdowns and to maintain the production systems'

performance for customers. *Id.* ¶ 81. OCLC alleges that customers nonetheless

experienced significant disruptions in paid services because of the attacks,

requiring OCLC to create system workarounds to ensure services functioned.

*Id.* ¶ 82.

     According to OCLC's Complaint, Anna's Archive took credit for the

"cyberattacks" in an October 2023 blog post, stating, "[o]ver the past year, we've

meticulously scraped all WorldCat records" by taking advantage of "security

flaws" OCLC allegedly had in its "backend systems." *Id.* ¶¶ 10, 86, 89. In the

blog post, Anna's Archive explained that it scraped 2.2 terabytes of WorldCat

data from WorldCat.org to "create a TODO list of remaining books" to pirate. *Id.*

¶ 87–91. Anna's Archive incorporated the WorldCat data into its search engine,

made the data available en masse for free, and encouraged its users to

download and analyze the data by creating a "mini-competition for data

scientists." *Id.* ¶¶ 10, 90, 93–95.

OCLC sued, alleging breach of contract, unjust enrichment, tortious interference with contract and prospective business relationships, violation of Ohio Revised Code § 2913.04, trespass to chattels, conversion, and civil conspiracy. Compl., ECF No. 1. OCLC's claims rest in Defendants' alleged scraping, hacking, and disseminating of WorldCat data. *Id.* OCLC alleges, among other things, that Defendants' conduct breached WorldCat.org's Terms and Conditions, which appear as a browsewrap agreement, that prohibits using the WorldCat data for commercial use; harvesting material amounts of the WorldCat data; distributing, displaying, or disclosing the WorldCat data; and storing the WorldCat data. *Id.* ¶¶ 123–125. OCLC also claimed that Defendants unjustly and intentionally interfered with OCLC's obligations to its customers under the WorldCat Rights and Responsibilities agreement by scraping and hacking WorldCat.org, specifically OCLC's obligations to maintain the WorldCat data, make it available in WorldCat.org so that individuals can easily search member libraries' catalogs, and use member-contributed data to support public purposes. *Id.* ¶¶ 43, 136–138. Defendants also allegedly accessed, used, and damaged OCLC's WorldCat data and servers without authorization, amounting to trespass to chattels or, in the alternative, conversion. *Id.* ¶¶ 182–189, 198–205.

OCLC alleges that prior to initiating this action, it investigated Anna's Archive and the individuals behind it. *Id.* ¶ 107. Through this investigation, OCLC identified Defendant Maria Matienzo as a likely culprit behind Anna's

Archive.  *Id.* ¶ 108–112.  Matienzo denied her involvement and, accordingly, moved to dismiss the claims against her.  Mot. to Dismiss, ECF No. 21.

OCLC did not obtain a physical address or other contact information besides email addresses for Anna's Archive.  Mot. to Serve by Email, ECF No. 9, PageID # 79–80.  The Court permitted OCLC to serve Anna's Archive by email, ECF No. 14, but Anna's Archive has thus far failed to respond to the Complaint or otherwise participate.  The Clerk accordingly awarded OCLC an entry of default on June 28, 2024, against Anna's Archive.  Entry of Default, ECF No. 39. OCLC then moved for default judgment against Anna's Archive.  Mot. for Default J., ECF No. 40.  OCLC requested declaratory judgment, injunctive relief, and monetary damages.  *Id.*  On September 19, 2024, the Court requested additional briefing to support OCLC's motion for default judgment.  Order for Suppl. Br'g, ECF No. 42.  In its Order, the Court directed OCLC to explain "which claims it seeks default judgment on and why, as a matter of law, the facts it has pled in its complaint are sufficient to establish Anna's Archive's liability for each such claim" in light of the "complex and developing area of law" regarding the "legal propriety of data harvesting."  *Id.* at PAGEID # 822.  OCLC submitted its supplemental brief on October 22, 2024.  Suppl. Br., ECF No. 46.

On March 21, 2025, the Court denied without prejudice OCLC's motion for default judgment and Ms. Matienzo's motion to dismiss.  Op., ECF No. 47.  The Court flagged in its Opinion that it is unclear (1) when browsewrap agreements are enforceable under Ohio law; (2) whether Ohio tort law (trespass to chattels,

conversion, and tortious interference, among others) prohibits data scraping; and (3) whether OCLC's claims are preempted by federal copyright law. *Id.* The Court concluded it would certify questions to the Supreme Court of Ohio for determination before considering OCLC's motion for default judgment or Matienzo's motion to dismiss. *Id.*

OCLC moved to dismiss Ms. Matienzo with prejudice so that the litigation would focus on a final judgment against Anna's Archive. Joint Motion to Dismiss, ECF No. 51; *see also* Notice of Voluntary Dismissal, ECF No. 48. The Court granted that motion. Order, ECF No. 52.

## III. QUESTIONS OF OHIO LAW TO BE CERTIFIED

1. What level of knowledge of browsewrap terms must a website user have for those terms to be enforceable against the website user under Ohio law?

2. Whether and under what circumstances data scraping gives rise to tort claims, such as trespass to chattels, conversion, and tortious interference, under Ohio law.

## IV. NAME OF EACH PARTY

1. Plaintiff OCLC, Inc.

2. Defendant Anna's Archive f/k/a Private Library Mirror

3. Defendants John/Jane Doe #1–20

## V. NAMES, ADDRESSES, AND TELEPHONE NUMBERS OF COUNSEL FOR EACH PARTY.

1. Plaintiff OCLC, Inc. is represented by:
   Jeffrey M. Walker (0096567), Trial Attorney
   Traci L. Martinez (0083989)
   Kathryn M. Brown (0100426)
   Brittany N. Silverman (0102263)
   **SQUIRE PATTON BOGGS (US) LLP**
   2000 Huntington Center 41 South High Street
   Columbus, Ohio 43215
   Telephone: (614) 365-2700
   jeffrey.walker@squirepb.com
   traci.martinez@squirepb.com
   kathryn.brown@squirepb.com
   brittany.silverman@squirepb.com

2. Counsel for Defendants Anna's Archive and Doe 1–20 have not appeared.

## VI. DESIGNATION AS ONE PARTY AS THE MOVING PARTY

Because the questions of Ohio law arise out of OCLC's pleadings, the Court designates OCLC as the moving party.

## VII. CONCLUSION

The Court **CERTIFIES** the above questions to the Supreme Court of Ohio.

Per Ohio Supreme Court Rule of Practice 9.03(A), the Clerk of the United States District Court for the Southern District of Ohio shall serve copies of this certification upon all parties or their counsel and file this certification order under the seal of this Court with the Clerk of the Supreme Court of Ohio.

**IT IS SO ORDERED.**

**MICHAEL H. WATSON, JUDGE
UNITED STATES DISTRICT COURT**